IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| JENNIFER PIGGOTT and SLADE PIGGOTT, | ) ) ) | |
| Plaintiffs, | ) ) | Case No.: CV-06-1158 |
| v. | ) ) | |
| GRAY CONSTRUCTION, INC., | ) ) | |
| Defendant/Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| COOPER'S STEEL FABRICATORS, INC., et al., | ) ) ) | |
| Third-Party Defendants. | ) | |

GRAY CONSTRUCTION INC.'S OPPOSITION TO FIRESTONE BUILDING
CORPORATION'S MOTION TO DISMISS

Defendant Gray Construction Inc.'s ("Gray") claim that Firestone Building Corporation ("Firestone") negligently inspected the office roof is a proper claim under Federal Rules of Civil Procedure, Rule 14. Firestone's Motion to Dismiss is due to be denied.

I.    STATEMENT OF FACTS.

On September 24, 2003, Gray and Hwashin America Corporation, Inc. ("Hwashin") entered into a design/build contract ("the Contract") for the design and construction of a manufacturing facility in Greenville, Alabama ("the Hwashin facility"). (A true and correct copy of the Contract is attached as Exhibit A.).

On May 6, 2004, a Certificate of Substantial Completion was issued for the Hwashin facility assembly area. (A true and correct copy of the May 6, 2004 Certificate of Substantial

Completion is attached as Exhibit B.). On June 30, 2004, a Certificate of Substantial Completion was issued for the Hwashin facility office area. (A true and correct copy of the June 30, 2004 Certificate of Substantial Completion is attached as Exhibit C.).

On August 17, 2004, Firestone inspected the roof of the Hwashin facility in connection with the issuance of its warranty. (A true and correct copy of the August 17, 2004 Repairs for Warranty is attached as Exhibit D.). Brad Graham, a Firestone Inspector, inspected the work of All-South Subcontractors, Inc. ("All-South"), the Firestone licensed/registered roofing subcontractor. (Id.).

Mr. Graham noted several repairs that were necessary before Firestone would issue a warranty. (Id.). The Repairs for Warranty states that each of the repairs were "completed during inspection" and stated no re-inspection of the roof was necessary for the issuance of the warranty. (Id.). Following the inspection, Firestone issued Hwashin a Roof Warranty with a retroactive effective date of July 21, 2004. (A true and correct copy of the Roofing System Limited Warranty is attached as Exhibit E.).

On or around October 17, 2006, the Hwashin facility office roof collapsed. (See Plaintiffs' Complaint at ¶ 13-14.). Mrs. Piggott was allegedly injured while exiting the office area. (See Plaintiffs' Complaint at ¶ 13-14.).

Following the roof collapse, Gray learned that the Firestone roof membrane had not been properly installed. (See Third-Party Complaint, Document No. 26 in the Court Docket.). All-South allowed the roofing membrane to extend over the drain openings, substantially diminishing the drainage system's ability to drain water from the roof. (Id.). The improper roof installation was a contributing cause of the roof collapse. (Id. At ¶ 132.). Firestone should have

discovered the defect in exercise of reasonable care when it inspected the Hwashin facility office roof. (Id. At ¶ 131.).

On November 17, 2006, Mr. And Mrs. Piggott filed their Complaint in the Circuit Court of Butler County, Alabama, which Gray timely removed to this Court on December 29, 2006. (See Plaintiffs' Complaint.). Mr. and Mrs. Piggott's Complaint alleges:

> Defendant Gray Construction and all fictitious Defendants negligently failed to inspect the roof and walls of the building during and/or at completion of construction to determine whether its structural integrity was capable of withstanding the elements, including rain and wind.

> (See Plaintiffs' Complaint at ¶24.).

On June 7, 2007, Gray filed its Motion for Leave to file its Third-Party Complaint. (See Motion for Leave, Document No. 24 in the Court Docket.). Gray alleged that Firestone's negligent inspection of the Hwashin facility office roof proximately caused, and will continue to cause, Gray to incur damages associated with Mr. and Mrs. Piggott's claims. (Id.). Gray's Motion was granted on June 8, 2007. (See Order on Motion for Leave to File, Document No. 25 in the Court Docket.). Gray filed its Third-Party Complaint on the same day. (See Third-Party Complaint, Document No. 26 in the Court Docket.).

On July 2, 2007, Firestone filed its Motion to Dismiss. (See Motion to Dismiss, Document No. 57 in the Court Docket.). Firestone argues that Gray's negligence claim against Firestone should be dismissed because it is not a proper third-party claim under Federal Rules of Civil Procedure, Rule 14. (Id.). Firestone argues that only claims for indemnity are proper under the Rule 14. (Id.).

## II.     ARGUMENT.

### A.     Firestone Owed Gray a Duty To Use Reasonable Care In Its Inspection Of The Hwashin Facility Office Roof.

To establish a claim for negligence under Alabama law, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach of the standard of care applicable to that duty, (3) causation and (4) damage. See Scott v. ABF Freight Systems, Inc., 306 F.Supp.2d 1169 (M.D.Ala. 2004). A legal duty arises where the parties are bound by contract, or where the obligations are expressly or impliedly imposed by statute, municipal ordinance, or by administrative rules or regulations, or by judicial decisions. See Gowens v. Tys. S. ex rel. Davis, 948 So.2d 513 (Ala. 2006). A person who voluntarily undertakes a duty may be held liable for failing to perform that duty with reasonable care. See Pescia v. Auburn Ford-Lincoln Mercury Inc., 68 F.Supp.2d 1269 (M.D.Ala. 1999).

The Courts have routinely imposed liability on individuals and entities that negligently perform inspections. In In re Silicone Gel Breast Implants Products Liability Litigation, 887 F.Supp. 1447 (N.D.Ala. 1995.), the Court held: "Under the theory of negligent undertaking, frequently applied in connection with safety inspections by insurers or with third-party repairs to equipment or premises, duty that would not otherwise have existed can arise when individual or company nevertheless undertakes to perform some action." The Court recognized that an individual's or entities' potential liability for failure to use reasonable care in its inspections extends to persons who may reasonably have been expected to suffer harm from that negligence. (Id.).

On or around August 17, 2004, Firestone inspected the Hwashin facility office roof. (See Exhibit D). Firestone warranted the roof was installed properly and according to the manufacturer's specifications and details. (Id.). Firestone represented all necessary repairs were made at the time of inspection. (Id.).

In fact, the Hwashin facility roof had not been properly installed. (See Gray's Third-Party Complaint at ¶ 131.). All-South allowed the roofing membrane to extend over drain openings, thereby substantially diminishing the drainage system's ability to remove water from the roof and prevent ponding. (Id.). The ponding that resulted from All-South's improper roof installation proximately caused the collapse of Hwashin facility's office roof. (Id. At ¶ 132.). Had Firestone properly inspected All-South's work and installation, the collapse could have been avoided.

> **B.     Gray Was Proximately Injured By Firestone's Negligent Inspection of the Hwashin Facility Office Roof.**

There is a direct causal link between Firestone's negligent inspection of the Hwashin facility's office roof and Gray's resulting damage. Mr. and Mrs. Piggott allege their injuries were caused by the negligent inspection of the office roof. Firestone is the entity that inspected the roof, not Gray. It was Firestone's negligent inspection of the roof that led to Mr. and Mrs. Piggott's claims against Gray and the resulting legal fees and costs Gray has incurred, and will continue to incur, in regard to Mr. and Mrs. Piggott's claims.

> **C.     Gray's Negligence Claim Is Proper Under <u>Federal Rules of Civil Procedure</u>, Rule 14.**

Firestone argues Gray's negligence claim should be dismissed because Gray did not use the word "indemnity". That is simply not the case. Gray's failure to use the word "indemnity" is not fatal.

Regardless of the title Gray gave Count 21 of its Third-Party Complaint, Gray alleges in that Count that Firestone is liable to Gray for any damages awarded Mr. and Mrs. Piggott under their Negligent Inspection claim. <u>Federal Rules of Civil Procedure</u>, Rule 14 (a) states in pertinent part:

At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff...

The Courts have already affirmed a Party's right to assert claims for indemnity as negligence or contract claims. In Swope Alabaster Supply v. City of Alabaster, 514 So.2d 927 (Ala. 1987), the Court addressed claims for indemnity made under theories of tort and contract. Swope filed a Third-Party Complaint against the City of Alabaster alleging liability under theories of negligence, wantonness, fraud, breach of contract and promissory estoppel. The Court noted that Swope's Third-Party Complaint made claims for indemnity which sounded in both negligence and contract. The Court dismissed Swope's negligence claims because Swope failed to file the statutorily required Notice of Claim for the claims against the City, but allowed those claims that sounded in contract to remain.

The Alabama Court of Civil Appeals addressed a similar issue in Walter L. Couse & Co. v. Hardy Corp. 274 So.2d 316 (Ala.Civ.App. 1972.). In Couse, the general contractor, Couse, asserted claims against the subcontractor, Hardy, who actually did the work at issue. (Id. at 318-319.). Couse alleged that Hardy's negligence was the actual cause of plaintiff's injuries and that Hardy should be responsible for any damages Couse incurred as a result of plaintiff's claims. (Id.)

The Court agreed with Couse. It noted that Couse's third-party complaint alleged the contractor sustained liability to a third-party by virtue of fact that the subcontractor performed the actual work negligently. (Id. at 321-322.). The Court recognized that because Couse's liability resulted solely from the acts of its subcontractor and Couse was at most passively negligent, it was entitled to indemnity from the subcontractor. (Id.).

Just as in <u>Couse</u>, Gray has been injured as a result of the negligent work actually performed by Firestone. It was Firestone that inspected the roof of the Hwashin facility, not Gray. (Exhibit D.). Firestone warranted that the roof had been properly installed and any necessary repairs were made at the time of inspection. (<u>Id</u>.). Firestone's negligent inspection gave rise to Mr. and Mrs. Piggott's claims against Gray. It is Firestone that should bear the burden of its own active negligence, not Gray.

### III.     CONCLUSION.

Firestone's argument that Gray's claim should be dismissed because Gray uses the term "negligence", not "indemnity", is without merit. Gray alleges that Firestone owed Gray a duty to inspect the roof of the Hwashin facility, that it negligently performed this inspection and that Gray has incurred and will continue to incur injury as a proximate result of Firestone's negligence. It is well settled that entities that actually perform work, such as Firestone, should bear the burden of their own negligence.

**WHEREFORE,** Gray respectfully requests this Court deny Firestone's Motion to Dismiss.

Done this __13__ day of July, 2007.

By: _____
    E. Britton Monroe (MON032)
    Mickey B. Wright (WRI048)
    Brian M. McClendon (MCC133)
    Attorneys for Defendant/ Third-Party
    Plaintiff Gray Construction, Inc.

**OF COUNSEL:**
LLOYD, GRAY & WHITEHEAD, P.C.
2501 20th Place South, Suite 300
Birmingham, Alabama 35223
Telephone: (205) 967-8822
Facsimile: (205) 967-2380

## CERTIFICATE OF SERVICE

I hereby certify that on the _13th_ day of July, a true and correct copy of the foregoing has been furnished by U.S. Mail, postage prepaid, and electronically upon the following parties:

Jere L. Beasley, Esq.
Julia Ann Beasley, Esq.
Beasley, Allen, Crow, Methvin,
    Portis & Miles, P.C.
P.O. Box 4160
Montgomery, AL 36103-4160
***Counsel for Plaintiffs Jennifer and Slade
Piggott***

Thomas T. Gallion, III, Esq.
Constance C. Walker, Esq.
Felicia A. Long, Esq.
Haskell, Slaughter, Young & Gallion, LLC
P.O. Box 4660
Montgomery, AL 36103-4660
***Counsel for Latta Plumbing & Construction Co.,
Inc.***

James A. Rives, Esq.
William Christopher Waller, Jr., Esq.
Ball, Ball, Matthews & Novak, P.A.
P.O. Box 2148
Montgomery, AL 36102-2148
***Counsel for Hwashin America Corp.***

John S. Somerset, Esq.
Sudderth & Somerset
5385 First Avenue North
Birmingham, AL 35212
***Counsel for All-South Subcontractors, Inc.***

Linda H. Ambrose, Esq.
Rogers & Associates
3000 Riverchase Galleria, Ste. 650
Birmingham, AL 35244
***Counsel for Hwashin America Corp.***

A. Joe Peddy, Esq.
Robert B. Stewart, Esq.
Smith, Spires & Peddy
2015 2nd Avenue North, Ste. 200
Birmingham, AL 35203
***Counsel for Cooper's Steel Fabricators, Inc.***

J. Lister Hubbard, Esq.
Richard H. Allen, Esq.
Arden Reed Pathak, Esq.
Capell & Howard, P.C.
P.O. Box 2069
Montgomery, AL 36102-2069
***Counsel for Hwashin America Corp.***

Charles Keith Hamilton, Esq.
Bainbridge, Mims, Rogers & Smith
P.O. Box 530886
Birmingham, AL 35253-0886
***Counsel for Freeland-Harris Consulting Engineers
of Kentucky, Inc.***

Hope T. Cannon, Esq.
Brittin T. Coleman, Esq.
Kenneth M. Perry, Esq.
Bradley, Arant, Rose & White, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
***Counsel for Firestone Building Products
Company, LLC***

John M. Laney, Jr., Esq.
John C. DeShazo, Esq.
Laney & Foster, P.C.
P.O. Box 43798
Birmingham, AL 35243-0798
***Counsel for Freeland-Harris Consulting Engineers
of Georgia, Inc.***

Larry William Harper, Esq.
Porterfield, Harper, Mills & Motlow, PA
P.O. Box 530790
Birmingham, AL   35253-0790
**_Counsel for The Hardy Corporation_**

OF COUNSEL

*20 2p. 18*
*executed copy*

# Owner and Design/Builder

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS USE, COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

This document comprises two separate Agreements: Part 1 Agreement and Part 2 Agreement. To the extent referenced in these Agreements, subordinate parallel agreements to A191 consist of AIA Document A491, Standard Form of Agreements Between Design/Builder and Contractor, and AIA Document B901, Standard Form of Agreements Between Design/Builder and Architect.

Copyright 1985, ©1996 The American Institute of Architects, 1735 New York Avenue, NW, Washington, DC 20006-5292. Reproduction of the material herein or substantial quotation of its provisions without the written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.

## PART 2 AGREEMENT

### 1996 EDITION

**AGREEMENT**
made as of the 24 day of September in the year of 2003
*(In words, indicate day, month and year.)*

**BETWEEN** the Owner:
*(Name and address)*
Hwashin America Corporation
P.O. Box 1139
Greenville, AL 36037

and the Design/Builder:
*(Name and address)*
James N. Gray Company
10 Quality Street
Lexington, KY 40507-1450

For the following Project:
*(Include Project name, location and a summary description.)*
To design and build an approximately 273,000 sq. ft. manufacturing facility on an undeveloped property located in Greenville, Alabama.

The architectural services described in Article 3 will be provided by the following person or entity who is lawfully licensed to practice architecture:

| *(Name and address)* | *(Registration Number)* | *(Relationship to Design/Builder)* |
|---|---|---|
| GNF Architects and Engineers, P.S.C. | Dennis Bopp (Alabama 5077) | Architect of Record |
| 10 Quality Street | | |
| Lexington, Kentucky 40507 | | |

Normal structural, mechanical and electrical engineering services will be provided contractually through the Architect except as indicated below:

| *(Name, address and discipline)* | *(Registration Number)* | *(Relationship to Design/Builder)* |
|---|---|---|
| Freeland Harris Structural Engineers | Freeland Harris, P.E. (Alabama 19702) | Structural Engineering Consultant |
| 108 Esplanade, Suite 210 | | |
| Lexington, Kentucky 40507 | | |

The Owner and the Design/Builder agree as set forth below.

---

## TERMS AND CONDITIONS - PART 2 AGREEMENT

**ARTICLE 1**
**GENERAL PROVISIONS**

**1.1 BASIC DEFINITIONS**

**1.1.1** The Contract Documents consist of the ~~Part~~ →

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia — 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
**8**

A000007001                                        A000007001

EXHIBIT A

Agreement to the extent not modified by this Part 2 Agreement, this Part 2 Agreement, the Design/Builder's Proposal and written addenda to the Proposal as well as other documents identified in Article 14, the Construction Documents approved by the Owner in accordance with Subparagraph 3.2.3 and Modifications issued after execution of this Part 2 Agreement. A Modification is a Change Order or a written amendment to this Part 2 Agreement signed by both parties, or a Construction Change Directive issued by the Owner in accordance with Paragraph 8.3.

**1.1.2** The term "Work" means the construction and services provided by the Design/Builder to fulfill the Design/Builder's obligations.

**1.2   EXECUTION, CORRELATION AND INTENT**

**1.2.1** It is the intent of the Owner and Design/Builder that the Contract Documents include all items necessary for proper execution and completion of the Work. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Design/Builder shall be required only to the extent consistent with and reasonably inferable from the Contract Documents as being necessary to produce the intended results. Words that have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

**1.2.2** If the Design/Builder believes or is advised by the Architect or by another design professional retained to provide services on the Project that implementation of any instruction received from the Owner would cause a violation of any applicable law, the Design/Builder shall notify the Owner in writing. Neither the Design/Builder nor the Architect shall be obligated to perform any act which either believes will violate any applicable law.

**1.2.3** Nothing contained in this Part 2 Agreement shall create a contractual relationship between the Owner and any person or entity other than the Design/Builder.

**1.3   OWNERSHIP AND USE OF DOCUMENTS**

**1.3.1** Drawings, specifications, and other documents and electronic data furnished by the Design/Builder are instruments of service. The Design/Builder's Architect and other providers of professional services shall retain all common law, statutory and other reserved rights, including copyright in those instruments of service furnished by them. Drawings, specifications, and other documents and electronic data are furnished for use solely with respect to this Part 2 Agreement. The Owner shall be permitted to retain copies, including reproducible copies, of the drawings, specifications, and other documents and electronic data furnished by the Design/Builder for information and reference in connection with the Project except as provided in Subparagraphs 1.3.2 and 1.3.3.

**1.3.2** Drawings, specifications, and other documents and electronic data furnished by the Design/Builder shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, except

by agreement in writing and with appropriate compensation to the Design/Builder, unless the Design/Builder is adjudged to be in default under this Part 2 Agreement or under any other subsequently executed agreement.

**1.3.3** If the Design/Builder defaults in the Design/Builder's obligations to the Owner, the Architect shall grant a license to the Owner to use the drawings, specifications, and other documents and electronic data furnished by the Architect to the Design/Builder for the completion of the Project, conditioned upon the Owner's execution of an agreement to cure the Design/Builder's default in payment to the Architect for services previously performed and to indemnify the Architect and Design/Builder with regard to claims arising from such reuse without the Design/Builder's or Architect's professional involvement to the extent such claims are not caused by the negligence of Design/Builder or Architect.

**1.3.4** Submission or distribution of the Design/Builder's documents to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the rights reserved in Subparagraph 1.3.1.

**ARTICLE 2
OWNER**

**2.1** The Owner shall designate a representative authorized to act on the Owner's behalf with respect to the Project. The Owner or such authorized representative shall examine documents submitted by the Design/Builder and shall render decisions in a timely manner and in accordance with the schedule accepted by the Owner. The Owner may obtain independent review of the Contract Documents and shop drawings by a separate architect, engineer, contractor or cost estimator under contract to or employed by the Owner. Such independent review shall be undertaken at the Owner's expense in a timely manner and shall not delay the orderly progress of the Work.

**2.2** The Owner may appoint an on-site project representative to observe the Work and to have such other responsibilities as the Owner and Design/Builder agree in writing.

**2.3** The Owner shall cooperate with the Design/Builder in securing building and other permits, licenses and inspections. The Owner shall not be required to pay the fees for such permits, licenses and inspections unless the cost of such fees is excluded from the Design/Builder's Proposal.

**2.4** Except where the City of Greenville has otherwise agreed to furnish. The Owner shall furnish services of land surveyors, geotechnical engineers and other consultants for subsoil, air and water conditions, in addition to those provided under the Part 1 Agreement, when such services are deemed necessary by the Design/Builder to properly carry out the design services required by this Part 2 Agreement. In the event the City of Greenville fails to furnish any item to

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
9

A000007002                                                              A000007002

Design/Builders that it has agreed to furnish, then Owner, upon written request from Design/Builder shall promptly furnish such item.

**2.5** The Owner shall disclose, to the extent known to the Owner, the results and reports of prior tests, inspections or investigations conducted for the Project involving: structural or mechanical systems; chemical, air and water pollution; hazardous materials; or other environmental and subsurface conditions. The Owner shall disclose all information known to the Owner regarding the presence of pollutants at the Project's site.

**2.6** The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including such auditing services as the Owner may require to verify the Design/Builder's Applications for Payment.

**2.7** Those services, information, surveys and reports required ~by Paragraphs 2.4 through 2.6 which are within the Owner's control~ provided by the Owner or the City of Greenville shall be furnished at the Owner's or City's expense, and the Design/Builder shall be entitled to rely upon, and the Owner accepts full responsibility and liability for, the accuracy and completeness thereof, except to the extent the Owner advises the Design/Builder to the contrary in writing.

**2.8** If the Owner requires the Design/Builder to maintain any special insurance coverage, policy, amendment, or rider, the Owner shall pay the additional cost thereof, except as otherwise stipulated in this Part 2 Agreement.

**2.9** If the Owner observes or otherwise becomes aware of a fault or defect in the Work or nonconformity with the Design/Builder's Proposal or the Construction Documents, the Owner shall give prompt written notice thereof to the Design/Builder.

**2.10** The Owner shall, at the request of the Design/Builder, prior to execution of this Part 2 Agreement and promptly upon request thereafter, furnish to the Design/Builder reasonable evidence and documentation acceptable to Design/Builder of Owner's ability to pay for the Work ~that financial arrangements have been made to fulfill the Owner's obligations under the Contract.~ Owner shall not thereafter materially alter such financial arrangements without written notice to, and consent in writing from, Design/Builder. Furnishing such evidence and documentation of financial arrangements shall be a condition precedent to Design/Builder's commencement or continuation of the Work.

**2.11** The Owner shall communicate with persons or entities employed or retained by the Design/Builder through the Design/Builder, unless otherwise directed by the Design/Builder.

## ARTICLE 3
## DESIGN/BUILDER

**3.1     SERVICES AND RESPONSIBILITIES**

**3.1.1** Design services required by this Part 2 Agreement shall be performed by qualified architects and other design professionals. The contractual obligations of such professional persons or entities are undertaken and performed in the interest of the Design/Builder. The standard of care for all design services performed to execute the Work shall be the care and skill ordinarily used by members of the design profession practicing under similar conditions at the same time and locality of the Project. Notwithstanding the preceding sentence, if the parties agree upon specific performance standards for any aspect of the Work, which standards are to be set forth in an exhibit to the Agreement entitled "Performance Standard Requirements," the design services shall be performed to achieve such standards.

**3.1.2** The agreements between the Design/Builder and the persons or entities identified in this Part 2 Agreement, and any subsequent modifications, shall be in writing. These agreements, including financial arrangements with respect to this Project, shall be promptly and fully disclosed to the Owner upon request.

**3.1.3** The Design/Builder shall be responsible to the Owner for the quality of the design services and for the quality of the construction performed by ~sets and omissions of the Design/Builder's employees, subcontractors and their agents and employees, and other persons, including the Architect and other design professionals, performing any portion of the Design/Builder's obligations under this Part 2 Agreement.~

**3.2     BASIC SERVICES**

**3.2.1** The Design/Builder's Basic Services are described below and in Article 14.

**3.2.2** The Design/Builder shall designate a representative authorized to act on the Design/Builder's behalf with respect to the Project.

**3.2.3** The Design/Builder shall submit Construction Documents for review and approval by the Owner. Construction Documents may include drawings, specifications, and other documents and electronic data setting forth in detail the requirements for construction of the Work, and shall:

    .1    be consistent with the intent of the ~May 21, 2003, Bid Package and the~ CONTRACT DOCUMENTS Design/Builder's Proposal;

    .2    provide information for the use of those in the building trades; and

    .3    include documents customarily required for regulatory agency approvals.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia — 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191 -1996
10

A000007003                                             A000007003

**3.2.4** The Design/Builder, with the assistance of the Owner, shall file documents required to obtain necessary approvals of governmental authorities having jurisdiction over the Project.

**3.2.5** Unless otherwise provided in the Contract Documents, the Design/Builder shall provide or cause to be provided and shall pay for design services, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

**3.2.6**   Design/Builder agrees to defend, indemnify (including payment of attorney's fees) and to hold Owner harmless from any and all liens, claims of lien, security interests or other encumbrances against Owner's property in favor of the Design/Builder, contractors, materials suppliers, consultants or other persons or entities making a claim by reason of having provided labor, services, materials and equipment relating to the Work. Design/Builder further agrees to bond off, at its cost, any such liens or encumbrances pursuant to Alabama law, if requested by Owner. Notwithstanding the foregoing, Design/Builder shall be obligated to defend, indemnify and hold Owner harmless from liens, claims of lien, security interests and other encumbrances and to bond off such liens or encumbrances only to the extent such lien, claim of lien, security interest or encumbrance is not the result of Owner's non-payment of funds justly due under this Agreement.

**3.2.6̶7** The Design/Builder shall be responsible for all construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under this Part 2 Agreement.

**3.2.7̶8** The Design/Builder shall keep the Owner informed of the progress and quality of the Work.

**3.2.8̶9**  The Design/Builder shall be responsible for correcting Work which does not conform to the Contract Documents as provided in Article 9 of this Agreement.

**3.2.9̶10** The Design/Builder warrants to the Owner that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the construction will be free from faults and defects, and that the construction will conform with the requirements of the Contract Documents. Construction not conforming to these requirements, including substitutions not properly approved by the Owner, shall be corrected in accordance with Article 9.  Notwithstanding any other provision of the Contract Documents, it is agreed that Design/Builder does not expressly or implied warrant the adequacy, sufficiency or suitability of any design

provided or specified by the Owner or specified sole source or brand-named products, equipment or materials and Owner accepts the manufacturer's warranty as its sole recourse with regard to such items.

**3.2.10̶11** The Design/Builder shall pay all sales, consumer, use and similar taxes which had been legally enacted at the time the Design/Builder's Proposal was first submitted to the Owner, and shall secure and pay for building and other permits and governmental fees, licenses and inspections necessary for the proper execution and completion of the Work which are either customarily secured after execution of a contract for construction or are legally required at the time the Design/Builder's Proposal was first submitted to the Owner.

**3.2.11̶12** The Design/Builder shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities relating to the Project.

**3.2.12̶13** The Design/Builder shall pay royalties and license fees for patented designs, processes or products. The Design/Builder shall defend suits or claims for infringement of patent rights and shall hold the Owner harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer is required by the Owner. However, if the Design/Builder has reason to believe the use of a required design, process or product is an infringement of a patent, the Design/Builder shall be responsible for such loss unless such information is promptly furnished to the Owner.

**3.2.13̶14** The Design/Builder shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under this Part 2 Agreement. At the completion of the Work, the Design/Builder shall remove from the site waste materials, rubbish, the Design/Builder's tools, construction equipment, machinery, and surplus materials.

**3.2.14̶15** The Design/Builder shall notify the Owner when the Design/Builder believes that the Work or an agreed upon portion thereof is substantially completed.  If the Owner concurs, the D̶e̶s̶i̶g̶n̶/̶B̶u̶i̶l̶d̶e̶r̶ Owner shall issue a Certificate of Substantial Completion which shall establish the Date of Substantial Completion, shall state the responsibility of each party for security, maintenance, heat, utilities, damage to the Work and insurance, shall include a list of items to be completed or corrected and shall fix the time within which the Design/Builder shall complete items listed therein. Disputes between the Owner and Design/Builder regarding the Certificate of Substantial Completion shall be resolved in accordance with provisions of Article 10.

**3.2.15̶16** The Design/Builder shall maintain at the site for the Owner one record copy of the drawings, specifications, product data, samples, shop drawings, Change Orders and other modifications, in good order and regularly updated to record the completed construction. These shall be delivered to the Owner upon completion of construction and prior to final payment.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996

11

A000007004                                                    A000007004

### 3.3   ADDITIONAL SERVICES

**3.3.1**   The services described in this Paragraph 3.3 are not included in Basic Services unless so identified in Article 14, and they shall be paid for by the Owner as provided in this Part 2 Agreement, in addition to the compensation for Basic Services. The services described in this Paragraph 3.3 shall be provided only if authorized or confirmed in writing by the Owner.

**3.3.2**   Making revisions in drawings, specifications, and other documents or electronic data when such revisions are required by the enactment or revision of codes, laws or regulations subsequent to the preparation of such documents or electronic data.

**3.3.3**   Providing consultation concerning replacement of Work damaged by fire or other cause during construction, and furnishing services required in connection with the replacement of such Work.

**3.3.4**   Providing services in connection with a public hearing, arbitration proceeding or legal proceeding, except where the Design/Builder is a party thereto.

**3.3.5**   Providing coordination of construction performed by the Owner's own forces or separate contractors employed by the Owner, and coordination of services required in connection with construction performed ~~and equipment supplied~~ by the Owner.

**~~3.3.6   Preparing a set of reproducible record documents or electronic data showing significant changes in the Work made during construction.~~**

**3.3.7**   Providing assistance in the utilization of equipment or systems such as preparation of operation and maintenance manuals, training personnel for operation and maintenance, and consultation during operation.

### ARTICLE 4
### TIME

**4.1**   Unless otherwise indicated, the Owner and the Design/Builder shall perform their respective obligations as expeditiously as is consistent with reasonable skill and care and the orderly progress of the Project.

**4.2**   Time limits stated in the Contract Documents are of the essence. The Work to be performed under this Part 2 Agreement shall commence upon receipt of a notice to proceed unless otherwise agreed and, subject to authorized Modifications, Substantial Completion shall be achieved on or before the date established in Article 14.

**4.3**   Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the Owner can occupy or utilize the Work for its intended use.

**4.4**   Based on the Design/Builder's Proposal, a construction schedule shall be provided consistent with Paragraph 4.2 above <u>and for Owner's approval</u>.

**4.5**   If the Design/Builder is delayed at any time in the progress of the Work by an act or neglect of the Owner, Owner's employees, or separate contractors employed by the Owner <u>or by the City of Greenville</u>, or by changes ordered in the Work, or by ~~labor disputes,~~ fire, ~~unusual delay in deliveries,~~ adverse weather conditions not reasonably anticipatable, unavoidable casualties or other causes beyond the Design/Builder's control, or by delay authorized by the Owner pending arbitration, or by other causes which the Owner and Design/Builder agree may justify delay, then the Contract Time shall be reasonably extended by Change Order.

### ARTICLE 5
### PAYMENTS

### 5.1   PROGRESS PAYMENTS

**5.1.1**   The Design/Builder shall deliver to the Owner itemized Applications for Payment in such detail as indicated in Article 14.

**5.1.2**   Within ~~ten (10)~~ <u>twenty (20)</u> days of the Owner's receipt of a properly submitted and correct Application for Payment, the Owner shall make payment to the Design/Builder.

**5.1.3**   The Application for Payment shall constitute a representation by the Design/Builder to the Owner that the design and construction have progressed to the point indicated, the quality of the Work covered by the application is in accordance with the Contract Documents, and the Design/Builder is entitled to payment in the amount requested.

**5.1.4**   Upon receipt of payment from the Owner, the Design/Builder shall promptly pay the Architect, other design professionals and each contractor the amount to which each is entitled in accordance with the terms of their respective contracts.

**5.1.5**   The Owner shall have no obligation under this Part 2 Agreement to pay or to be responsible in any way for payment to the Architect, another design professional or a contractor performing portions of the Work.

**5.1.6**   Neither progress payment nor partial or entire use or occupancy of the Project by the Owner shall constitute an acceptance of Work not in accordance with the Contract Documents.

**5.1.7**   The Design/Builder warrants that title to all construction covered by an Application for Payment will pass to the Owner no later than the time of payment. The Design/Builder further warrants that upon submittal of an Application for Payment all construction for which payments have been received from the Owner shall be free and clear of liens, claims, security interests or encumbrances in favor of the

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 •
OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to
legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license
without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on
10/31/2003.

A000007005    A000007005

Design/Builder or any other person or entity performing construction at the site or furnishing design services materials or equipment relating to the construction.

**5.1.8** At the time of Substantial Completion, the Owner shall pay the Design/Builder the retainage, if any, less the reasonable cost to correct or complete incorrect or incomplete Work and any offsets or credits to which Owner is entitled under the terms of this Agreement. Final payment of such withheld sum shall be made upon correction or completion of such Work.

**5.1.9** Contemporaneously with the execution of this Agreement, Owner shall make an initial, up-front payment to Design/Builder in the amount of Six Hundred Twenty-Five Thousand and No/100 U.S. Dollars ($625,000.00).

**5.1.10** Notwithstanding any other provisions of the Contract Documents to the contrary, if the Owner does not pay the Design/Builder for any partial billing within the twenty (20) day period following receipt by the Owner of a properly submitted and correct application for payment from the Design/Builder, then, after providing Owner with seven (7) days written notice of such nonpayment, the Design/Builder shall have the absolute unconditional right to stop the work until payment has been received. The Contract Sum and Contract Time shall be increased by the amount of the Design/Builder's cost and time of shutdown, delay and startup and such changes shall be effected by appropriate change order before Design/Builder shall be obligated to return to work. Design-Builder shall not have or incur any liability to Owner or any other person as a result of exercising its rights hereunder.

**5.2    FINAL PAYMENT**

**5.2.1** Neither final payment nor amounts retained, if any, shall become due until the Design/Builder submits to the Owner: (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or Owner's property might be responsible or encumbered (less amounts withheld by the Owner) have been paid or otherwise satisfied; (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner; (3) a written statement that the Design/Builder knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents; (4) consent of surety, if any, to final payment; and (5) if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a contractor or other person or entity entitled to assert a lien against the Owner's property refuses to furnish a release or waiver required by the Owner, the Design/ Builder may furnish

a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Design/Builder shall indemnify the Owner for all loss and cost, including reasonable attorneys' fees incurred as a result of such lien.

**5.2.2** When the Work has been completed and the contract fully performed, the Design/Builder shall submit a final application for payment to the Owner, who shall make final payment within 30 days of receipt in accordance with subparagraphs 13.1.54 through 13.1.56.

**5.2.3** The making of final payment shall constitute a waiver of claims by the Owner except those arising from:

.1 liens, claims, security interests or encumbrances arising out of the Contract and unsettled;

.2 failure of the Work to comply with the requirements of the Contract Documents; or

.3 terms of special or general warranties required by the Contract Documents.

.4 latent defects;

.5 Design/Builder's indemnity and insurance obligations as set forth in this Agreement; or

**5.2.4** Acceptance of final payment shall constitute a waiver of all claims by the Design/Builder except those previously made in writing and identified by the Design/Builder as unsettled at the time of final Application for Payment.

**5.3    INTEREST PAYMENTS**

**5.3.1** Payments due the Design/Builder under this Part 2 Agreement which are not paid when due shall bear interest from the date due at the rate specified in Article 13, or in the absence of a specified rate, at the legal rate prevailing where the Project is located.

**ARTICLE 6
PROTECTION OF PERSONS AND PROPERTY**

**6.1** The Design/Builder shall be responsible for initiating, maintaining and providing supervision of all safety precautions and programs in connection with the performance of this Part 2 Agreement. Notwithstanding any other provision of the Contract Documents, all provisions of this Article 6 are solely for the benefit of the Owner and are not intended to benefit or create a duty to, and shall not be relied upon in any way whatsoever by any other person, firm, or entity.

**6.2** The Design/Builder shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to: (1) employees on the Work and other persons who may be affected thereby; (2) the Work

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
13

A000007006                                              A000007006

and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody, or control of the Design/Builder or the Design/Builder's contractors; and (3) other property at or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal relocation or replacement in the course of construction.

**6.3**    The Design/Builder shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on the safety of persons or property or their protection from damage, injury or loss.

**6.4**    The Design/Builder shall promptly remedy damage and loss (other than damage or loss insured or required to be insured under property insurance provided or required by the Contract Documents) to property at the site but only to the extent caused in whole or in part by the Design/Builder, a contractor of the Design/Builder or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable.

### ARTICLE 7
### INSURANCE AND BONDS

**7.1**    **DESIGN/BUILDER'S LIABILITY INSURANCE**

**7.1.1**    The Design/Builder shall purchase from and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, such insurance as will protect the Design/Builder from claims set forth below which may arise out of or result from operations under this Part 2 Agreement by the Design/Builder or by a contractor of the Design/Builder, or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

  .1    claims under workers' compensation, disability benefit and other similar employee benefit laws that are applicable to the Work to be performed;

  .2    claims for damages because of bodily injury, occupational sickness or disease, or death of the Design/Builder's employees;

  .3    claims for damages because of bodily injury, sickness or disease, or death of persons other than the Design/Builder's employees;

  .4    claims for damages covered by usual personal injury liability coverage which are sustained (1) by a person as a result of an offense directly or indirectly related to employment of such person by the Design/Builder or (2) by another person;

  .5    claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

  .6    claims for damages because of bodily injury, death of a person or property damage arising out of ownership,

maintenance or use of a motor vehicle; and

  .7    claims involving contractual liability insurance applicable to the Design/Builder's obligations under Paragraph 11.5.

  .8    claims arising out of the performance of professional services caused by negligent errors or omissions.

**7.1.2**    The insurance required by Subparagraph 7.1.1 shall be written for not less than limits of liability specified in this Part 2 Agreement or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work until until date of final payment and termination of any coverage required to be maintained after final payment three (3) years after the final payment.

**7.1.3**    Certificates of Insurance acceptable to the Owner shall be delivered to the Owner immediately after execution of this Part 2 Agreement. These Certificates and the insurance policies required by this Paragraph 7.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. If any of the foregoing insurance coverages are required to remain in force after final payment, an additional certificate evidencing continuation of such coverage shall be submitted with the application for final payment. Information concerning reduction of coverage shall be furnished by the Design/Builder to the Owner with reasonable promptness in accordance with the Design/Builder's information and belief.

**7.1.4**    Design/Builder shall name Owner as an additional insured on Design/Builder's general liability, automobile liability and excess liability insurance policies and such insurance shall be primary and non-contributory with respect to the additional insured.

**7.1.5**    Design/Builder's worker's compensation insurance policy shall provide for a waiver of subrogation against Owner arising out of claims covered by such insurance.

**7.2**    **OWNER'S LIABILITY INSURANCE**

**7.2.1**    The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance. Optionally, the Owner may purchase and maintain other insurance for self-protection against claims which may arise from operations under this Part 2 Agreement. The Design/Builder shall not be responsible for purchasing and maintaining this optional Owner's liability insurance unless specifically required by the Contract Documents.

**7.3**    **PROPERTY INSURANCE**

**7.3.1**    Unless otherwise provided under this Part 2 Agreement, the Owner - Design/Builder shall purchase and maintain, in a company or companies authorized to do business in the jurisdiction in which the principal

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017436, which expires on 10/31/2003.

Electronic Format A191-1996
14

A000007007

A000007007

improvements are to be located, property insurance upon the Work to the full insurable value thereof on a replacement cost basis ~~without optional deductibles~~. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made or until no person or entity other than the Owner has an insurable interest in the property required by this Paragraph 7.3 to be insured, whichever is earlier. This insurance shall include interests of the Owner, the Design/Builder, and their respective contractors and subcontractors in the Work.

**7.3.2** Property insurance shall be on an all-risk policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, falsework, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for the services and expenses of the Design/Builder's Architect and other professionals required as a result of such insured loss. Coverage for other perils shall not be required unless otherwise provided in the Contract Documents.

**7.3.3** ~~If the Owner does not intend to purchase such property insurance required by this Part 2 Agreement and with all of the coverages in the amount described above, the Owner shall so inform the Design/Builder prior to commencement of the construction. The Design/Builder may then effect insurance which will protect the interests of the Owner and the Design/Builder's contractors in the construction, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Design/Builder is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, then the Owner shall bear all reasonable costs properly attributable thereto.~~

**7.3.4** ~~Unless otherwise provided,~~ ~~t~~The Owner shall purchase and maintain such boiler and machinery insurance required by this Part 2 Agreement or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner. This insurance shall include interests of the Owner, the Design/Builder, the Design/Builder's contractors and subcontractors in the Work, and the Design/Builder's Architect and other design professionals. The Owner and the Design/Builder shall be named insureds.

**7.3.5** A loss insured under the ~~Owner's~~ Design/Builder's property insurance shall be adjusted by the ~~Owner~~ Design/Builder as fiduciary and made payable to the ~~Owner~~Design/Builder as fiduciary for the insureds, as their interests may appear, ~~subject to requirements of any applicable mortgage clause and of Subparagraph 7.3.10.~~ The Design/Builder shall pay contractors their shares of insurance proceeds received by the Design/Builder, and by appropriate agreement, written where legally required for validity, shall require contractors to make payments to their subcontractors in similar manner.

**7.3.6** Before an exposure to loss may occur, the ~~Owner~~Parties shall file with the each other Design/Builder a copy of each policy that includes insurance coverages required by this Paragraph 7.3. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Design/Builder or Owner, whichever is applicable.

**7.3.7** If the ~~Design/Builder~~Owner requests in writing that insurance for risks other than those described herein or for other special hazards be included in the property insurance policy, the ~~Owner~~Design/Builder shall, if possible, obtain such insurance, and the cost thereof shall be charged to the ~~Design/Builder~~ Owner by appropriate Change Order.

**7.3.8** The Owner and the Design/Builder waive all rights against each other and the Architect and other design professionals, contractors, subcontractors, agents and employees, each of the other, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 7.3 or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the ~~Owner~~Design/Builder as trustee. The Owner or Design/Builder, as appropriate, shall require from contractors and subcontractors by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated in this Paragraph 7.3. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

**7.3.9** If required in writing by a party in interest, the ~~Owner~~ Design/Builder as trustee shall, upon occurrence of an insured loss, give bond for proper performance of the~~ir~~ Owner's duties. The cost of required bonds shall be charged against proceeds received as fiduciary. The ~~Owner~~ Design/Builder shall deposit in a separate account proceeds so received, which the ~~Owner~~ Design/Builder shall distribute in accordance with such agreement as the parties in interest may reach, or in accordance with an arbitration award in which case the procedure shall be as provided in Article 10. If after such loss no other special agreement is made, replacement of damaged Work shall be covered by appropriate Change Order.

**7.3.10** The ~~Owner~~ Design/Builder as trustee shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing, within five (5) days after occurrence of loss to the ~~Owner's~~ Design/Builder's exercise of this power; if such objection be made, the parties shall enter into dispute resolution under procedures provided in Article 10. If distribution of insurance proceeds by arbitration is required, the arbitrators will direct such distribution.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191 -1996

15

A000007008                                                          A000007008

7.3.11 Partial occupancy or use prior to Substantial Completion shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Design/Builder shall take reasonable steps to obtain consent of the insurance company or companies and shall not, without mutual written consent, take any action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of coverage.

### 7.4    LOSS OF USE INSURANCE

7.4.1    The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Design/Builder for loss of use of the Owner's property, including consequential losses due to fire or other hazards, however caused.

### ARTICLE 8
### CHANGES IN THE WORK

### 8.1    CHANGES

8.1.1    Changes in the Work may be accomplished after execution of this Part 2 Agreement, without invalidating this Part 2 Agreement, by Change Order, Construction Change Directive, or order for a minor change in the Work, subject to the limitations stated in the Contract Documents.

8.1.2    A Change Order shall be based upon agreement between the Owner and the Design/Builder; a Construction Change Directive may be issued by the Owner without the agreement of the Design/Builder; an order for a minor change in the Work may be issued by the Design/Builder alone.

8.1.3    Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Design/Builder shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive, or order for a minor change in the Work.

8.1.4    If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are so changed in a proposed Change Order or Construction Change Directive that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or the Design/Builder, the applicable unit prices shall be equitably adjusted.

### 8.2    CHANGE ORDERS

8.2.1    A Change Order is a written instrument prepared by the Design/Builder and signed by the Owner and the Design/Builder, stating their agreement upon all of the

following:

.1    a change in the Work;

.2    the amount of the adjustment, if any, in the Contract Sum; and

.3    the extent of the adjustment, if any, in the Contract Time.

8.2.2    If the Owner requests a proposal for a change in the Work from the Design/Builder and subsequently elects not to proceed with the change, a Change Order shall be issued to reimburse the Design/Builder for any costs incurred for estimating services, design services or preparation of proposed revisions to the Contract Documents.

### 8.3    CONSTRUCTION CHANGE DIRECTIVES

8.3.1    A Construction Change Directive is a written order prepared and signed by the Owner, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both.

8.3.2    Except as otherwise agreed by the Owner and the Design/Builder, the adjustment to the Contract Sum shall be determined on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including the expenditures for design services and revisions to the Contract Documents. In case of an increase in the Contract Sum, the cost shall include a reasonable allowance for overhead and profit. In such case, the Design/Builder shall keep and present an itemized accounting together with appropriate supporting data for inclusion in a Change Order. Unless otherwise provided in the Contract Documents, costs for these purposes shall be limited to the following:

.1    costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

.2    costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

.3    rental costs of machinery and equipment exclusive of hand tools, whether rented from the Design/Builder or others;

.4    costs of premiums for all bonds and insurance permit fees, and sales, use or similar taxes;

.5    additional costs of supervision and field office personnel directly attributable to the change; and fees paid to the Architect, engineers and other professionals.

8.3.3    Pending final determination of cost to the Owner, amounts not in dispute may be included in Applications for Payment. The amount of credit to be allowed by the Design/Builder to the Owner for deletion or change which results in a net decrease in the Contract Sum will be actual net

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
16

A000007009                                        A000007009

cost. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of the net increase, if any, with respect to that change.

**8.3.4**  When the Owner and the Design/Builder agree upon the adjustments in the Contract Sum and Contract Time, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

**8.4   MINOR CHANGES IN THE WORK**

**8.4.1**  The Design/Builder shall have authority to make minor changes in the Construction Documents and construction consistent with the intent of the Contract Documents when such minor changes do not involve adjustment in the Contract Sum or extension of the Contract Time. The Design/Builder shall promptly inform the Owner, in writing, of minor changes in the Construction Documents and construction.

**8.5   CONCEALED CONDITIONS**

**8.5.1**  If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially  from those indicated in the Contract Documents, or (2) unknown physical conditions of an unusual nature which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Contract Sum shall be equitably adjusted for such concealed or unknown conditions by Change Order upon claim by either party made within 21 days after the claimant becomes aware of the conditions.

**8.6   REGULATORY CHANGES**

**8.6.1**  The Design/Builder shall be compensated for changes in the construction necessitated by the enactment or revisions of codes, laws or regulations subsequent to the submission of the Design/Builder's Proposal.

**ARTICLE 9**
**CORRECTION OF WORK**

**9.1**  The Design/Builder shall promptly correct Work rejected by the Owner or known by the Design/Builder to be defective or failing to conform to the requirements of the Contract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed. The Design/Builder shall bear costs of correcting such rejected Work, including additional testing and inspections.

**9.2**  If, within one (1) year after the date of Substantial Completion of the Work or, after the date for commencement of warranties established in a written agreement between the Owner and the Design/Builder, or by terms of an applicable special warranty required by the Contract Documents, any of

the Work is found to be not in accordance with the requirements of the Contract Documents, the Design/Builder shall correct it promptly after receipt of a written notice from the Owner to do so unless the Owner has previously given the Design/Builder a written acceptance of such condition.

**9.3**  Nothing contained in this Article 9 shall be construed to establish a period of limitation with respect to other obligations which the Design/Builder might have under the Contract Documents. Establishment of the time period of one (1) year as described in Subparagraph 9.2 relates only to the specific obligation of the Design/Builder to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Design/Builder's liability with respect to the Design/Builder's obligations other than specifically to correct the Work.

**9.4**  If the Design/Builder fails to correct nonconforming Work as required or fails to carry out Work in accordance with the Contract Documents, the Owner, by written order signed personally or by an agent specifically so empowered by the Owner in writing, may order the Design/Builder to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the Owner's right to stop the Work shall not give rise to a duty on the part of the Owner to exercise the right for benefit of the Design/Builder or other persons or entities.

**9.5**  If the Design/Builder defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within seven (7) days after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may give a second written notice to the Design/Builder and, seven (7) days following receipt by the Design/Builder of that second written notice and without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Design/ Builder, the costs of correcting such deficiencies. If the payments then or thereafter due the Design/Builder are not sufficient to cover the amount of the deduction, the Design/Builder shall pay the difference to the Owner. Such action by the Owner shall be subject to dispute resolution procedures as provided in Article 10.

**ARTICLE 10**
**DISPUTE RESOLUTION -**
**MEDIATION AND ARBITRATION**

**10.1**  Claims, disputes or other matters in question between the parties to this Part 2 Agreement arising out of or relating to this Part 2 Agreement or breach thereof, except those claims that have been waived by the making or acceptance of final payment and those claims expressly excluded by Paragraph 10.7, shall be subject to and decided by mediation or arbitration. Such mediation or arbitration shall be conducted in accordance with the Construction Industry Mediation or Arbitration Rules of the American Arbitration Association

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191 -1996
17

A000007010                                          A000007010

currently in effect. The location of such mediation or arbitration shall be the Project site or Montgomery, Alabama, as mutually agreed by the parties.

10.2    In addition to and Prior to a demand for arbitration or initiation of litigation of claims not subject to arbitration, the parties shall attempt in good faith to resolve the dispute during the twenty (20) day period following first written notice by one party of its claim. If the matter remains unresolved, prior to arbitration, the parties shall endeavor to settle disputes by mediation. Demand for mediation shall be filed in writing with the other party to this Part 2 Agreement and with the American Arbitration Association. A demand for mediation shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for mediation be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of repose or limitations.

10.3    If the matter remains unresolved for ninety (90) days following the first written notice of the claim, then Ddemand for arbitration shall be filed in writing with the other party to this Part 2 Agreement and with the American Arbitration Association. A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of repose or limitations.

10.4    An arbitration pursuant to this Article may be joined with an arbitration involving common issues of law or fact between the Design/Builder and any person or entity with whom the Design/Builder has a contractual obligation to arbitrate disputes. No other arbitration arising out of or relating to this Part 2 Agreement shall include, by consolidation, joinder or in any other manner, an additional person or entity not a party to this Part 2 Agreement or not a party to an agreement with the Design/Builder, except by written consent containing a specific reference to this Part 2 Agreement signed by the Owner, the Design/Builder and any other person or entities sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Part 2 Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

10.5    The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

10.6    Unless otherwise agreed in writing, Design/Builder shall continue with the Work pending arbitration and, if so, Owner shall continue to make payments earned by Design/Builder in accordance with this Agreement.

10.7    This Agreement to arbitrate shall not apply to any claim:

(a)    For contribution or indemnity asserted by one party to this Agreement against the other party and arising out of an action brought in a state or federal court or in arbitration by a person who is under no obligation to arbitrate the subject matter of such action with either of the parties hereto; or

(b)    Asserted by the Owner against Design/Builder if Design/Builder asserts said claim, either in whole or part, against a Subcontractor or Supplier and such Subcontractor or Supplier will not consent to arbitration or the contract between Design/Builder and such Subcontractor or Supplier does not provide for binding arbitration, or does so provide but the two arbitration proceedings cannot be consolidated, in any case of which the parties hereto shall so notify each other either before or after demand for arbitration is made.

(c)    Asserted by the Design/Builder against the Owner if Owner asserts said claim, either in whole or in part against the City of Greenville and the City of Greenville will not consent to arbitration or the contract between Owner and the City of Greenville does not provide for binding arbitration, or does so provide but the two arbitration proceedings cannot be consolidated, in any case of which the parties hereto shall so notify each other either before or after demand for arbitration is made.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

11.1    Unless otherwise provided, this Part 2 Agreement shall be governed by the law of the place where the Project is located.

11.2    SUBCONTRACTS

11.2.1    The Design/Builder, as soon as practicable after execution of this Part 2 Agreement, shall furnish to the Owner in writing the names of the persons or entities the Design/Builder will engage as contractors for the Project.

11.2.2    Design/Builder shall use its best efforts to include in any subcontracts and supplier agreements a binding arbitration clause with a provision for consolidation of any arbitration between Design/Builder and Subcontractor or supplier with related disputes between Owner and Design/Builder.

11.3    WORK BY OWNER, CITY OF GREENVILLE OR OWNER'S THEIR CONTRACTORS

11.3.1    The Owner and The City of Greenville reserves the right to perform construction or operations related to the Project with the Owner's or City of Greenville's own forces, and to award separate contracts in connection with other

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
18

A000007011                                    A000007011

portions of the Project or other construction or operations on the site under conditions of insurance and waiver of subrogation identical to the provisions of this Part 2 Agreement. If the Design/Builder claims that delay or additional cost is involved because of such action by the Owner, the Design/Builder shall assert such claims as provided in Subparagraph 11.4. Claims against the City of Greenville arising out of the City's performance of work at or adjacent to the Project during the course of Design/Builder's work shall be asserted against the City.

**11.3.2**  The Design/Builder shall afford the Owner's and City of Greenville's separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities and shall connect and coordinate the Design/Builder's construction and operations with theirs as required by the Contract Documents.

**11.3.3**  Costs caused by delays or by improperly timed activities or defective construction shall be borne by the party responsible therefor.

## 11.4   CLAIMS FOR DAMAGES

**11.4.1**  If either party to this Part 2 Agreement suffers injury or damage to person or property because of an act or omission of the other party, of any of the other party's employees or agents, or of others for whose acts such party is legally liable, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after first observance. The notice shall provide sufficient detail to enable the other party to investigate the matter. If a claim of additional cost or time related to this claim is to be asserted, it shall be filed in writing.

## 11.5   INDEMNIFICATION

**11.5.1**  To the fullest extent permitted by law, the Design/Builder shall indemnify and hold harmless the Owner, Owner's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by negligent acts or omissions of the Design/Builder, anyone directly or indirectly employed by the Design/Builder or anyone for whose acts the Design/Builder may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 11.5.

**11.5.2**  In claims against any person or entity indemnified under this Paragraph 11.5 by an employee of the Design/Builder, anyone directly or indirectly employed by the Design/Builder or anyone for whose acts the Design/Builder may be liable, the

indemnification obligation under this Paragraph 11.5 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Design/Builder under workers' compensation acts, disability benefit acts or other employee benefit acts.

## 11.6   SUCCESSORS AND ASSIGNS

**11.6.1**  The Owner and Design/Builder, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Part 2 Agreement and to the partners, successors and assigns of such other party with respect to all covenants of this Part 2 Agreement. Neither the Owner nor the Design/Builder shall assign this Part 2 Agreement without the written consent of the other. The Owner may assign this Part 2 Agreement to any institutional lender providing construction financing, and the Design/Builder agrees to execute all consents reasonably required to facilitate such an assignment. If either party makes such an assignment, that party shall nevertheless remain legally responsible for all obligations under this Part 2 Agreement, unless otherwise agreed by the other party.

## 11.7   TERMINATION OF PROFESSIONAL DESIGN SERVICES

**11.7.1**  Prior to termination of the services of the Architect or any other design professional designated in this Part 2 Agreement, the Design/Builder shall identify to the Owner in writing another architect or other design professional with respect to whom the Owner has no reasonable objection, who will provide the services originally to have been provided by the Architect or other design professional whose services are being terminated.

## 11.8   EXTENT OF AGREEMENT

**11.8.1**  This Part 2 Agreement represents the entire agreement between the Owner and the Design/Builder and supersedes prior negotiations, representations or agreements, either written or oral. This Part 2 Agreement may be amended only by written instrument and signed by both the Owner and the Design/Builder.

**11.9   Claims for Consequential Damages.  Except for (i) Owner's claims for liquidated damages as expressly specified in this Agreement and except (ii) to the extent Owner's claims are covered by insurance provided by Design/Builder under this Agreement, the Design/Builder and Owner waive any and all claims against each other for consequential damages arising out of or relating to this Contract. Subject to the above-cited exceptions, this mutual waiver includes: (1) Damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and (2) damages incurred by the Design/Builder for principal or home office expenses including the compensation of personnel stationed there, for losses of financing, income, business and reputation, for loss of management or employee productivity or of the services of**

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996

19

A000007012                                        A000007012

such persons, and for loss of profit except anticipated profit arising directly from the Work. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination of this Agreement.

### 11.10  Site Conditions/Environmental Matters

11.10.1  Notwithstanding any other provision of the Contract Documents to the contrary, it is hereby expressly agreed that the Design/Builder and its parent, successors, officers, agents, employees, and assigns (hereinafter collectively referred to as "Design/Builder") shall not have any liability or responsibility of any kind whatsoever to the Owner, or any other person, firm or entity, with regard to, or for, any actions, suits, claims, liabilities, warranties, controversies, damages, demands, expenses, incidental damages, causes of action or grievances, of any kind, character, or description, now existing or which may hereafter arise, known or unknown, permanent or otherwise (hereinafter collectively referred to as "claims") indirectly or directly resulting from, growing out of, pertaining to, or in connection with the condition (including but not limited to, any earth work, fill work, compaction, settlement, soil density, plasticity, or slippage) of the site on which the Project is to be constructed except to the extent such claim is caused by the negligent act or omission of, or breach of contract by, Design/Builder, its Subcontractors, suppliers, consultants, agents and employees.

11.10.2  Notwithstanding any other provision of this Contract, the Owner is solely responsible for furnishing the site to the Design/Builder in a condition which meets all applicable Federal, State, and/or local requirements concerning hazardous materials, chemicals and/or any other form of contamination. Furthermore, Owner shall be solely responsible for all testing, inspections, permits and/or any other requirements related to the environmental condition of the site necessary in order to make the site suitable for construction of the Project, whether necessary before or after the commencement of Work by Design/Builder on the Project. Notwithstanding any language which may be to the contrary in any of the Contract Documents, Design/Builder shall have no obligation to investigate subsurface or otherwise concealed conditions at the site or unknown physical conditions of an unusual nature at the site, and shall be entitled to relief with respect to any such conditions as provided in Section 8.5.1 of this Agreement. Owner has contracted with the City of Greeneville to perform the subsurface investigation and geotechnical engineering for the Owner with respect to the project and Design/Builder shall be entitled to fully and completely rely upon such subsurface investigation and geotechnical engineering.

11.10.3  Environmental Audit. Owner is responsible for performing or furnishing an environmental audit. If Owner does not perform or furnish an environmental audit, Design/Builder shall have no responsibility or liability of any kind arising from any conditions, substances, or material

which would have been ascertained or discovered by the performance of an environmental audit of the premises upon which the Project is located.

11.10.4  Pollutants from Owner's Operations. Owner's knowledge of its activities that will be conducted within the facility to be designed and constructed by Design/Builder and the materials involved in those activities, is superior to Design/Builder's knowledge. Accordingly, and anything contained in this Agreement to the contrary notwithstanding, any duty or warranty by Design/Builder hereto shall not apply to the discharge, dispersal, escape, release or saturation of any pollutant into the atmosphere or any body of water or on, onto, upon, in or into the surface or subsurface of land resulting from Owner's operations. For purpose of this section, the word "pollutant" shall mean any solid liquid, gaseous, or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkaline, chemicals and waste and shall include any Hazardous Substance. The capacity of the facility and the design of any of its parts, so as to prevent the escape, release, discharge, dispersal or saturation of pollutants shall be the sole responsibility of Owner.

11.10.4.1  Encountering Hazardous Substances. In the event Design/Builder or its Subcontractors encounter on the Project site material reasonably believed to be asbestos, polychlorinated biphenyl ("PCB") or other "Hazardous Substances" as defined in paragraph 11.10.4.4, which has not been rendered harmless, Gray shall immediately stop Work in the area affected and report the condition to the Owner in writing. The Work in the affected area shall be resumed (1) in the absence of any Hazardous Substances, (2) when any Hazardous Substances have been rendered harmless, (3) by written agreement of the Owner and Gray, or (4) in accordance with the final determination under Article 10.

11.10.4.2  Working Conditions. Neither Design/Builder nor its Subcontractors shall be required without their consent to perform any Work relating to asbestos, PCB, or other Hazardous Substances.

11.10.4.3  Owner's Indemnification Responsibilities. To the fullest extent permitted by law, the Owner shall defend, indemnify, and hold harmless Design/Builder, its Subcontractors, Suppliers, consultants, agents and employees, from any and all claims, liability, damages and expenses (including attorney fees and expenses), arising out of or resulting from:

(e) Any claim, suit or legal proceeding to recover damages for wrongful death, bodily injury, illness or disease or injury to, or destruction of, tangible property alleged to be caused either directly or indirectly by any substances, condition, element, or material or any combination of the foregoing: (a) produced by

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
20

A000007013                                           A000007013

Owner or omitted or released by Owner either intentionally or unintentionally, from the facilities designed and/or constructed by Design/Builder for the benefit of Owner, or (b) used by Design/Builder or incorporated by Design/Builder into the Work herein agreed to be performed by Design/Builder for the benefit of Owner if specifically required by Owner or if necessary for the planned use of the work and to the extent not caused by the mishandling of such substances, condition, element, or material by Design/Builder, its Subcontractors, suppliers, consultants, agents, and employees;

**(b)** Performance of the Work in the affected area if in fact the material is asbestos, PCB, or other Hazardous Substances, and has not been rendered harmless, provided that such claim, damages, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and to the extent not caused by the negligent act or omission of Design/Builder, its Subcontractors, suppliers, consultants, agents and employees.

**11.10.4.4**  Definition of Hazardous Substances.  For purposes of this Agreement, the term "Hazardous Substances" means any substance, including solid, liquid or gaseous material, which is listed or defined as "Hazardous" in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S. Section 1251, et seq., or regulations promulgated pursuant thereto; and source, special nuclear, or by product material as defined by the Atomic Energy Act of 1954, 42 U.S.C., Section 3011, et seq., or regulations promulgated pursuant thereto; and includes any other substance defined by federal, state or local statute, regulations, or ordinance as hazardous, toxic or dangerous waste or substance.

## ARTICLE 12
## TERMINATION OF THE AGREEMENT

**12.1**    **TERMINATION BY THE OWNER**

**12.1.1**    This Part 2 Agreement may be terminated by the

Owner upon 14 days' written notice to the Design/Builder in the event that the Project is abandoned.  If such termination occurs, the Owner shall pay the Design/Builder for Work that is satisfactorily completed, and for proven loss sustained upon materials, equipment, tools, and construction equipment and machinery, including reasonable profit ~~and applicable~~ ~~damages~~.  Design/Builder will not be entitled to payment for uncompleted work, anticipated profit on Work not completed, or unabsorbed overhead.

**12.1.2**    If the Design/Builder defaults or persistently fails or neglects to carry out the Work in accordance with the Contract Documents or fails to perform the provisions of this Part 2 Agreement, the Owner may give written notice that the Owner intends to terminate this Part 2 Agreement.    If the Design/Builder fails to correct the defaults, failure or neglect within seven (7) days after being given notice, the ~~Owner may~~ ~~then give a second written notice and, after an additional seven~~ ~~(7) days,~~ the Owner may without prejudice to any other remedy terminate the employment of the Design/Builder and take possession of the site and of all materials, equipment, tools and construction equipment and machinery thereon owned by the Design/Builder and  finish the Work by whatever method the Owner may deem expedient.  If the unpaid balance of the Contract Sum exceeds the expense of finishing the Work and all damages incurred by the Owner, such excess shall be paid to the Design/Builder to the extent earned and payable under the Agreement.    If the expense of completing the Work and all damages incurred by the Owner exceeds the unpaid balance, the Design/Builder shall pay the difference to the Owner. This obligation for payment shall survive termination of this Part 2 Agreement.

**12.2**    **TERMINATION BY THE DESIGN/BUILDER**

**12.2.1**    If the Owner fails to make payment when due, the Design/Builder may give written notice of the Design/ Builder's intention to terminate this Part 2 Agreement.    If the Design/Builder fails to receive payment within seven  (7) days after receipt of such notice by the Owner, the Design/Builder may give a second written notice and, seven (7) days after receipt of such second written notice by the Owner, may terminate this Part 2 Agreement and recover from the Owner payment for Work satisfactorily completed executed and for proven losses sustained upon materials, equipment, tools, and construction equipment and machinery, including reasonable profit and applicable damages.

## ARTICLE 13
## BASIS OF COMPENSATION

The Owner shall compensate the Design/Builder in accordance with Article 5, Payments, and the other provisions of this Part 2 Agreement as described below.

**13.1**    **COMPENSATION**

**13.1.1**    For the ~~Design/Builder's performance of the Work, as described in Paragraph 3.2 and including any other services listed in~~ ~~Article 14 as part of Basic Services, the Owner shall pay the Design/Builder in current funds the Contract Sum as follows:~~  For Basic Services, as described in Paragraphs 3.2.2. through 3.2.16, and for any other services included in Article 14 as part of Basic Services, basic compensation shall be as follows:  Owner shall pay Design/Builder in current U.S. funds for the Cost of the Work as

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia — 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996

A000007014                                            A000007014

**Guaranteed Maximum Price**

**13.1.2**  The sum of the Cost of the Work and the Design/Builder's Fee is guaranteed by the Design/Builder not to exceed Twelve Million Five Hundred Thousand and No/100 U.S. Dollars ($U.S. 12,500,000.00), subject to additions and deductions by Change Order as provided in the Contract Documents.  Such maximum sum is referred to in the Contract Documents as the Guaranteed Maximum Price.  Costs which would cause the Guaranteed Maximum Price, as adjusted from time to time pursuant to the Contract Documents, to be exceeded shall be paid by the Design/Builder without reimbursement by the Owner and with no additional Fee to Design/Builder.  Upon completion of the Work, an accounting will be made of the Cost of Work and if the Cost of the Work plus Design/Builder's Fee is less than the adjusted Guaranteed Maximum Price, the difference (the "savings") shall be divided as follows:  ninety percent (90%) to Owner and ten percent (10%) to Design/Builder.

Design/Builder's Fee shall be a lump sum of  Nine Hundred Thirty Thousand and 00/100 U. S. Dollars ($930,000.00).  In the event of changes to the Work, the Design/Builder's Fee shall be adjusted as follows:  If a change in the Work is made during the first six (6) weeks of the detailed design phase (i.e. within the first six (6) weeks after the date of Design/Builder's letter of intent dated June 17, 2003) and the Cost of the Work associated with such change is less than $500,000.00, then Design/Builder's Fee shall not be adjusted.  If a change in the Work is made during the first six (6) weeks of the detailed design phase and the Cost of the Work associated with such change exceeds $500,000.00, then Design/Builder's Fee shall be adjusted by an amount equal to 5.5% of the Cost of the Work associated with such change (3% for overhead, 2.5% for profit).  If a change in the Work is made after the first six (6) weeks of the detailed design phase, then Design/Builder's Fee shall be adjusted to include the design costs associated with such change (at the hourly rates set forth on the attached schedule) plus 7.5% of the Cost of the Work associated with such change (5% for overhead, 2.5% for profit).

**13.1.3**  The Guaranteed Maximum Price is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:

**13.1.4**  The amounts agreed to for unit prices, if any, are as follows:

**13.1.5**  The Guaranteed Maximum Price includes the following allowance items/categories.  In the event the Cost of the Work allocable to any one or more items/categories exceeds the amount allocated below, the excess shall be an addition to the Guaranteed Maximum Price and shall be paid by the Owner to the Contractor:

| | |
|---|---|
| 1.  Pit Allowance | $2,116,104.00 |
| 2.  Office Allowance | $   $5,200.00 |

**13.1.6**  The Guaranteed Maximum Price includes Design/Builder's contingency in the amount of One Hundred Thirty Thousand and No/100 Dollars ($130,000.00), a sum mutually agreed upon for use at Design/Builder's sole and exclusive discretion to cover costs incurred in performing the Work which are properly reimbursable as a Cost of the Work but which are not included in a specific line item or the basis for a Change Order.  The contingency is not available to the Owner for any reason including, without limitation, changes in scope or any other item which would enable Design/Builder to increase the Guaranteed Maximum Price under the Contract Documents or which would otherwise entitle Design/Builder to additional compensation.

**13.1.7**  Adjustments to the Guaranteed Maximum Price on account of changes in the Work may be determined by any of the methods listed in Article 8 of the Agreement.

**COSTS TO BE REIMBURSED**

**13.1.8**  The term Cost of the Work shall mean costs necessarily incurred by the Design/Builder in the proper performance of the Work.  Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner.  The Cost of the Work shall include only the items set forth in this Article 13.

**LABOR COSTS**

**13.1.9**  Wages of construction workers directly employed by the Design/Builder to perform the construction of the Work at the site or, with the Owner's agreement, at off-site workshops.

**13.1.10**  Wages or salaries of the Design/Builder's supervisory and administrative personnel when stationed at the site with the Owner's

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996

A000007015                                          A000007015

**13.1.11**  Wages and salaries of the Design/Builder's supervisory or administrative personnel engaged, at factories or workshops on the road, in expediting the production of transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

**13.1.12**  Costs paid or incurred by the Design/Builder for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations, and pensions, provided such costs are based on wages and salaries included the the Cost of the Work under Clauses 13.1.9 through 13.1.12.

## SUBCONTRACT COSTS

**13.1.13**  Payments made by the Design/Builder to Subcontractors in accordance with the requirements of the subcontracts.

## COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION

**13.1.14**  Costs, including transportation of materials and equipment incorporated or to be incorporated in the completed construction.

**13.1.15**  Costs of materials described in the preceding Clause 13.1.14 in excess of those actually installed but required to provide reasonable allowance for waste and for spoilage. Unused excess materials, if any, shall be handed over to the Owner at the completion of the Work or, at the Owner's option, shall be sold by the Design/Builder and amounts realized, if any, from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

## COST OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS

**13.1.16**  Costs, including transportation, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by the construction workers, which are provided by the Design/Builder at the site and fully consumed in the performance of the Work; and cost less salvage value on such items if not fully consumed, whether sold to others or retained by the Design/Builder. Cost for items previously used by the Design/Builder shall mean fair market value.

**13.1.17**  Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by the construction workers, which are provided by the Design/Builder at the site, whether rented from the Design/Builder or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof. Rates and quantities of equipment rented shall be subject to the Owner's prior approval.

**13.1.18**  Costs of removal of debris from the site.

**13.1.19**  Costs of telegrams and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

**13.1.20**  That portion of the reasonable travel and subsistence expenses of the Design/Builder's personnel incurred while traveling in discharge of duties connected with the Work.

## MISCELLANEOUS COSTS

**13.1.21**  That portion directly attributable to this Contract to premiums for insurance and bonds.

**13.1.22**  Sales, use or similar taxes imposed by a governmental authority which are related to the Work and for which the Design/Builder is liable.

**13.1.23**  Fees and assessments for the building permit and for other permits, licenses and inspections for which the Design/Builder is required by the Contract Documents to pay.

**13.1.24**  Fees of testing laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded due to failure of the portions of the Work to comply with requirements established by the Contract Documents and which do not fall within the scope of Clauses 13.1.30 through 13.1.32 below.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

A000007016                                                    A000007016

required and tested, and for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement by the Contract Documents; payments made in accordance with legal judgments against the Design/Builder resulting from such suits or claims and payments of settlements made with the Owner's consent; provided, however, that such costs of legal defenses, judgment and settlements shall not be included in the calculation of the Design/Builder's Fee or of a Guaranteed Maximum Price. However, if the Design/Build has reason to believe that the required design, process or product is an infringement of a copyright or patent, the Design/Builder shall be responsible for such loss unless such information is promptly furnished to the Owner.

**13.1.26** Deposits lost for causes other than the Design/Builder's fault or negligence.

### OTHER COSTS

**13.1.27** Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

### EMERGENCIES; REPAIRS TO DAMAGED, DEFECTIVE OR NONCONFORMING WORK

**13.1.28** The cost of the Work shall also include costs described below which are incurred by the Design/Builder:

**13.1.29** In taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property. Additional compensation or extension of time claimed by the Design/Builder on account of acting at the Design/Builder's discretion shall be determined as provided in Article 8 of the Agreement.

**13.1.30** In repairing or correcting Work damaged or improperly executed by construction workers in the employ of the Design/Builder, provided such damage or improper execution did not result from the fault or negligence of the Design/Builder or the Design/Builder's foremen, engineers or superintendents, or other supervisory, administrative or managerial personnel of the Design/Builder.

**13.1.31** In repairing damaged Work other than that described in Clause 13.1.30, provided such damage did not result from the fault or negligence of the Design/Builder or the Design/Builder's personnel, and only to the extent that the cost of such repairs is not recoverable by the Design/Builder from others and the Design/Builder is not compensated therefor by insurance or otherwise.

**13.1.32** [DELETED]

### COSTS NOT TO BE REIMBURSED

**13.1.33** The Cost of the Work shall not include:

**13.1.34** Salaries and other compensation of the Design/Builder's personnel stationed at the Design/Builder's principal office or offices other than the site office, except as specifically provided in Clauses 13.1.10 and 13.1.11 or as may be provided in Article 14.

**13.1.35** Expenses of the Design/Builder's principal office and offices other than the site office.

**13.1.36** Overhead and general expenses, except as may be expressly included in Article 13.

**13.1.37** Rental costs of machinery and equipment, except as specifically provided in Clause 13.1.17.

**13.1.38** Except as provided in Clauses 13.1.30 through 13.1.32, costs due to the fault or negligence of the Design/Builder, Subcontractors, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including but not limited to costs for the correction of damaged, defective or nonconforming Work, disposal and replacement of materials and equipment incorrectly ordered or supplied, and making good damage to property not forming part of the Work.

**13.1.39** Any cost not specifically and expressly described in Article 13.

**13.1.40** Costs which would cause the Guaranteed Maximum Price, if any, to be exceeded.

### DISCOUNTS, REBATES AND REFUNDS

**13.1.41** Cash discounts obtained on payments made by the Design/Builder shall accrue to the Owner if (1) before making the payment,

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191 -1996
24

A000007017                          A000007017

the Design/Builder included therein in ap... ...ication and Certificate for payment that ... tion) the Owner, or (2) the Owner has deposited funds with the Design/Builds... ...ith which to make payments, otherwise, cash disco...nts shall accrue to the Design/Builder. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Design/Builder shall make provisions so that they can be secured.

**13.1.42** Amounts which accrue to the Owner in accordance with the provisions of Clause 13.1.41 shall be credited to the Owner as a deduction from the Cost of the Work.

## SUBCONTRACTS AND OTHER AGREEMENTS

**13.1.43** Those portions of the Work that the Design/Builder does not customarily perform with the Design/Builder's own personnel shall be performed under subcontracts or by other appropriate agreements with the Design/Builder. The Design/Builder shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work. The Owner will then determine, with the advice of the Design/Builder, which bids will be accepted. The Owner may designate specific persons or entities from whom the Design/Builder shall obtain bids; however, if a Guaranteed Maximum Price has been established, the Owner may not prohibit the Design/Builder from obtaining bids from others without reasonable objection. The Design/Builder shall not be required to contract with anyone to whom the Design/Builder has a reasonable objection.

**13.1.44** If a Guaranteed Maximum Price has been established and a specific bidder among those whose bids are delivered by the Design/Builder to the Owner (1) is recommended to the Owner by the Design/Builder; (2) is qualified to perform that portion of the Work; and (3) has submitted a bid which conforms to the requirements of the Contract Documents without reservations or exceptions, but the Owner requires another bid be accepted, then the Design/Builder may require that a Change Order be issued to adjust the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Owner by the Design/Builder and the amount of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

## ACCOUNTING RECORDS

**13.1.45** The Design/Builder shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract and  the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to the Design/Builder's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Contract, and the Design/Builder shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

## PROGRESS PAYMENTS

**13.1.46** Each Application for Payment shall be based upon the most recent schedule of values submitted by the Design/Builder and approved by the Owner in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work, except that the Design/Builder's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Owner may require. This schedule, unless object to by the Owner, shall be used as a basis for reviewing the Design/Builder's Application for Payment.

**13.1.47** Applications for Payment shall show percentage completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage completion shall be the percentage of that portion of the Work which has actually been completed.

**13.1.48** Subject to other provisions of the Contract Documents, the amount of progress payment shall be computed as follows:

**13.1.49** Take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute may be included as provided in Article 8 of the Agreement, even though the Guaranteed Maximum Price has not yet been adjusted by Change Order.

**13.1.50** Add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored and insured at the site for subsequent incorporation in the Work or, if approved in advance by the Owner, suitably stored and insured off the site at a location agreed upon in writing.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
25

A000007018                                            A000007018

**13.1.51** Add the Design/Builder's Fee. Subtract from the total sum retainage of ten percent (10%). The Design/Builder's Fee shall be computed upon the allocable values described in the two preceding Clauses. Upon achieving 50% completion of the Work, retainage withheld from Design/Builder shall be reduced to five (5%) percent.

**13.1.52** Subtract the aggregate of previous payments made by the Owner.

**13.1.53** Subtract the shortfall, if any, indicated by the Design/Builder in the documentation required by the Owner to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's accountants in such documentation.

*This article supplements but does not modify the terms of Article 5, Progress Payments of the Agreement.*

**FINAL PAYMENT**

**13.1.54** The Owner's final payment to the Design/Builder shall be made after the Owner's receipt of Design/Builder's properly submitted and correct final Application for Payment as provided below.

**13.1.55** The Owner's accountants will review and report in writing on the Design/Builder's final accounting within thirty (30) days after delivery of the final accounting to the Owner by the Design/Builder. Based upon such Cost of the Work as the Owner's accountants report to be substantiated by the Design/Builder's final accounting, and provided the other conditions of final payment have been met, the Owner will, within seven (7) days after receipt of the written report of the Owner's accountants, either make final payment to Design/Builder, or notify the Design/Builder in writing of the Owner's reasons for withholding payment, which reasons shall be set forth in detail with references to particular provisions of the Contract Documents pursuant to which Owner is withholding such amounts.

**13.1.56** If the Owner's accountants report the Cost of the Work as substantiated by the Design/Builder's final accounting to be less than claimed by the Design/Builder, the Owner shall so notify the Design/Builder in writing, and the Design/Builder shall be entitled to demand arbitration of the disputed amount within thirty (30) days from the receipt thereof; failure to demand arbitration within this thirty (30) day period shall result in the substantiated amount reported by the Owner's accountants becoming binding on the Design/Builder. Pending a final resolution by arbitration, the Owner shall pay the Design/Builder the amount substantiated by Owner's accountants.

**13.1.57** [DELETED]

**13.1.258** For Additional Services, as described in Paragraph 3.3 and including any other services listed in Article 14 as Additional Services, compensation shall be as follows:

**13.2    REIMBURSABLE EXPENSES**

**13.2.1**    Reimbursable Expenses are in addition to the compensation for Basic and Additional Services, and include actual expenditures made by the Design/Builder and the Design/Builder's employees and contractors in the interest of the Project, as follows:

**13.2.2**    FOR REIMBURSABLE EXPENSES, compensation shall be a multiple of (  ) times the amounts expended.

**13.3    INTEREST PAYMENTS**

**13.3.1**    The rate of interest for past due payments shall be as follows:

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Design/Builder's principal places of business, at the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletion, modification or other requirements, such as written disclosures or waivers.)*

**ARTICLE 14**
**OTHER CONDITIONS AND SERVICES**

**14.1**    The Basic Services to be performed shall be commenced on _____ and, subject to authorized adjustments and to delays not caused by the Design/Builder, Substantial Completion shall be achieved on or before May 6, 2004 in the Contract Time of —

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
26

(~) calendar days.

14.1.1    Acceleration

(a) Design/Builder shall at all times supply sufficient tools, equipment, materials, supervision, subcontracted services and labor to meet the then-current approved project schedule. To the extent, in the reasonable belief of the Owner, the progress of the Work is such that the contract completion date, as adjusted for time extensions provided elsewhere in this Agreement, will not be met due to the fault or cause of Design/Builder or its subcontractors, suppliers, consultants, agents and employees, then the Owner may direct Design/Builder in writing to take such steps as Owner deems necessary to improve Design/Builder's progress, all without additional cost or fee to the Owner. Such steps may include, but shall not be limited to, increasing the number of shifts, adding overtime operations, increasing the labor force and/or supervision, working holidays and weekends and adding equipment and operators. Such an acceleration shall be separately accounted for by Design/Builder. If Design Builder reasonably believes that acceleration is not justified under the terms of this clause, it shall so advise Owner in writing within seven (7) days of receipt of the directive to accelerate. In such case of objection, Design/Builder may expressly reserve its right to claim a compensable acceleration under paragraph (b) below, but nevertheless must proceed with the acceleration as directed.

(b) In the event the progress of the Work is on schedule for meeting the contract completion date, as adjusted for time extensions provided elsewhere in this Agreement, the Owner reserves the right to direct Design/Builder to accelerate its progress as a change in the Work and with compensation as provided in Article 8 hereof; provided, however, that Design/Builder shall have no obligation to so accelerate its progress unless and until a change order or constructive change directive is executed by Owner with respect to such acceleration. Costs of such acceleration shall be separately accounted for by Design/Builder and shall be cause for an increase in the Guaranteed Maximum Price.

14.2    The Basic Services beyond those described in Article 3 are as follows:

14.3    Additional Services beyond those described in Article 3 are as follows:

14.4    The Design/Builder shall submit an Application for Payment on the last (~) day of each month. It shall be in a form and with such certifications and releases as reasonably required by Owner.

14.5    The Design/Builder's Proposal includes the following documents:
(List the documents by specific title and date; include any required performance and payment bonds.)

14.6    Other documents forming part of the Contract Documents include:

| | | |
|---|---|---|
| | A. | Bid Documents prepared by SSOE dated April 04, 2003 |
| | B. | Addendum No. 1 dated April 11, 2003 |
| | C. | Addendum No. 2 dated April 23, 2003 |
| | D. | Gray Proposal dated April 24, 2003 |
| | E. | Proposal Clarification dated April 28, 2003 |
| | F. | Re-Bid and Addendum No. 3 dated May 21, 2003 |
| | G. | To Do/Decision List Release 6/15 dated June 15, 2003 |
| | H. | Letter of Intent Meeting Minutes dated June 17, 2003, including hourly rate attachment |
| | I. | Letter of Intent dated June 17, 2003 |

Title                                                    Date   8 OCTOBER, 2003

This Agreement entered into as of the day and year first written above.

OWNER (Signature)                            DESIGN/BUILDER (Signature)

President / CEO  DONGKIL NAM          JIM GRAY,  DIRECTOR
(Printed name and title)                      (Printed name and title)

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
27

A000007020                                              A000007020

# CERTIFICATE OF
# SUBSTANTIAL COMPLETION

| | |
|---|---|
| **PROJECT:**<br>Hwashin<br>661 Montgomery Hwy<br>Greenville, AL 36037 | **PROJECT NO:**    203048<br>**CONTRACT FOR:**    Design/Build Services<br>**CONTRACT DATE:**    09/24/03 |
| **CUSTOMER:**<br>Mr. David Nam, President<br>Hwashin America Corp.<br>2821 Eastern Blvd., Ste. 100<br>Montgomery, AL 36116 | **DESIGN/BUILDER:**<br>James N. Gray Co.<br>10 Quality Street<br>Lexington, KY 40507 |

**DATE OF ISSUANCE:**

PROJECT OR DESIGNATED PORTION SHALL INCLUDE: Manufacturing, E-Coat, Waste Water, M/E Room and Press Bay

The work performed under this Contract has been reviewed and found, to the Design/Builder's best knowledge, information and belief, to be substantially complete. Substantial Completion is the stage in the progress of the work when the work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the customer can occupy or utilize the work for its intended use. The date of Substantial Completion of the Project or portion thereof designated above is hereby established as:

05/06/04

which is also the date of commencement of applicable warranties required by the Contract Documents, except as stated below:

---

A list of items to be completed or corrected is attached hereto. The failure to include any items on such list does not alter the responsibility of the Design/Builder to complete all work in accordance with the Contract Documents.

GNF Architects and Engineers, P.S.C.
**PROJECT ARCHITECT/ENGINEER**     BY: Dennis E. Bopp, R.A.       DATE

The Contractor will complete or correct the work on the list of items attached hereto within     day(s) from the above date of Substantial Completion.

James N. Gray Co.
**PROJECT CONTRACTOR**     BY: Brad D. Cvengros       DATE   6/23/04

The Customer accepts the work or designated portion thereof as substantially complete and will assume full possession thereof at     on

Hwashin America Corp.
**CUSTOMER**     BY: David Nam, President       DATE   6/20/04

1

The responsibilities of the Customer and the Design/Builder for security, maintenance, heat, utilities, damage to the work and insurance shall be as follows:

1.    Muddy wall panels at blanking line in addition to remainder of facility.

2.    Missing expansion joint cover at column lines A-17 – provide and install

3.    Water at blanking line pit by scrap treatment door?

4.    Repair floor at sprinkler riser in high bay where riser penetrates floor slab.

5.    Door hardware and sweeps to be installed at all exterior doors (typical).

6.    Paint bollard/caps yellow – retouch paint at base (typical all bollards).

7.    Paint steel plating door frame at interior around dock doors. Recaulk perimeter, ensure top is sealed from weather.

8.    Caulk top of edge angle at base of metal panel. Daylight visible.

9.    Damage to overhead door #153.

10.    Overhead door #156 out of alignment.

11.    Paint steel and x-bracing along G line adjacent to E-coat.

12.    Clean masonry and liner panels around E-coat.

13.    Flash masonry at E-coat at end of wall where meeting exterior metal panels. Flashing to match metal panel closure above masonry.

14.    Paint and caulk cased window opening in masonry wall at E-coat lab.

15.    Caulk base of masonry wall at E-coat

16.    Finish head and jamb at saw cut opening for equipment opening at E-coat masonry wall.

17.    Roof leak in mechanical/electrical room, approximately column lines A.5 and 2.5.

18.    Paint bottom section of D.S.'s to match siding; D.S. above office to remain blue.

19.    Water on floor and metal panel adjacent to sprinkler riser by office?

20.    Paint bollards at sprinkler riser in E-coat.

21.    Verify requirements for floor painting at ramp to exterior doors at E-coat.

22.    Roof leaks at E-coat area – multiple places.

23.    Roof leak in main bay near door #121.

## REQUIREMENTS FOR CERTIFICATE OF OCCUPANCY

Hwashin America Corp.
Gray Job #203046

08/23/2004

| Item | Area | Descriptions | Responsibility | Sub | Date Completed | Note |
|---|---|---|---|---|---|---|
| 1 | 2500T, 800T foundation | Install barricade or fall protection and wheel bumps around the open pits. | Gray | TBD | | Not in Contract |
| 2 | Roof | Install an exterior transition ladder (high-low bay). | Gray | Cooper | | |
| 3 | S.tunnel | Fire suppression system to be installed. | Gray | Tri-State | | |
| 4 | S.tunnel | Fire alarm to be installed and tested. | Gray | Tri-State | | |
| 5 | S.tunnel | Lighting to be installed. | Gray | Tri-State | | |
| 6 | S.tunnel | Egress stairs to be installed. | Hwashin | M&L | | Not in Contract |
| 7 | S.tunnel | Slab opening to be cut and compete for egress. | Hwashin | | | Not in Contract |
| 8 | S.tunnel | Install hand rail or fall protection at the transition of 800T sub-tunnel to the main. | Gray | Cooper | | Not in Contract |
| 9 | Press bay | Provide yellow stripe for trip hazard around wiring duct at Spot press. | Hwashin | | | Not in Contract |
| 10 | All Mfrg. | All HVAC units to be completed and in operation. | Gray | Hardy | | |
| 11 | All Mfrg. | Install sign-off tags @ fire riser. | Gray | Tri-State | | |
| 12 | All Mfrg. | Complete locking mechanism at doors. | Gray | CDP | | |
| 13 | All Mfrg. | Provide safety yellow strip to identify electrical panels on walls/columns and 36" clearance. | Hwashin | | | Not in Contract |
| 14 | E-coat | Install means of collision protection around the fiberglass tanks between CL,F-G. | Hwashin | | | Not in Contract |
| 15 | E-coat | Install fire suppression system underneath the equipment platform. | Hwashin | | | Not in Contract |
| 16 | E-coat | Install emergency lights at corridor between CL.1 and paint equipment. | Gray | M&L | | |
| 17 | E-coat | Stripe paint ramp (door #172) in safety yellow. | Hwashin | | | |
| 18 | E-coat | Stripe paint containment curb at corridor (CL.B) in safety yellow. | Hwashin | | | Not in Contract |
| 19 | Mfrg. | Low clearance identification at conveyor's mesh fall protection. | Hwashin | | | Not in Contract |
| 20 | M/E Rm. | Install "Mech. Elect. Room" identification sign plate on wall both interior and exterior. | Gray | Gray | | |
| 21 | | Install "Not Exit" sign plate at M/E room interior door. | Gray | Gray | | |
| 22 | All Bldg. | Paint all ladders in safety yellow. | Gray | W/ooslay | | |
| 23 | All Bldg. | Fire alarm for each zone to be tested and reported. | Gray | Tri-State | | |

**REQUIREMENTS FOR CERTIFICATE OF OCCUPANCY**

06/23/2004

Hwashin America Corp.
Gray Job #203048

| 24 | Mfrg. | Install exit sign at door #178. | Gray | M&L | | |
|----|-------|----------------------------------|------|-----|---|---|
| | | | | | | |

# CERTIFICATE OF
# SUBSTANTIAL COMPLETION

| | |
|---|---|
| **PROJECT:** | **PROJECT NO:** 203048 |
| Hwashin | **CONTRACT FOR:** Design/Build Services |
| 661 Montgomery Hwy | **CONTRACT DATE:** 09/24/03 |
| Greenville, AL 36037 | |

**CUSTOMER:**
Mr. David Nam, President
Hwashin America Corp.
2821 Eastern Blvd., Ste. 100
Montgomery, AL 36116

**DESIGN/BUILDER:**
James N. Gray Co.
10 Quality Street
Lexington, KY 40507

DATE OF ISSUANCE:

PROJECT OR DESIGNATED PORTION SHALL INCLUDE: Office

The work performed under this Contract has been reviewed and found, to the Design/Builder's best knowledge, information and belief, to be substantially complete. Substantial Completion is the stage in the progress of the work when the work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the customer can occupy or utilize the work for its intended use. The date of Substantial Completion of the Project or portion thereof designated above is hereby established as:

06/30/04

which is also the date of commencement of applicable warranties required by the Contract Documents, except as stated below:

---

A list of items to be completed or corrected is attached hereto. The failure to include any items on such list does not alter the responsibility of the Design/Builder to complete all work in accordance with the Contract Documents.

GNF Architects and Engineers, P.S.C.
**PROJECT ARCHITECT/ENGINEER**    BY: Dennis E. Bopp, R.A.    DATE 00 augost04

The Contractor will complete or correct the work on the list of items attached hereto within    day(s) from the above date of Substantial Completion.

James N. Gray Co.
**PROJECT CONTRACTOR**    BY: Brad T. Cvengros    DATE 6/23/04

The Customer accepts the work or designated portion thereof as substantially complete and will assume full possession thereof at    on

Hwashin America Corp.
**CUSTOMER**    BY: David Nam, President    DATE 8/20/04

1

EXHIBIT C

The responsibilities of the Customer and the Design/Builder for security, maintenance, heat, utilities, damage to the work and insurance shall be as follows:

1.    Door hardware and sweeps to be installed at all exterior doors (typical).

2.    Column at entry vestibule to be wrapped.

3.    Roof leak in office at door between vestibule and cafeteria.

4.    Paint accent soffit between corridor C and Cafeteria 109. See revised finish schedule.

5.    Verify HIPAA requirements at First Aid -- possibly replace lay-in ceiling system with hard ceiling.

2

REQUIREMENTS FOR CERTIFICATE OF OCCUPANCY

Hwashin America Corp.
Gray Job #203048

08/23/2004

| Item | Area | Descriptions | Responsibility | Sub | Date Completed | Note |
|------|------|--------------|----------------|-----|----------------|------|
| 1 | n/a | Produce "Life Safety Plan" drawing. | Gray | Gray | | |
| 2 | All Bldg. | Paint all ladders in safety yellow. | Gray | Woosley | | |
| 3 | All Bldg. | Fire alarm for each zone to be tested and reported. | Gray | Tri-State | | |
| 4 | Mftg. | Install exit sign at door #178. | Gray | M&L | | |
| 5 | All Office | Complete ceiling system. | Gray | Ken Isaacs | | |
| 6 | All Office | Complete all system above ceiling. | Gray | Herdy, M&L, Tri-State | | |
| 7 | All Office | Complete flooring. | Gray | Faulkner | | |
| 8 | All Office | Complete all electrical outlet. | Gray | M&L | | |
| 9 | All Office | Complete all doors. | Gray | CDP | | |
| 10 | All Office | Complete all interior paint. | Gray | Woosley | | |
| 11 | All Office | All emergency device to be complete, tested, and reported. | Gray | M&L | | |
| 12 | Rm#132 | Replace two outlets at workroom (above sink) with GFI receptacles. | Gray | M&L | | |
| 13 | Rm#113 | Replace outlet with medical grade GFI receptacle. | Gray | M&L | | |
| 14 | Rm#116, 118, 119, 120 | Complete receptacle and wiring with GFI rated. | Gray | M&L | | |
| 15 | Rm#116, 120 | Install toilet partitions. | Gray | Ken Isaacs | | |
| 16 | Exterior | Complete employee parking lot (asphalt, stripe, handicap sign, lighting) | Hwashin | --- | | Asphalt andStriping Not in Contract |

# Firestone
**BUILDING PRODUCTS**

## REPAIRS FOR WARRANTY
### Complete Repairs, Sign, And Return Within 60 Days Of Inspection

Building Name: H WAShin America Corporation

Building Address: *(only needs to be completed if address is different from PIN)*

Firestone Contractor (Firm Name): All South          Firestone License or Registration No.: 1229

Contractor's Representative: Kenny

Inspection Date: 8-17-04    Firestone Inspector: BRAD GRAHAM    Phone 1-800-428-4511 (ext): 3289

Requested Inspection: ☒1st ☐2nd ☐3rd ☐4th ☐___th ☐Interim ___% Completed    ☐Audit ☐Other:

*It is the contractor's responsibility to ensure the repair is completed per current policy, including repairs caused by other (CHO).*   System Type: TPO

☐No Repairs Required    ☒The Following Repairs Must Be Completed Within 60 Days Of The Inspection    Leaks Reported ☐Yes ☒No

PRIOR TO MAKING REPAIRS ALL SURFACES MUST BE CLEANED WITH SOAP AND WATER, RINSED AND DRIED, THEN FOLLOW PROPER SPLICING PROCEDURES.

### SEAMS

1. Apply Seam Edge Treatment / Sealant Per Detail:_____

2. Repair "Fishmouth" Or Wrinkle & Strip in Seam._____

3. Strip in Seam/Flashing (A) Where No Seam Edge Treatment Was Applied. (B) Which Has Less Than The Minimum Required Lap (C) Where QuickPrime Was Not Applied properly or At An Inadequate Rate. (D) Seam Tape Not Properly Placed In Seam_____

4. Install "T" Joint Patches Per Detail:_____

5. Strip-In Seams With (A) Excessive / Insufficient Bleed Out (B) Feathered Lap Edges (C) improper adhesion_____

6. Batten/Seam Plate misplaced in Seam (Contact Firestone Technical Services)

7. Install T Joint Patches at Tape Laps:_____

### BASE TIE-INS / CORNERS

8. Install Base Tie-in and Flash Per Detail:_____

9. Apply Joint Cover To Vertical EPDM Seam Per Detail:_____

10. Cut Out And Repair "Bridging":_____

11. Reflash Outside Corner Per Detail:_____

12. Reflash Inside Corner Per Detail:_____

### TERMINATIONS

13. Install (Horiz./Vert.) Termination / Counterflashing Per Detail:_____

14. Fasten Flashing_____ o.c. Per Detail:_____

15. Apply Water Block Per Detail:_____

16. Re-Apply Lap Sealant to top of T-Bar:_____

17. Add additional fasteners to T-Bar to provide continuous compression:_____

☐SPECIAL CONSIDERATION:_____

34. Additional Repair(s):_____

### PENETRATIONS

18. Reflash Pipe Per Detail: Clamp + Fastener @ Pipe CBO
    New Penetration

19. Install/Reflash Penetration Pocket Per Detail:_____

20. Remove And Replace Soft Pourable Sealer.

21. Add Additional Pourable Sealer Or Roof Mastic To Shed Water

### DRAINS & SCUPPERS

22. Repair Drain / Scupper_____

23. Drains: (A.) Replace Broken Drain Bolt. (B.) Tighten Loose Drain Bolt. (C.) Install Missing Drain Bolt/Clamp. (D.) Install 4' x 4' Target Patch. (E.) Strip-In Seam Within 18" Of Drain With 6" FormFlash. (F.) Unplug Drain. (G.) Install Screen Basket. (H.) Install Waterblock. (I.) Replace Missing / Broken Clamping Ring. (J.) Install 3' x 3' Modified Target Patch. (K.) Install Lead. (L.) Install Roof Mastic

### MISCELLANEOUS

24. Install Additional Fasteners Per Specifications.
    (A) Insulation (B) Termination Bar (C) Base Tie-In (D) Drain Bar (E) In Seam

25. Fill Void In Insulation And Repair Per Firestone Specification_____

26. Repair Damaged Membrane/Flashing._____

27. Locate and Repair Leaks. (Reinspection is necessary)_____

28. Install Protective Layer Under Wood Sleeper/Pavers._____

29. Redistribute/ Add Ballast To Provide Proper Coverage._____

30. Install Walkway At Roof Access._____

31. Submit Roof Drawing Showing All Seams And Penetrations._____

32. Remove Debris From The Roof._____

33. Repair Unfused Membrane. Voids_____

✳ Repairs Complete during Inspection ✳

Owners Representative at inspection:_____

| UPON COMPLETION OF REPAIRS, REINSPECTION BY FIRESTONE | ☐ Sq Footage of Roof appears to differ from PIN | ROOF ACCESSIBILITY ☒YES ☐NO |
|---|---|---|
| ☒Is and Necessary At This Time ☐ Is Necessary ☐ Field Deviation | | Installation Rating: I ☒II III IV V |

The above repairs were completed in accordance with Firestone's Specification's on:_____ By:_____

And the roof system now conforms with Firestone specifications, details, and installation requirements.

Applicator's Signature:_____ Title (Authorized Officer Or Agent):_____

**EXHIBIT D**

Please sign and return Yellow Copy to your Regional Technical Coordinator, by mail or fax.

**If no repairs are required, it is not necessary to return this form to Firestone.**

White-Firestone file copy    Yellow-Acknowledgement: Sign And send copy to Firestone    Tan-Applicator file copy

**Mail Or Fax To: Contractor Technical Services / Firestone Building Products P.O. Box 1962 Carmel, In. 46032-5607 / Fax 800-242-0504**

# RED SHIELD WARRANTY

## ROOFING SYSTEM LIMITED WARRANTY

**Warranty No:** RD046954    **FBPCO #BA6132**    **Square Footage:** 261825 s.f.
**Building Owner:** HWASHIN AMERICA CORPORATION
**Building Identification:** HWASHIN AMERICA CORPORATION
**Building Address:** 661 MONTGOMERY HIGHWAY, GREENVILLE, AL, 36037
**Warranty Period Of:** FIFTEEN (15) Years Beginning on: 07/21/04
**Roofing Contractor:** ALL SOUTH SUBCONTRACTORS, INC.    (01229)

For the warranty period indicated above, Firestone Building Products Company ("Firestone"), a division of BFS Diversified Products, LLC, a Delaware limited liability company, warrants to the Building Owner ("Owner") above that Firestone will, subject to the Terms, Conditions and Limitations set forth below, repair any leak in the Firestone Roofing System ("System").

### TERMS, CONDITIONS AND LIMITATIONS

1. The System is limited to mean the Firestone brand membranes, Firestone brand insulation, and other Firestone brand accessories when installed in accordance with Firestone technical specifications.
2. In the event any leak should occur in the System: (a) The Owner must give written notice to Firestone within thirty (30) days of any occurrence of a leak. By so notifying Firestone, the Owner authorizes Firestone or its designee to investigate the cause of the leak. (b) If upon investigation, Firestone determines that the leak is not excluded under the Terms, Conditions and Limitations set forth in this limited warranty, the Owner's sole and exclusive remedy and Firestone's liability will be limited to the repair of the leak. (c) Should the investigation reveal that the leak is excluded under the Terms, Conditions and Limitations, the Owner is responsible for payment of the investigation costs. Failure by Owner to pay for these costs shall render this Red Shield Roof System Limited Warranty ("Limited Warranty") null and void. Firestone will advise the Owner of the type and/or extent of repairs required to be made at the Owner's expense that will permit this Limited Warranty to remain in effect for the unexpired portion of its term. Failure by the Owner to properly make these repairs in a reasonable manner using a Firestone licensed applicator and within a reasonable time shall render this Limited Warranty null and void. (d) Any dispute, controversy or claim between the Owner and Firestone concerning this Limited Warranty shall be settled by mediation. In the event that the Owner and Firestone do not resolve the dispute, controversy or claim in mediation, the Owner and Firestone agree that neither party will commence or prosecute any suit, proceeding, or claim other than in the courts of Hamilton County in the state of Indiana or the United States District Court, Southern District of Indiana, Indianapolis Division. Each party irrevocably consents to the jurisdiction and venue of the above-identified courts.
3. Firestone shall have no obligation under this Limited Warranty unless and until Firestone and the licensed applicator have been paid in full for all materials, supplies, services, warranty costs and other costs which are included in, or incidental to, the System.
4. Firestone shall have no obligation under this Limited Warranty, or any other liability, now or in the future if a leak or damage is caused by: (a) Natural forces, disasters, or acts of God including, but not limited to: winds in excess of 55 MPH, hurricanes, tornadoes, hail, lightning, earthquakes, atomic radiation, insects, or animals; (b) Any act(s), conduct or omission(s) by any person, or act(s) of war, which damages the System or which impairs the System's ability to resist leaks; (c) Failure by the Owner to use reasonable care in maintaining the System, said maintenance to include, but not limited to those items listed on the reverse side of this Limited Warranty titled "Building Envelope Care and Maintenance Guide"; (d) Deterioration or failure of building components, including, but not limited to, the roof substrate, walls, mortar, HVAC units, etc.; (e) Condensation or infiltration of moisture in, through, or around the walls, copings, rooftop hardware or equipment, building structure or underlying or surrounding materials. Firestone specifically excludes any damage to the Firestone insulation or roof system that may come from moisture within the roof deck or existing roof system. (f) Any acid, oil, harmful chemical, chemical or physical reaction and the like which comes in contact with the System, which damages the System, or which impairs the System's ability to resist leaks; (g) Alterations or repairs to the System not approved in writing by Firestone; (h) The architecture, engineering, construction or design of the roof, roofing system, or building. Firestone does not undertake any analysis of the architecture or engineering required to evaluate what type of roof system is appropriate; (i) A change in building use or purpose; (j) Failure to give proper notice as set forth in paragraph 2(a) above.
5. This Limited Warranty shall be transferable subject to Firestone inspection, written approval, and payment of the current transfer fee.
6. During the term of this Limited Warranty, Firestone, its designated representative or employees shall have free access to the roof during regular business hours. In the event that roof access is limited due to security or other restrictions, Owner shall reimburse Firestone for all reasonable costs incurred during inspection and/or repair of the System that are due to delays associated with said restrictions. Owner shall be responsible for the removal and replacement of any overburdens, superstrata or overlays, either permanent or temporary, excluding accepted stone ballast or pavers, as necessary to expose the system for inspection and/or repair.
7. Firestone's failure to enforce any of the terms or conditions stated herein shall not be construed as a waiver of such provision or of any other terms and conditions of this Limited Warranty.
8. This Limited Warranty shall be governed and construed in accordance with the laws of the State of Indiana without regard to conflict of laws.

FIRESTONE DOES NOT WARRANT PRODUCTS INCORPORATED OR UTILIZED IN THIS INSTALLATION WHICH IT HAS NOT FURNISHED. FIRESTONE SPECIFICALLY DISCLAIMS LIABILITY UNDER ANY THEORY OF LAW, ARISING OUT OF THE INSTALLATION OR PERFORMANCE OF, OR DAMAGES SUSTAINED BY, OR CAUSED BY, PRODUCTS NOT FURNISHED BY FIRESTONE. THIS LIMITED WARRANTY SUPERSEDES AND IS IN LIEU OF ALL OTHER WARRANTIES OR GUARANTEES WHETHER WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THIS LIMITED WARRANTY SHALL BE THE OWNER'S SOLE AND EXCLUSIVE REMEDY AGAINST FIRESTONE, AND FIRESTONE SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL, SPECIAL, INCIDENTAL OR OTHER DAMAGES INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS OR DAMAGE TO THE BUILDING OR ITS CONTENTS OR THE ROOF DECK. THIS LIMITED WARRANTY CANNOT BE AMENDED, ALTERED OR MODIFIED IN ANY WAY EXCEPT IN WRITING SIGNED BY AN AUTHORIZED OFFICER OF FIRESTONE. NO OTHER PERSON HAS ANY AUTHORITY TO BIND FIRESTONE WITH ANY REPRESENTATION OR WARRANTY WHETHER ORAL OR WRITTEN.

FIRESTONE BUILDING PRODUCTS COMPANY
By:    George Furman

Authorized
Signature:    *George Furman*
Title:    Manager, Contractor Services

## Firestone

EXHIBIT E

# RED SHIELD  WARRANTY

## BUILDING ENVELOPE CARE AND MAINTENANCE GUIDE
### (Recommendations for Buildings with Firestone Red Shield Limited Warranty)

**Congratulations** on your purchase of a Firestone Roofing System for your building! Your building is a valuable asset and as such should be properly maintained. All building envelope components require periodic attention to perform as designed and to protect your investment.

1. The building envelope, including the roof, should be inspected at least twice yearly (in the Spring and Fall), and after any severe storms. Record maintenance procedures as they occur. Log all access times and parties working on the roof.

2. Although Firestone roofing membranes are designed to accommodate moderate levels of standing water, the weight of standing water, ice or snow on a roof may exceed building structural design loads. As a consequence, good roofing practice suggests that water not be allowed to remain on the roof for more than 48 hours after a rainfall. Roofs should have slope to drain and all drain areas should remain clean. Bag and remove all debris from the roof since such debris can be quickly swept into drains by rain. This will allow for proper water run-off and avoid overloading the roof with standing water.

3. The Firestone Roofing System should not be exposed to acids, solvents, greases, oil, fats, chemicals and the like. If the Firestone Roofing System is subject to contact with any such materials, contact Firestone immediately.

4. The Firestone Roofing System is designed to be a waterproofing component – not a traffic-bearing component – of the building envelope. If there is to be roof traffic for any reason, contact Firestone or your Firestone Licensed Applicator for the installation of acceptable protective walkways.

5. Although periodic inspection is recommended to assure that building components have not been subjected to unusual forces or conditions, the Firestone Roofing System components do not require normal service in order to perform as designed or to keep this Limited Warranty in effect. Surfacings, such as coatings, are sometimes applied to roof membranes for a number of reasons. These surfacings are not covered under the terms of this limited warranty, although they may be covered under a separate agreement.

    a) The application of an approved liquid coating, such as Firestone's Acrylic Coating System for Asphalt or Aluminum Roof Coating to smooth surfaced APP membranes provides additional protection from the environment. If this coating is not applied as part of the initial roofing installation, it should be applied within the first five years after the roof is installed to help protect the membrane from surface cracking inherent in such asphalt products. In addition, this coating should be maintained as needed to recover any areas of the coating that have blistered, peeled or worn through.

    b) Granular surfaced APP and SBS membranes do not normally require surface maintenance other than periodic inspection for contaminants (See Item 3.) or damage. If areas of granular loss are discovered during inspection, new granules should be broadcast into hot asphalt or emulsion to protect the surface of the membrane. The application of an approved liquid coating, such as Firestone's Acrylic Coating System for Asphalt or Aluminum Roof Coating to granular surfaced APP or SBS membranes does provide additional protection from the environment. If this coating is not applied as part of the initial roofing installation, it can be applied later to help protect the membrane. If installed, this coating should be maintained as needed to recover any areas of the coating that have blistered, peeled or worn through.

    c) Gravel surfaced BUR membranes do not normally require surface maintenance other than periodic inspection for contaminants (See Item 3) or damage. If areas of gravel loss are discovered during inspection, gravel must be reinstalled into hot asphalt to protect the surface of the membrane. Smooth surface BUR membranes must be kept coated using original coating materials for the life of this warranty.

    d) EPDM and other single-ply roofing membranes do not normally require surface maintenance other than periodic inspection for contaminants (See Item 3.) or damage. Occasionally, approved liquid roof coatings, such as Firestone AcryliTop, are applied to the surface of EPDM membranes in order to provide a lighter surface color. Such coatings do not need to be maintained to assure the performance of the underlying EPDM roof membrane, but some maintenance and re-coating may be necessary in order to maintain a uniform surface appearance.

6. All counterflashing, metal work, drains, skylights, equipment curb and supports, and any other rooftop accessories functioning in conjunction with the Firestone Roofing System must be properly maintained at all times.

7. If any additional equipment is to be installed on your roof (e.g. HVAC units, TV antennas, etc.), contact Firestone, in writing, for approval before proceeding.

8. Should there be an addition to the building, requiring tie-in to the existing Firestone Roofing System, contact Firestone before proceeding to ensure the tie-in is in accordance with Firestone specifications.

9. Should you have a problem?

    a) Check for the obvious: clogged roof drains, loose counterflashings, broken skylights, open grills or vents, broken water pipes.

    b) Note conditions resulting in leakage. Heavy or light rain, wind direction, temperature and time of day that the leak occurs are all-important clues to tracing roof leaks. Note whether the leak stops shortly after each rain or continues to drip until the roof is dry. If you are prepared with the facts, the diagnosis and repair of the leak can proceed more rapidly.

    c) Contact Firestone Warranty Claims at 1-800-830-5612 immediately...but please don't call until you are reasonably sure that the Firestone Roofing System is the cause of the leak.

Firestone feels that the preceding recommendations will assist you, the building owner, in maintaining your building for many years. Remember, your building is an investment. To maximize your return on this investment, appropriate care is essential.

## Firestone

TP Firestone
6/6/07  0007