**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **JENNIFER PIGGOTT and** | ) | |
| **SLADE PIGGOTT,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No.: CV-06-1158** |
| **v.** | ) | |
| | ) | |
| **GRAY CONSTRUCTION, INC.,** | ) | |
| | ) | |
| **Defendant/Third-Party Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **COOPER'S STEEL** | ) | |
| **FABRICATORS, INC., et al.,** | ) | |
| | ) | |
| **Third-Party Defendants.** | ) | |

**GRAY CONSTRUCTION INC.'S OPPOSITION TO HWASHIN AMERICA
CORPORATION'S MOTION FOR LEAVE TO AMEND COMPLAINT IN
INTERVENTION**

Hwashin America Corporation ("Hwashin") seeks to amend a Complaint filed on behalf

of its worker's compensation carrier, the Alabama Self-Insured Worker's Compensation Fund's

("the Fund"), to protect the Fund's worker's compensation subrogation interest to interject

property damage claims which the Fund has no standing to assert. Even if Hwashin or the Fund

had standing, to allow the interjection of Hwashin's property damage claims into this personal

injury suit (which contains no property damage claim to date) would unduly delay these

proceedings and unfairly prejudice the original parties. Moreover, Gray has already sued

Hwashin in a separate action in this Court for the failure to pay repair costs to the facility, a

property damage case.   Hwashin should assert its property damage claim in that case as a counterclaim.  Hwashin's Motion for Leave is due to be denied.

## I.    STATEMENT OF FACTS.

On September 24, 2003, Gray and Hwashin entered into a design/build contract ("the Contract") for the design and construction of a manufacturing facility in Greenville, Alabama ("the Hwashin facility").  (A true and correct copy of the Contract is attached hereto as Exhibit A.). The Hwashin facility was completed on June 30, 2004. (A true and correct copy of the Certificate of Substantial Completion is attached hereto as Exhibit B.).

On or around October 17, 2006, the Hwashin facility office roof collapsed.  (Plaintiffs' Complaint at ¶ 13-14.).  Plaintiff Jennifer Piggott ("Mrs. Piggott") is alleged to have been injured while exiting the office area during the collapse.  (Plaintiffs' Complaint at ¶ 13-14.).

On November 17, 2006, Slade Piggott ("Mr. Piggott") and Mrs. Piggott filed their Complaint in the Circuit Court of Butler County, Alabama. (See Plaintiffs' Complaint.). Gray timely removed the action to this Court on December 29, 2006.  (Notice of Removal, Document No. 2 in the Court Docket.).

On December 7, 2006, Hwashin, by and through the Fund, filed its Motion to Intervene in the Circuit Court of Butler County, Alabama. (See Hwashin's Motion to Intervene.). That Motion was transferred to this Court at the time of removal. (Id.).

On January 24, 2007, Gray filed its Response to the Motion to Intervene. (Response to Motion, Document No. 4 in the Court Docket.). Gray did not oppose the Fund's intervention for the sole purpose of protecting its worker's compensation subrogation interest.  (Id.). The Court granted the Fund's Motion to Intervene on May 16, 2007. (Order on Motion to Intervene, Document No. 17 in the Court Docket.).

On June 7, 2007, Gray filed its Motion for Leave to file a Third-Party Complaint. (Motion For Leave to File, Document No. 24 in the Court Docket.). Gray sought leave to file third-party claims against Hwashin, subcontractors and suppliers for their conduct which caused the collapse of the roof. (Id.). Gray sought to file claims of indemnity against Hwashin for its failure to maintain the roof drains of the Hwashin facility. (Id.). Gray's Third-Party Complaint seeks only the recovery of any funds it has to pay Mr. and Mrs. Piggott for their alleged injuries. (Id.). Gray's Third-Party Complaint contains no property damage claims and did seek recovery for any property damage. (Id.).

Gray's Motion was granted on June 8, 2007. (Order on Motion for Leave to File, Document No. 25 in the Court Docket.). Gray filed its Third-Party Complaint that same day. (Third Party Complaint, Document No. 26 in the Court Docket.).

On June 26, 2007, Gray filed a separate Complaint in the United States District Court for the Middle District of Alabama against Hwashin. (A true and correct copy of Gray's Complaint in Case No. cv-07-584 is attached as Exhibit C.). Gray alleges Hwashin is liable to Gray for Hwashin's failure to pay Gray for repairs made by Gray to the Hwashin facility. (Id.). Hwashin has not yet answered Gray's Complaint. (Id.).

On June 29, 2007, the deadline to amend pleadings, Hwashin, for itself, and not by or through the Fund, filed a Motion for Leave to Amend the Complaint in Intervention. (Motion For Leave to File, Document No. 55.). Hwashin seeks to add parties and assert claims against Gray, GNF Architects and Engineers, P.S.C. ("GNF"), Freeland Harris Structural Engineers ("Freeland Harris"), Freeland Harris Consulting Engineers of Georgia, Inc. ("Freeland Harris-Georgia"), Cooper's Steel Fabricators, Inc. ("Cooper's Steel"), The Hardy Corporation ("Hardy"), Latta Plumbing & Construction Co., Inc. ("Latta"), All-South Subcontractors ("All-

South"), Firestone Building Products Company, LLC ("Firestone") and Mid-South Subcontractors, Inc. ("Mid-South") for property damage and other consequential damages not related to Mrs. Piggott's injuries it contends it sustained as a result of the office roof collapse. (Id.).

Hwashin seeks to recover Hwashin's "damages to its manufacturing facility, business property and other contents, an interruption of its business and other related damages." (Id.). Hwashin attempts to interject into this case for the first time property damage claims which have absolutely nothing to do with Mr. and Mrs. Piggott's alleged injuries. (Id.).

## II.    ARGUMENT.

### A.    Hwashin, Itself, Is Not the Plaintiff in Intervention and Has No Standing to Add Property Damage Claims.

Ala. Code § 25-5-11(a) provides, in pertinent part, that:

To the extent of the recovery of damages against the other party, the employer shall be entitled to reimbursement for the amount of compensation theretofore paid on account of injury or death.

* * * * *

For purposes of this amendatory act, the employer shall be entitled to subrogation for medical and vocational benefits expended by the employer on behalf of the employee. . . . .

The Alabama Supreme Court has interpreted § 25-5-11(a) to mean:

The employer or insurance carrier is entitled to be reimbursed, out of any judgment recovered by the employee or his representative in a suit against a third party wrongdoer, all payments made by the employer or the insurance carrier which are included within the meaning of the word 'compensation' as used in § 312, Title 26 [predecessor to § 25-5-11], as amended, irrespective of the type of damages claimed in the complaint in the suit against the third party wrongdoer.

See Millers Mut. Ins. Ass'n v. Young 601 So.2d 962 (Ala. 1992).

The original Complaint in Intervention clearly indicates the claim is being brought "by and through the Alabama Self-Insured Worker's Compensation Fund". The Fund is the true party Plaintiff. The party designation alone indicates that the real party in interest is the Fund.

Even overlooking Hwashin's own description of the true party in interest, it is clear from the pleadings the real party in interest is the Fund. The Alabama Supreme Court has held that §25-5-11 allows for the recovery of "payments made by the employer or the insurance carrier". See Millers Ins. Ass'n at 963. See also Foster & Creighton Co. v. St. Paul Mercury Indem. Co. 88 So.2d 825 (Ala. 1956) (insurance carrier has right to seek compensation paid to the injured employee.).

Hwashin never paid Mrs. Piggott any workers compensation benefits. (See Hwashin's First Amended Complaint in Intervention at Paragraph 76.). Mrs. Piggott's worker's compensation payments were made by the Fund. (Id.). Hwashin has no statutory right to recover the worker's compensation subrogation interest, only the Fund does since it paid. (Id.).

**B.     The Fund Has No Standing to Assert Hwashin's Property Damage Claims.**

The Fund lacks standing to assert claims for Hwashin's alleged property damage. The Fund is not alleged to have incurred and has not incurred any of the property damage Hwashin seeks to recover in its First Amended Complaint in Intervention. The Fund's only claim is to recover its worker's compensation subrogation interest. The Fund has no property damage claims alleged in the First Amended Complaint in Intervention against Gray.

**C.    Neither Hwashin Nor the Fund Should Be Allowed to Permissively Intervene to Interject Property Damage Claims.**

The Fund intervened as a matter of right to protect its worker's compensation subrogation interest. (See Hwashin's Motion to Intervene.). Hwashin now seeks to permissively intervene and assert unrelated claims for Hwashin's property damage.

Federal Rules of Civil Procedure, Rule 24(b) provides:

> Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.  When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

**1.    There Are No Questions of Law Common to Both Mr. and Mrs. Piggott's Claims or Hwashin's Claims.**

Gray concedes there is a common issue of fact as to why the roof collapsed; however, that is where the similarities between Mr. and Mrs. Piggott's personal injury claims and Hwashin's property damage claims ends.

None of the claims asserted by Mr. and Mrs. Piggott and Hwashin overlap.  The only claims Hwashin and Mr. and Mrs. Piggott have in common are negligence and wantonness. However, Gray's duty to each differs.  Gray owed Mr. and Mrs. Piggott a common law duty. Gray's duties to Hwashin arise from the parties Contract. Thus, the issue of duty is different as to both.

Hwashin makes claims which Mr. and Mrs. Piggott do not.  Hwashin alleges Gray is liable for breaching the implied warranty of suitability and implied warranty of workmanship.

Mr. and Mrs. Piggott do not allege Gray violated any implied warranty. Hwashin makes contract claims. Mr. and Mrs. Piggott do not.

Hwashin's claims are severely limited, if not waived in total, in Paragraph 5.2.3 of the Contract between Hwashin and Gray:

> The making of final payment shall constitute a waiver of claims by the Owner except those arising from: 1) liens, claims, security interests or encumbrances arising out of the Contract and unsettled; 2) failure of the Work to comply with the requirements of the Contract Documents; or 3) terms of special or general warranties required by the Contract Documents. 4) latent defects; 5) Design/Builder's indemnity and insurance obligations as set forth in this Agreement. . . .

> Paragraph 7.3.8 states:

> The Owner and the Design/Builder waive all rights against each other and the Architect and other design professionals, contractors, subcontractors, agents and employees, each of the other, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 7-3 or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the Owner and Design/Builder as trustee. The Owner or Design/Builder, as appropriate, shall require from contractors and subcontractors by appropriate agreements, written where legal required for validity, similar waivers each in favor of other parties enumerated in this Paragraph 7-3. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

> Hwashin has also waived its right to consequential damages. Paragraph 11.9 states:

> Except for (i) Owner's claims for liquidated damages as expressly specified in this Agreement and except (ii) to the extent Owner's claims are covered by insurance provided by Design/Builder under this Agreement, the Design/Builder and Owner waive any and all claims against each other for consequential damages arising out of or relating to this Contract. Subject to the above-cited exceptions, this mutual waiver includes: (1) Damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity

or of the services of such person; and (2) damages incurred by the Design/Builder for principal or home office expenses including the compensation of personnel stationed there, for losses of financing, income, business and reputation, for loss of management or employee productivity or of the services of such persons, and for loss of profit except anticipated profit arising directly from the Work. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination of this Agreement.

Interpretation of these and the other provisions of the Contract are unique to Hwashin's claims. To interject Hwashin's claims will present contractual issues which are not necessary to adjudicate Mr. and Mrs. Piggott's claims.

The law of damages for Hwashin's claims and Mr. and Mrs. Piggott's claims are completely different. Mr. and Mrs. Piggott allege personal injury claims, while Hwashin seeks property damage. The law concerning the two types of damages focuses on different issues that do not overlap. Mr. and Mrs. Piggott's damages will focus on Mrs. Piggott's actual physical injury, pain and suffering, emotional distress and mental anguish, lost income, lost ability to earn future income, the expenses associated with the injury and Mr. Piggott's loss of marital services. Hwashin's damages will focus on the costs of repairs, loss of property in the Hwashin facility and the unrecoverable consequential damages it alleges in its Amended Complaint.

Courts have repeatedly denied requests for permissive intervention where allowing the intervention will require the interjection of additional issues. See Utah v. U.S., 394 U.S. 89, 96, (1969)(it was not an abuse of discretion to prevent intervention where doing so would "introduce new issues which had not been raised."); ManaSota-88, Inc. v. Tidwell, 896 F.2d 1318 (11th Cir. 1990)(the interjection of issues not raised by the plaintiff in the underlying action would result in protracted litigation and denial of permissive intervention was not an abuse of discretion.); U.S. v. South Florida Water Management Dist., 922 F.2d 704 (11th Cir. 1991)(where permissive

intervention would result in the addition of witnesses and interjection of collateral issues, denial of motion for permissive intervention was not an abuse of discretion.); Shea v. Angulo, 19 F.3d 343 (7th Cir. 1994)(denial of motion for permissive intervention was not an abuse of discretion, "as allowing the intervention would insert into the action a complex factual question completely unrelated to the quarrel between the original parties and delay the adjudication of the rights of the original parties"); SEC v. Everest Management Corp. 475 F.2d 1236, 1240 (2nd Cir. 1972)(individual investors were not allowed to intervene into an SEC enforcement proceeding, as additional issues that would be raised outweighed the benefit of adjudicating the matter in a single action); Federal Trade Comm'n v. First Capital Consumer Membership Servs., Inc., 206 F.R.D. 358 (D.C.N.Y. 2001)(it was not an abuse of discretion to deny permissive intervention where grant of motion would result in introduction of collateral issues and cause undue delay).

This case is similar to Marvel Entertainment Group, Inc. v. Hawaiian Triathlon Corp., 132 F.R.D. 143 (S.D.N.Y.1990). Marvel, owners of the copyrighted Iron Man comic book merchandise and trademark, sued Hawaiian Triathlon, the sponsor of the Iron Man Triathlon, for alleged breach of an agreement concerning Hawaiian Triathlon's use of the Iron Man name. Timex Corporation sought leave to intervene to assert claims of unfair competition and intentional interference against Marvel and claims of breach of contract and fraud against Hawaiian Triathlon arising out of a tri-party licensing agreement which named Timex the official timekeeper of the race and allowed Timex to market a line of watches using the Iron Man name. The Court denied Timex's Motion for permissive intervention. While the Court recognized "some overlap in the factual and legal issues", the Court determined that the interjection of unrelated issues would cause undue delay and ultimately prejudice the original parties by protracting the litigation.

2.    **Hwashin's Claims Will Cause Undue Delay and Prejudice to the Original Parties.**

Even if a Court determines that a common question of law or fact exists, it has the discretion to deny a motion for permissive intervention, if the intervention will result in undue delay or prejudice.  Id. See also Sunbelt Veterinary Supply, Inc. v. International Business Systems United States, Inc., 200 F.R.D. 463 (M.D.Ala. 2001).   In considering a motion for permissive intervention, the Court must consider its potential to delay progress of case and the effect of intervention on existing parties.  see Dillard v. City of Foley, 926 F.Supp. 1053 (M.D.Ala. 1995).

The introduction of Hwashin's claims will interject numerous witnesses and substantial documents not related at all to Mr. and Mrs. Piggott's claims.  Hwashin alleges it has incurred "damages to its manufacturing facility, business property and other contents, an interruption of its business and other related damages."  Proving each of these areas of damage will result in substantial delays in the discovery process and trial of Mr. and Mrs. Piggott's claims.

Hwashin alleges it has incurred damage to its manufacturing facility.  This claim will require testimony and documents concerning the costs to clean up the debris after the roof collapse and the reasonableness of these costs, the costs to rebuild the office and the reasonableness of these costs, the effect of the waiver provisions found in the Contract, the value of the Hwashin facility both prior to and after the roof collapse and whether Hwashin properly mitigated its damages.

Hwashin also alleges it has incurred damage to it business property and contents of the office.  This claim will require testimony and documents concerning the exact business property and contents damaged, the extent of the damage, the repair or replacement costs of the property

and the reasonableness of those costs, the value of the property prior to and after the roof collapse, whether the property could be salvaged or was a total loss, whether Hwashin properly mitigated its damages, whether any defects in the property existed prior to the roof collapse and the effect of the waiver provisions found in the Contract on Hwashin's claim.

Hwashin alleges it has suffered damage as a result of the interruption of its business. This area of damage will require testimony and documents concerning the length of the alleged interruption, whether the interruption resulted in lost sales, whether Hwashin was forced to pay its employees during the interruption, the profitability of Hwashin prior to and after the collapse, whether Hwashin properly mitigated its damages and the effect of the waiver provisions found in the Contract.

The case will be further delayed by the additional legal issues raised. Interpretation issues regarding the Contract provisions regarding indemnity and waiver alone are substantial

Hwashin's dual role as both Mrs. Piggott's employer seeking to recover its worker's compensation subrogation interest and its role as the property owner seeking to recover its property damage and lost profits will confuse the jury. As to the worker's compensation subrogation claim, Hwashin stands in the shoes of Mrs. Piggott. Gray can only assert defenses it has against Mrs. Piggott. Gray has no known contributory negligence against Mrs. Piggott.

On the other hand, Hwashin, as the property owner, does not stand in the shoes of Mrs. Piggott and Gray has an excellent contributory negligence defense to Hwashin's property damage claims. The prospect of the jury not applying contributory negligence to Hwashin's subrogation claim, but to Hwashin's property damage claim, will be confusing.

There is also the certainty of additional intervenors as to Hwashin's property damage claims. Hwashin seeks to recover for damage to the Hwashin facility and to its business property.

A large portion of these alleged damages have been paid by Hwashin's insurance carrier. Allowing Hwashin to assert property damages claims as a Plaintiff in Intervention will result in Hwashin's insurance carrier filing its own Motion to Intervene to protect its subrogation interest. There will clearly be one more Plaintiff in this case, and probably others, if this Court allows Hwashin's property damage claims in this case.

If Hwashin is allowed to assert its claims in this case, Gray will be prejudiced by the interjection of the existence of insurance into the personal injury portion of this case. Federal Rules of Civil Procedure, Rule 411 states:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

Federal courts have unequivocally held that the existence of insurance coverage cannot be raised before the jury in personal injury action. See Joynor v. Berman Leasing Co., 398 F.2d 875 (5th Cir. 1968).

The Contract paragraphs 7.3.8 and 11.9 both limit Hwashin's and Gray's right to recover damages against each other to the extent their claims are covered by insurance. By allowing Hwashin to assert claims for property damage, Gray will be forced to raise these contractual defenses and thereby interject the existence of insurance into this action. Gray will be unfairly prejudiced by the mention of insurance at the trial of Mr. and Mrs. Piggott's personal injury case. Mr. and Mrs. Piggott will also be prejudiced by having to endure the substantial delay in these proceedings while discovery proceeds on Hwashin's property damage claims.

**D.    Hwashin Should Either File a New Action or a Counterclaim in the Related Litigation.**

While the question of whether a party seeking to intervene has other means of protecting its rights is not controlling, Courts have held that it may be considered.  See Korioth v. Briscoe, 523 F.2d 1271. (5th Cir. 1975)(held that when appellant had other adequate means of asserting its rights, a charge of abuse of discretion in the denial of a motion for permissive intervention would appear to be almost untenable on its face.); In re Bank of New York Derivative Litigation, 320 F.3d 291 (2nd Cir. 2003); Head v. Jellico Housing Authority, 870 F.2d 1117 (6th Cir.  1989).

Hwashin has adequate means of protecting its interests outside of its alleged Amended Complaint.  Hwashin is free to file its own Complaint claiming property damage and lost profits. Hwashin would not be prejudiced.  The statute of limitations is far from expired.  This would free this action from the undue delay, unfair prejudice and confusion Hwashin's claims will certainly cause.

Second, there is an existing case in this Court to which Hwashin is already a party on June 26, 2007.  Gray filed suit against Hwashin in CV-07-584 pending in this Court. Gray has sued Hwashin for Hwashin's failure to pay Gray for repairs to the facility, the exact same property damage Hwashin is trying to assert in this action.  Hwashin could easily, and more appropriately, file a counterclaim in that action.

Hwashin will not be prejudiced by pursuing its recovery as a counterclaim, rather than a claim in intervention in this one.  In fact, it is expected that Hwashin will argue that it is entitled to a set off for the payments owed to Gray due to Gray's negligence and breach of contract in the action Gray has filed. If so, the exact same legal and factual issues Hwashin attempts to assert in this action will be litigated in the other case.

## III.    CONCLUSION.

Hwashin is not a true party Plaintiff and lacks standing. The Fund is not the proper party to assert Hwashin's property damage claim and lacks standing. Even if Hwashin or the Fund had standing, they should not be allowed to permissively intervene to interject property damage claims into this case which will only unduly delay this litigation and prejudice the original parties. Rather, Hwashin should file a new case or assert its property damage claim as a counterclaim in Case No. CV-07-584.

**WHEREFORE,** Gray respectfully requests this Court deny Hwashin's Motion for Leave to Amend it Complaint in Intervention.

Done this ___13___ day of July, 2007.

By: _____
E. Britton Monroe (MON032)
Mickey B. Wright (WRI048)
Brian M. McClendon (MCC133)
Attorneys for Defendant/ Third Party Plaintiff Gray Construction, Inc.

**OF COUNSEL:**
LLOYD, GRAY & WHITEHEAD, P.C.
2501 20th Place South, Suite 300
Birmingham, Alabama 35223
Telephone: (205) 967-8822
Facsimile: (205) 967-2380

## CERTIFICATE OF SERVICE

I hereby certify that on the _13th_ day of July, a true and correct copy of the foregoing has been furnished by U.S. Mail, postage prepaid, and electronically upon the following parties:

Jere L. Beasley, Esq.
Julia Ann Beasley, Esq.
Beasley, Allen, Crow, Methvin,
    Portis & Miles, P.C.
P.O. Box 4160
Montgomery, AL 36103-4160
***Counsel for Plaintiffs Jennifer and Slade Piggott***

Thomas T. Gallion, III, Esq.
Constance C. Walker, Esq.
Felicia A. Long, Esq.
Haskell, Slaughter, Young & Gallion, LLC
P.O. Box 4660
Montgomery, AL 36103-4660
***Counsel for Latta Plumbing & Construction Co., Inc.***

James A. Rives, Esq.
William Christopher Waller, Jr., Esq.
Ball, Ball, Matthews & Novak, P.A.
P.O. Box 2148
Montgomery, AL 36102-2148
***Counsel for Hwashin America Corp.***

John S. Somerset, Esq.
Sudderth & Somerset
5385 First Avenue North
Birmingham, AL 35212
***Counsel for All-South Subcontractors, Inc.***

Linda H. Ambrose, Esq.
Rogers & Associates
3000 Riverchase Galleria, Ste. 650
Birmingham, AL 35244
***Counsel for Hwashin America Corp.***

A. Joe Peddy, Esq.
Robert B. Stewart, Esq.
Smith, Spires & Peddy
2015 2nd Avenue North, Ste. 200
Birmingham, AL 35203
***Counsel for Cooper's Steel Fabricators, Inc.***

J. Lister Hubbard, Esq.
Richard H. Allen, Esq.
Arden Reed Pathak, Esq.
Capell & Howard, P.C.
P.O. Box 2069
Montgomery, AL 36102-2069
***Counsel for Hwashin America Corp.***

Charles Keith Hamilton, Esq.
Bainbridge, Mims, Rogers & Smith
P.O. Box 530886
Birmingham, AL 35253-0886
***Counsel for Freeland-Harris Consulting Engineers of Kentucky, Inc.***

Hope T. Cannon, Esq.
Brittin T. Coleman, Esq.
Kenneth M. Perry, Esq.
Bradley, Arant, Rose & White, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
***Counsel for Firestone Building Products Company, LLC***

John M. Laney, Jr., Esq.
John C. DeShazo, Esq.
Laney & Foster, P.C.
P.O. Box 43798
Birmingham, AL 35243-0798
***Counsel for Freeland-Harris Consulting Engineers of Georgia, Inc.***

Larry William Harper, Esq.
Porterfield, Harper, Mills & Motlow, PA
P.O. Box 530790
Birmingham, AL  35253-0790
***Counsel for The Hardy Corporation***

OF COUNSEL

# Owner and Design/Builder

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS USE, COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

This document comprises two separate Agreements: Part 1 Agreement and Part 2 Agreement. To the extent referenced in these Agreements, subordinate parallel agreements to A191 consist of AIA Document A491, Standard Form of Agreements Between Design/Builder and Contractor, and AIA Document B901, Standard Form of Agreements Between Design/Builder and Architect.

Copyright 1985, ©1996 The American Institute of Architects, 1735 New York Avenue, NW, Washington, DC 20006-5292. Reproduction of the material herein or substantial quotation of its provisions without the written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.

## PART 2 AGREEMENT

## 1996 EDITION

### AGREEMENT

made as of the 24 day of September in the year of 2003
*(In words, indicate day, month and year.)*

BETWEEN the Owner:
*(Name and address)*
Hwashin America Corporation
P.O. Box 1139
Greenville, AL 36037

and the Design/Builder:
*(Name and address)*
James N. Gray Company
10 Quality Street
Lexington, KY 40507-1450

For the following Project:
*(Include Project name, location and a summary description.)*
To design and build an approximately 273,000 sq. ft. manufacturing facility on an undeveloped property located in Greenville, Alabama.

The architectural services described in Article 3 will be provided by the following person or entity who is lawfully licensed to practice architecture:
*(Name and address)*

| | *(Registration Number)* | *(Relationship to Design/Builder)* |
|---|---|---|
| GNF Architects and Engineers, P.S.C.<br>10 Quality Street<br>Lexington, Kentucky 40507 | Dennis Bopp (Alabama 5077) | Architect of Record |

Normal structural, mechanical and electrical engineering services will be provided contractually through the Architect except as indicated below:
*(Name, address and discipline)*

| | *(Registration Number)* | *(Relationship to Design/Builder)* |
|---|---|---|
| Freeland Harris Structural Engineers<br>108 Esplanade, Suite 210<br>Lexington, Kentucky 40507 | Freeland Harris, P.E. (Alabama 19702) | Structural Engineering Consultant |

The Owner and the Design/Builder agree as set forth below.

---

## TERMS AND CONDITIONS – PART 2 AGREEMENT

---

| ARTICLE 1<br>GENERAL PROVISIONS | 1.1 | **BASIC DEFINITIONS** |
|---|---|---|
| | 1.1.1 | The Contract Documents consist of the Part 2 |

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia — 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
8

A000007001

A000007001

EXHIBIT A

Agreement to the extent not modified by this Part 2 Agreement, this Part 2 Agreement, the Design/Builder's Proposal and written addenda to the Proposal _as well as other documents_ identified in Article 14, the Construction Documents approved by the Owner in accordance with Subparagraph 3.2.3 and Modifications issued after execution of this Part 2 Agreement. A Modification is a Change Order or a written amendment to this Part 2 Agreement signed by both parties, or a Construction Change Directive issued by the Owner in accordance with Paragraph 8.3.

1.1.2    The term "Work" means the construction and services provided by the Design/Builder to fulfill the Design/Builder's obligations.

**1.2    EXECUTION, CORRELATION AND INTENT**

1.2.1    It is the intent of the Owner and Design/Builder that the Contract Documents include all items necessary for proper execution and completion of the Work.  The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Design/Builder shall be required only to the extent consistent with and reasonably inferable from the Contract Documents as being necessary to produce the intended results. Words that have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

1.2.2    If the Design/Builder believes or is advised by the Architect or by another design professional retained to provide services on the Project that implementation of any instruction received from the Owner would cause a violation of any applicable law, the Design/Builder shall notify the Owner in writing.  Neither the Design/Builder nor the Architect shall be obligated to perform any act which either believes will violate any applicable law.

1.2.3    Nothing contained in this Part 2 Agreement shall create a contractual relationship between the Owner and any person or entity other than the Design/Builder.

**1.3    OWNERSHIP AND USE OF DOCUMENTS**

1.3.1    Drawings, specifications, and other documents and electronic data furnished by the Design/Builder are instruments of service. The Design/Builder's Architect and other providers of professional services shall retain all common law, statutory and other reserved rights, including copyright in those instruments of service furnished by them. Drawings, specifications, and other documents and electronic data are furnished for use solely with respect to this Part 2 Agreement. The Owner shall be permitted to retain copies, including reproducible copies, of the drawings, specifications, and other documents and electronic data furnished by the Design/Builder for information and reference in connection with the Project except as provided in Subparagraphs 1.3.2 and 1.3.3.

1.3.2    Drawings, specifications, and other documents and electronic data furnished by the Design/Builder shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, except

by agreement in writing and with appropriate compensation to the Design/Builder, unless the Design/Builder is adjudged to be in default under this Part 2 Agreement or under any other subsequently executed agreement.

1.3.3    If the Design/Builder defaults in the Design/Builder's obligations to the Owner, the Architect shall grant a license to the Owner to use the drawings, specifications, and other documents and electronic data furnished by the Architect to the Design/Builder for the completion of the Project, conditioned upon the Owner's execution of an agreement to cure the Design/Builder's default in payment to the Architect for services previously performed and to indemnify the Architect _and Design/Builder_ with regard to claims arising from such reuse without the _Design/Builder's or_ Architect's professional involvement _to the extent such claims are not caused by the negligence of Design/Builder or Architect._

1.3.4    Submission or distribution of the Design/Builder's documents to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the rights reserved in Subparagraph 1.3.1.

**ARTICLE 2
OWNER**

**2.1**    The Owner shall designate a representative authorized to act on the Owner's behalf with respect to the Project. The Owner or such authorized representative shall examine documents submitted by the Design/Builder and shall render decisions in a timely manner and in accordance with the schedule accepted by the Owner.  The Owner may obtain independent review of the Contract Documents _and shop drawings_ by a separate architect, engineer, contractor or cost estimator under contract to or employed by the Owner. Such independent review shall be undertaken at the Owner's expense in a timely manner and shall not delay the orderly progress of the Work.

**2.2**    The Owner may appoint an on-site project representative to observe the Work and to have such other responsibilities as the Owner and Design/Builder agree in writing.

**2.3**    The Owner shall cooperate with the Design/Builder in securing building and other permits, licenses and inspections. The Owner shall not be required to pay the fees for such permits, licenses and inspections unless the cost of such fees is excluded from the Design/Builder's Proposal.

**2.4**    _Except where the City of Greenville has otherwise agreed to furnish._ ~~The~~ Owner shall furnish services of land surveyors, geotechnical engineers and other consultants for subsoil, air and water conditions, in addition to those provided under the Part 1 Agreement, when such services are deemed necessary by the Design/Builder to properly carry out the design services required by this Part 2 Agreement. _In the event the City of Greenville fails to furnish any item to_

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
9

A000007002                                          A000007002

Design/Builders that it has agreed to furnish, then Owner, upon written request from Design/Builder, shall promptly furnish such item.

**2.5**   The Owner shall disclose, to the extent known to the Owner, the results and reports of prior tests, inspections or investigations conducted for the Project involving: structural or mechanical systems; chemical, air and water pollution; hazardous materials; or other environmental and subsurface conditions. The Owner shall disclose all information known to the Owner regarding the presence of pollutants at the Project's site.

**2.6**   The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including such auditing services as the Owner may require to verify the Design/Builder's Applications for Payment.

**2.7**   Those services, information, surveys and reports required by Paragraphs 2.4 which are within the Owner's control provided by the Owner or the City of Greenville shall be furnished at the Owner's or City's expense, and the Design/Builder shall be entitled to rely upon, and the Owner accepts full responsibility and liability for, the accuracy and completeness thereof, except to the extent the Owner advises the Design/Builder to the contrary in writing.

**2.8**   If the Owner requires the Design/Builder to maintain any special insurance coverage, policy, amendment, or rider, the Owner shall pay the additional cost thereof, except as otherwise stipulated in this Part 2 Agreement.

**2.9**   If the Owner observes or otherwise becomes aware of a fault or defect in the Work or nonconformity with the Design/Builder's Proposal or the Construction Documents, the Owner shall give prompt written notice thereof to the Design/Builder.

**2.10**   The Owner shall, at the request of the Design/Builder, prior to execution of this Part 2 Agreement and promptly upon request thereafter, furnish to the Design/Builder reasonable evidence and documentation acceptable to Design/Builder of Owner's ability to pay for the Work that financial arrangements have been made to fulfill the Owner's obligations under the Contract. Owner shall not thereafter materially alter such financial arrangements without written notice to, and consent in writing from, Design/Builder. Furnishing such evidence and documentation of financial arrangements shall be a condition precedent to Design/Builder's commencement or continuation of the Work.

**2.11**   The Owner shall communicate with persons or entities employed or retained by the Design/Builder through the Design/Builder, unless otherwise directed by the Design/Builder.

## ARTICLE 3
## DESIGN/BUILDER

**3.1   SERVICES AND RESPONSIBILITIES**

**3.1.1**   Design services required by this Part 2 Agreement shall be performed by qualified architects and other design professionals. The contractual obligations of such professional persons or entities are undertaken and performed in the interest of the Design/Builder. The standard of care for all design services performed to execute the Work shall be the care and skill ordinarily used by members of the design profession practicing under similar conditions at the same time and locality of the Project. Notwithstanding the preceding sentence, if the parties agree upon specific performance standards for any aspect of the Work, which standards are to be set forth in an exhibit to the Agreement entitled "Performance Standard Requirements," the design services shall be performed to achieve such standards.

**3.1.2**   The agreements between the Design/Builder and the persons or entities identified in this Part 2 Agreement, and any subsequent modifications, shall be in writing.   These agreements, including financial arrangements with respect to this Project, shall be promptly and fully disclosed to the Owner upon request.

**3.1.3**   The Design/Builder shall be responsible to the Owner for the quality of the design services and for the quality of the construction performed by acts and omissions of the Design/Builder's employees, subcontractors and their agents and employees and other persons, including the Architect and other design professionals, performing any portion of the Design/Builder's obligations under this Part 2 Agreement.

**3.2   BASIC SERVICES**

**3.2.1**   The Design/Builder's Basic Services are described below and in Article 14.

**3.2.2**   The Design/Builder shall designate a representative authorized to act on the Design/Builder's behalf with respect to the Project.

**3.2.3**   The Design/Builder shall submit Construction Documents for review and approval by the Owner. Construction Documents may include drawings, specifications, and other documents and electronic data setting forth in detail the requirements for construction of the Work, and shall:

.1   be consistent with the intent of the ~~May 21, 2003, Bid Package and the~~ CONTRACT DOCUMENTS Design/Builder's Proposal;

.2   provide information for the use of those in the building trades; and

.3   include documents customarily required for regulatory agency approvals.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1012416, which expires on 10/31/2003.

Electronic Format A191-1996
10

A000007003

3.2.4    The Design/Builder, with the assistance of the Owner, shall file documents required to obtain necessary approvals of governmental authorities having jurisdiction over the Project.

3.2.5    Unless otherwise provided in the Contract Documents, the Design/Builder shall provide or cause to be provided and shall pay for design services, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

3.2.6    Design/Builder agrees to defend, indemnify (including payment of attorney's fees) and to hold Owner harmless from any and all liens, claims of lien, security interests or other encumbrances against Owner's property in favor of the Design/Builder, contractors, materials suppliers, consultants or other persons or entities making a claim by reason of having provided labor, services, materials and equipment relating to the Work. Design/Builder further agrees to bond off, at its cost, any such liens or encumbrances pursuant to Alabama law, if requested by Owner. Notwithstanding the foregoing, Design/Builder shall be obligated to defend, indemnify and hold Owner harmless from liens, claims of lien, security interests and other encumbrances and to bond off such liens or encumbrances only to the extent such lien, claim of lien, security interest or encumbrance is not the result of Owner's non-payment of funds justly due under this Agreement.

3.2.67    The Design/Builder shall be responsible for all construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under this Part 2 Agreement.

3.2.78    The Design/Builder shall keep the Owner informed of the progress and quality of the Work.

3.2.89    The Design/Builder shall be responsible for correcting Work which does not conform to the Contract Documents as provided in Article 9 of this Agreement.

3.2.910    The Design/Builder warrants to the Owner that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the construction will be free from faults and defects, and that the construction will conform with the requirements of the Contract Documents. Construction not conforming to these requirements, including substitutions not properly approved by the Owner, shall be corrected in accordance with Article 9. Notwithstanding any other provision of the Contract Documents, it is agreed that Design/Builder does not expressly or implied warrant the adequacy, sufficiency or suitability of any design

provided or specified by the Owner or specified sole source or brand-named products, equipment, or materials and Owner accepts the manufacturer's warranty as its sole recourse with regard to such items.

3.2.101   The Design/Builder shall pay all sales, consumer, use and similar taxes which had been legally enacted at the time the Design/Builder's Proposal was first submitted to the Owner, and shall secure and pay for building and other permits and governmental fees, licenses and inspections necessary for the proper execution and completion of the Work which are either customarily secured after execution of a contract for construction or are legally required at the time the Design/Builder's Proposal was first submitted to the Owner.

3.2.112   The Design/Builder shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities relating to the Project.

3.2.123   The Design/Builder shall pay royalties and license fees for patented designs, processes or products. The Design/Builder shall defend suits or claims for infringement of patent rights and shall hold the Owner harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer is required by the Owner. However, if the Design/Builder has reason to believe the use of a required design, process or product is an infringement of a patent, the Design/Builder shall be responsible for such loss unless such information is promptly furnished to the Owner.

3.2.134   The Design/Builder shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under this Part 2 Agreement. At the completion of the Work, the Design/Builder shall remove from the site waste materials, rubbish, the Design/Builder's tools, construction equipment, machinery, and surplus materials.

3.2.145   The Design/Builder shall notify the Owner when the Design/Builder believes that the Work or an agreed upon portion thereof is substantially completed. If the Owner concurs, the Design/Builder Owner shall issue a Certificate of Substantial Completion which shall establish the Date of Substantial Completion, shall state the responsibility of each party for security, maintenance, heat, utilities, damage to the Work and insurance, shall include a list of items to be completed or corrected and shall fix the time within which the Design/Builder shall complete items listed therein. Disputes between the Owner and Design/Builder regarding the Certificate of Substantial Completion shall be resolved in accordance with provisions of Article 10.

3.2.15-6   The Design/Builder shall maintain at the site for the Owner one record copy of the drawings, specifications, product data, samples, shop drawings, Change Orders and other modifications, in good order and regularly updated to record the completed construction. These shall be delivered to the Owner upon completion of construction and prior to final payment.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
11

A000007004                                        A000007004

### 3.3    ADDITIONAL SERVICES

**3.3.1** The services described in this Paragraph 3.3 are not included in Basic Services unless so identified in Article 14, and they shall be paid for by the Owner as provided in this Part 2 Agreement, in addition to the compensation for Basic Services. The services described in this Paragraph 3.3 shall be provided only if authorized or confirmed in writing by the Owner.

**3.3.2** Making revisions in drawings, specifications, and other documents or electronic data when such revisions are required by the enactment or revision of codes, laws or regulations subsequent to the preparation of such documents or electronic data.

**3.3.3** Providing consultation concerning replacement of Work damaged by fire or other cause during construction, and furnishing services required in connection with the replacement of such Work.

**3.3.4** Providing services in connection with a public hearing, arbitration proceeding or legal proceeding, except where the Design/Builder is a party thereto.

**3.3.5** Providing coordination of construction performed by the Owner's own forces or separate contractors employed by the Owner, and coordination of services required in connection with construction performed and equipment supplied by the Owner.

~~**3.3.6** Preparing a set of reproducible record documents or electronic data showing significant changes in the Work made during construction.~~

**3.3.7** Providing assistance in the utilization of equipment or systems such as preparation of operation and maintenance manuals, training personnel for operation and maintenance, and consultation during operation.

### ARTICLE 4
### TIME

**4.1** Unless otherwise indicated, the Owner and the Design/Builder shall perform their respective obligations as expeditiously as is consistent with reasonable skill and care and the orderly progress of the Project.

**4.2** Time limits stated in the Contract Documents are of the essence. The Work to be performed under this Part 2 Agreement shall commence upon receipt of a notice to proceed unless otherwise agreed and, subject to authorized Modifications, Substantial Completion shall be achieved on or before the date established in Article 14.

**4.3** Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the Owner can occupy or utilize the Work for its intended use.

**4.4** Based on the Design/Builder's Proposal, a construction schedule shall be provided consistent with Paragraph 4.2 above and for Owner's approval.

**4.5** If the Design/Builder is delayed at any time in the progress of the Work by an act or neglect of the Owner, Owner's employees, or separate contractors employed by the Owner or by the City of Greenville, or by changes ordered in the Work, or by ~~labor disputes,~~ fire, ~~unusual delay in deliveries,~~ adverse weather conditions not reasonably anticipatable, unavoidable casualties or other causes beyond the Design/Builder's control, or by delay authorized by the Owner pending arbitration, or by other causes which the Owner and Design/Builder agree may justify delay, then the Contract Time shall be reasonably extended by Change Order.

### ARTICLE 5
### PAYMENTS

### 5.1    PROGRESS PAYMENTS

**5.1.1** The Design/Builder shall deliver to the Owner itemized Applications for Payment in such detail as indicated in Article 14.

**5.1.2** Within ten ~~(10)~~ twenty (20) days of the Owner's receipt of a properly submitted and correct Application for Payment, the Owner shall make payment to the Design/Builder.

**5.1.3** The Application for Payment shall constitute a representation by the Design/Builder to the Owner that the design and construction have progressed to the point indicated, the quality of the Work covered by the application is in accordance with the Contract Documents, and the Design/Builder is entitled to payment in the amount requested.

**5.1.4** Upon receipt of payment from the Owner, the Design/Builder shall promptly pay the Architect, other design professionals and each contractor the amount to which each is entitled in accordance with the terms of their respective contracts.

**5.1.5** The Owner shall have no obligation under this Part 2 Agreement to pay or to be responsible in any way for payment to the Architect, another design professional or a contractor performing portions of the Work.

**5.1.6** Neither progress payment nor partial or entire use or occupancy of the Project by the Owner shall constitute an acceptance of Work not in accordance with the Contract Documents.

**5.1.7** The Design/Builder warrants that title to all construction covered by an Application for Payment will pass to the Owner no later than the time of payment. The Design/Builder further warrants that upon submittal of an Application for Payment all construction for which payments have been received from the Owner shall be free and clear of liens, claims, security interests or encumbrances in favor of the

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

A000007005          A000007005

Design/Builder or any other person or entity performing construction at the site or furnishing design services materials or equipment relating to the construction.

**5.1.8** At the time of Substantial Completion, the Owner shall pay the Design/Builder the retainage, if any, less the reasonable cost to correct or complete incorrect or incomplete Work and any offsets or credits to which Owner is entitled under the terms of this Agreement. Final payment of such withheld sum shall be made upon correction or completion of such Work.

**5.1.9** Contemporaneously with the execution of this Agreement, Owner shall make an initial, up-front payment to Design/Builder in the amount of Six Hundred Twenty-Five Thousand and No/100 U.S. Dollars ($625,000.00).

**5.1.10** Notwithstanding any other provisions of the Contract Documents to the contrary, if the Owner does not pay the Design/Builder for any partial billing within the twenty (20) day period following receipt by the Owner of a properly submitted and correct application for payment from the Design/Builder, then, after providing Owner with seven (7) days written notice of such nonpayment, the Design/Builder shall have the absolute unconditional right to stop the work until payment has been received. The Contract Sum and Contract Time shall be increased by the amount of the Design/Builder's cost and time of shutdown, delay and startup and such changes shall be effected by appropriate change order before Design/Builder shall be obligated to return to work. Design-Builder shall not have or incur any liability to Owner or any other person as a result of exercising its rights hereunder.

**5.2    FINAL PAYMENT**

**5.2.1** Neither final payment nor amounts retained, if any, shall become due until the Design/Builder submits to the Owner: (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or Owner's property might be responsible or encumbered (less amounts withheld by the Owner) have been paid or otherwise satisfied; (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner; (3) a written statement that the Design/Builder knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents; (4) consent of surety, if any, to final payment; and (5) if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a contractor or other person or entity entitled to assert a lien against the Owner's property refuses to furnish a release or waiver required by the Owner, the Design/ Builder may furnish

a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Design/Builder shall indemnify the Owner for all loss and cost, including reasonable attorneys' fees incurred as a result of such lien.

**5.2.2** When the Work has been completed and the contract fully performed, the Design/Builder shall submit a final application for payment to the Owner, who shall make final payment within 30 days of receipt in accordance with subparagraphs 13.1.54 through 13.1.56.

**5.2.3** The making of final payment shall constitute a waiver of claims by the Owner except those arising from:

.1 liens, claims, security interests or encumbrances arising out of the Contract and unsettled;

.2 failure of the Work to comply with the requirements of the Contract Documents; or

.3 terms of special or general warranties required by the Contract Documents.

.4 latent defects;

.5 Design/Builder's indemnity and insurance obligations as set forth in this Agreement; or

**5.2.4** Acceptance of final payment shall constitute a waiver of all claims by the Design/Builder except those previously made in writing and identified by the Design/Builder as unsettled at the time of final Application for Payment.

**5.3    INTEREST PAYMENTS**

**5.3.1** Payments due the Design/Builder under this Part 2 Agreement which are not paid when due shall bear interest from the date due at the rate specified in Article 13, or in the absence of a specified rate, at the legal rate prevailing where the Project is located.

**ARTICLE 6**
**PROTECTION OF PERSONS AND PROPERTY**

**6.1** The Design/Builder shall be responsible for initiating, maintaining and providing supervision of all safety precautions and programs in connection with the performance of this Part 2 Agreement. Notwithstanding any other provision of the Contract Documents, all provisions of this Article 6 are solely for the benefit of the Owner and are not intended to benefit or create a duty to, and shall not be relied upon in any way whatsoever by any other person, firm, or entity.

**6.2** The Design/Builder shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to: (1) employees on the Work and other persons who may be affected thereby; (2) the Work

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

A000007006                                                A000007006

and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody, or control of the Design/Builder or the Design/Builder's contractors; and (3) other property at or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal relocation or replacement in the course of construction.

**6.3**    The Design/Builder shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on the safety of persons or property or their protection from damage, injury or loss.

**6.4**    The Design/Builder shall promptly remedy damage and loss (other than damage or loss insured ~~or required to be insured~~ under property insurance provided or required by the Contract Documents) to property at the site ~~but only to the extent~~ caused in ~~whole or in part~~ by the Design/Builder, a contractor of the Design/Builder or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable.

### ARTICLE 7
### INSURANCE AND BONDS

**7.1    DESIGN/BUILDER'S LIABILITY INSURANCE**

**7.1.1**    The Design/Builder shall purchase from and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, such insurance as will protect the Design/Builder from claims set forth below which may arise out of or result from operations under this Part 2 Agreement by the Design/Builder or by a contractor of the Design/Builder, or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

.1    claims under workers' compensation, disability benefit and other similar employee benefit laws that are applicable to the Work to be performed;

.2    claims for damages because of bodily injury, occupational sickness or disease, or death of the Design/Builder's employees;

.3    claims for damages because of bodily injury, sickness or disease, or death of persons other than the Design/Builder's employees;

.4    claims for damages covered by usual personal injury liability coverage which are sustained (1) by a person as a result of an offense directly or indirectly related to employment of such person by the Design/Builder, or (2) by another person;

.5    claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

.6    claims for damages because of bodily injury, death of a person or property damage arising out of ownership,

maintenance or use of a motor vehicle; and

.7    claims involving contractual liability insurance applicable to the Design/Builder's obligations under Paragraph 11.5.

.8    claims arising out of the performance of professional services caused by negligent errors or omissions.

**7.1.2**    The insurance required by Subparagraph 7.1.1 shall be written for not less than limits of liability specified in this Part 2 Agreement or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work ~~until~~ ~~date of final payment and termination of any coverage required to be maintained~~ after final payment three (3) years after the final payment.

**7.1.3**    Certificates of insurance acceptable to the Owner shall be delivered to the Owner immediately after execution of this Part 2 Agreement. These Certificates and the insurance policies required by this Paragraph 7.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. If any of the foregoing insurance coverages are required to remain in force after final payment, an additional certificate evidencing continuation of such coverage shall be submitted with the application for final payment. Information concerning reduction of coverage shall be furnished by the Design/Builder with reasonable promptness in accordance with the Design/Builder's information and belief.

**7.1.4**    Design/Builder shall name Owner as an additional insured on Design/Builder's general liability, automobile liability and excess liability insurance policies and such insurance shall be primary and non-contributory with respect to the additional insured.

**7.1.5**    Design/Builder's worker's compensation insurance policy shall provide for a waiver of subrogation against Owner arising out of claims covered by such insurance.

**7.2    OWNER'S LIABILITY INSURANCE**

**7.2.1**    The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance. Optionally, the Owner may purchase and maintain other insurance for self-protection against claims which may arise from operations under this Part 2 Agreement. The Design/Builder shall not be responsible for purchasing and maintaining this optional Owner's liability insurance unless specifically required by the Contract Documents.

**7.3    PROPERTY INSURANCE**

**7.3.1**    Unless otherwise provided under this Part 2 Agreement, the ~~Owner~~ Design/Builder shall purchase and maintain, in a company or companies authorized to do business in the jurisdiction in which the principal

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
14

A000007007

A000007007

improvements are to be located, property insurance upon the Work to the full insurable value thereof on a replacement cost basis without ~~optional deductibles~~. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made or until no person or entity other than the Owner has an insurable interest in the property required by this Paragraph 7.3 to be insured, whichever is earlier. This insurance shall include interests of the Owner, the Design/Builder, and their respective contractors and subcontractors in the Work.

**7.3.2** Property insurance shall be on an all-risk policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, falsework, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for the services and expenses of the Design/Builder's Architect and other professionals required as a result of such insured loss. Coverage for other perils shall not be required unless otherwise provided in the Contract Documents.

~~7.3.3    If the Owner does not intend to purchase such property insurance required by this Part 2 Agreement and with all of the coverages in the amount described above, the Owner shall so inform the Design/Builder prior to commencement of the construction. The Design/Builder may then effect insurance which will protect the interests of the Design/Builder and the Design/Builder's contractors in the construction, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Design/Builder is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, then the Owner shall bear all reasonable costs properly attributable thereto.~~

**7.3.4** Unless otherwise provided, ~~tT~~he Owner shall purchase and maintain such boiler and machinery insurance required by this Part 2 Agreement or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner. This insurance shall include interests of the Owner, the Design/Builder, the Design/Builder's contractors and subcontractors in the Work, and the Design/Builder's Architect and other design professionals. The Owner and the Design/Builder shall be named insureds.

**7.3.5** A loss insured under the ~~Owner's~~ Design/Builder's property insurance shall be adjusted by the ~~Owner~~ Design/Builder as fiduciary and made payable to the ~~Owner~~Design/Builder as fiduciary for the insureds, as their interests may appear, subject to requirements of any applicable mortgage clause and of Subparagraph 7.3.10. The Design/Builder shall pay contractors their shares of insurance proceeds received by the Design/Builder, and by appropriate agreement, written where legally required for validity, shall require contractors to make payments to their subcontractors in similar manner.

**7.3.6** Before an exposure to loss may occur, the ~~Owner~~Parties shall file with the ~~each~~ other ~~Design/Builder~~ a copy of each policy that includes insurance coverages required by this Paragraph 7.3. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Design/Builder ~~or Owner, whichever is applicable.~~

**7.3.7** If the ~~Design/Builder~~Owner requests in writing that insurance for risks other than those described herein or for other special hazards be included in the property insurance policy, the ~~Owner~~Design/Builder shall, if possible, obtain such insurance, and the cost thereof shall be charged to the ~~Design/Builder~~ Owner by appropriate Change Order.

**7.3.8** The Owner and the Design/Builder waive all rights against each other and the Architect and other design professionals, contractors, subcontractors, agents and employees, each of the other, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 7.3 or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the ~~Owner~~Design/Builder as trustee. The Owner or Design/ Builder, as appropriate, shall require from contractors and subcontractors by appropriate agreement, written where legally required for validity, similar waivers each in favor of other parties enumerated in this Paragraph 7.3. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

**7.3.9** If required in writing by a party in interest, the ~~Owner~~ Design/Builder as trustee shall, upon occurrence of an insured loss, give bond for proper performance of ~~the~~its ~~Owner's~~ duties. The cost of required bonds shall be charged against proceeds received as fiduciary. The ~~Owner~~ Design/Builder shall deposit in a separate account proceeds so received, which the ~~Owner~~ Design/Builder shall distribute in accordance with such agreement as the parties in interest may reach, or in accordance with an arbitration award in which case the procedure shall be as provided in Article 10. If after such loss no other special agreement is made, replacement of damaged Work shall be covered by appropriate Change Order.

**7.3.10** The ~~Owner~~ Design/Builder as trustee shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing, within five (5) days after occurrence of loss to the ~~Owner's~~ Design/Builder's exercise of this power; if such objection be made, the parties shall enter into dispute resolution under procedures provided in Article 10. If distribution of insurance proceeds by arbitration is required, the arbitrators will direct such distribution.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

A000007008                                                        A000007008

7.3.11 Partial occupancy or use prior to Substantial Completion shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Design/Builder shall take reasonable steps to obtain consent of the insurance company or companies and shall not, without mutual written consent, take any action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of coverage.

## 7.4   LOSS OF USE INSURANCE

7.4.1 The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Design/Builder for loss of use of the Owner's property, including consequential losses due to fire or other hazards, however caused.

## ARTICLE 8
## CHANGES IN THE WORK

## 8.1   CHANGES

8.1.1 Changes in the Work may be accomplished after execution of this Part 2 Agreement, without invalidating this Part 2 Agreement, by Change Order, Construction Change Directive, or order for a minor change in the Work, subject to the limitations stated in the Contract Documents.

8.1.2 A Change Order shall be based upon agreement between the Owner and the Design/Builder; a Construction Change Directive may be issued by the Owner without the agreement of the Design/Builder; an order for a minor change in the Work may be issued by the Design/Builder alone.

8.1.3 Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Design/Builder shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive, or order for a minor change in the Work.

8.1.4 If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are so changed in a proposed Change Order or Construction Change Directive that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or the Design/Builder, the applicable unit prices shall be equitably adjusted.

## 8.2   CHANGE ORDERS

8.2.1 A Change Order is a written instrument prepared by the Design/Builder and signed by the Owner and the Design/Builder, stating their agreement upon all of the following:

.1  a change in the Work;

.2  the amount of the adjustment, if any, in the Contract Sum; and

.3  the extent of the adjustment, if any, in the Contract Time.

8.2.2 If the Owner requests a proposal for a change in the Work from the Design/Builder and subsequently elects not to proceed with the change, a Change Order shall be issued to reimburse the Design/Builder for any costs incurred for estimating services, design services or preparation of proposed revisions to the Contract Documents.

## 8.3   CONSTRUCTION CHANGE DIRECTIVES

8.3.1 A Construction Change Directive is a written order prepared and signed by the Owner, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both.

8.3.2 Except as otherwise agreed by the Owner and the Design/Builder, the adjustment to the Contract Sum shall be determined on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including the expenditures for design services and revisions to the Contract Documents. In case of an increase in the Contract Sum, the cost shall include a reasonable allowance for overhead and profit. In such case, the Design/Builder shall keep and present an itemized accounting together with appropriate supporting data for inclusion in a Change Order. Unless otherwise provided in the Contract Documents, costs for these purposes shall be limited to the following:

.1  costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

.2  costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

.3  rental costs of machinery and equipment exclusive of hand tools, whether rented from the Design/Builder or others;

.4  costs of premiums for all bonds and insurance permit fees, and sales, use or similar taxes;

.5  additional costs of supervision and field office personnel directly attributable to the change; and fees paid to the Architect, engineers and other professionals.

8.3.3 Pending final determination of cost to the Owner, amounts not in dispute may be included in Applications for Payment. The amount of credit to be allowed by the Design/Builder to the Owner for deletion or change which results in a net decrease in the Contract Sum will be actual net

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017436, which expires on 10/31/2003.

Electronic Format A191-1996
16

A000007009                                                          A000007009

cost. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of the net increase, if any, with respect to that change.

**8.3.4**    When the Owner and the Design/Builder agree upon the adjustments in the Contract Sum and Contract Time, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

**8.4    MINOR CHANGES IN THE WORK**

**8.4.1**    The Design/Builder shall have authority to make minor changes in the Construction Documents and construction consistent with the intent of the Contract Documents when such minor changes do not involve adjustment in the Contract Sum or extension of the Contract Time. The Design/Builder shall promptly inform the Owner, in writing, of minor changes in the Construction Documents and construction.

**8.5    CONCEALED CONDITIONS**

**8.5.1**    If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially    from those indicated in the Contract Documents, or (2) unknown physical conditions of an unusual nature which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in    the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Contract Sum shall be equitably adjusted for such concealed or unknown conditions by Change Order upon claim by either party made within 21 days after the claimant becomes aware of the conditions.

**8.6    REGULATORY CHANGES**

**8.6.1**    The Design/Builder shall be compensated for changes in the construction necessitated by the enactment or revisions of codes, laws or regulations subsequent to the submission of the Design/Builder's Proposal.

**ARTICLE 9**
**CORRECTION OF WORK**

**9.1**    The Design/Builder shall promptly correct Work rejected by the Owner or known by the Design/Builder to be defective or failing to conform to the requirements of the Contract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed. The Design/Builder shall bear costs of correcting such rejected Work, including additional testing and inspections.

**9.2**    If, within one (1) year after the date of Substantial Completion of the Work or, after the date for commencement of warranties established in a written agreement between the Owner and the Design/Builder, or by terms of an applicable special warranty required by the Contract Documents, any of

the Work is found to be not in accordance with the requirements of the Contract Documents, the Design/Builder shall correct it promptly after receipt of a written notice from the Owner to do so unless the Owner has previously given the Design/ Builder a written acceptance of such condition.

**9.3**    Nothing contained in this Article 9 shall be construed to establish a period of limitation with respect to other obligations which the Design/Builder might have under the Contract Documents. Establishment of the time period of one (1) year as described in Subparagraph 9.2 relates only to the specific obligation of the Design/Builder to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Design/Builder's liability with respect to the Design/Builder's obligations other than specifically to correct the Work.

**9.4**    If the Design/Builder fails to correct nonconforming Work as required or fails to carry out Work in accordance with the Contract Documents, the Owner, by written order signed personally or by an agent specifically so empowered by the Owner in writing, may order the Design/Builder to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the Owner's right to stop the Work shall not give rise to a duty on the part of the Owner to exercise the right for benefit of the Design/Builder or other persons or entities.

**9.5**    If the Design/Builder defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within seven (7) days after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may give a second written notice to the Design/Builder and, seven (7) days following receipt by the Design/Builder of that second written notice and without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Design/ Builder, the costs of correcting such deficiencies.    If the payments then or thereafter due the Design/Builder are not sufficient to cover the amount of the deduction, the Design/Builder shall pay the difference to the Owner. Such action by the Owner shall be subject to dispute resolution procedures as provided in Article 10.

**ARTICLE 10**
**DISPUTE RESOLUTION -**
**MEDIATION AND ARBITRATION**

**10.1**    Claims, disputes or other matters in question between the parties to this Part 2 Agreement arising out of or relating to this Part 2 Agreement or breach thereof, except those claims that have been waived by the making or acceptance of final payment and those claims expressly excluded by Paragraph 10.7, shall be subject to and decided by mediation or arbitration. Such mediation or arbitration shall be conducted in accordance with the Construction Industry Mediation or Arbitration Rules of the American Arbitration Association

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

A000007010                                                                    A000007010

currently in effect. The location of such mediation or arbitration shall be the Project site or Montgomery, Alabama, as mutually agreed by the parties.

10.2    In addition to and Prior to a demand for arbitration or initiation of litigation of claims not subject to arbitration, the parties shall attempt in good faith to resolve the disputes during the twenty (20) day period following first written notice by one party of its claim. If the matter remains unresolved, prior to arbitration, the parties shall endeavor to settle disputes by mediation. Demand for mediation shall be filed in writing with the other party to this Part 2 Agreement and with the American Arbitration Association. A demand for mediation shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for mediation be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of repose or limitations.

10.3    If the matter remains unresolved for ninety (90) days following the first written notice of the claim, then Ddemand for arbitration shall be filed in writing with the other party to this Part 2 Agreement and with the American Arbitration Association. A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of repose or limitations.

10.4    An arbitration pursuant to this Article may be joined with an arbitration involving common issues of law or fact between the Design/Builder and any person or entity with whom the Design/Builder has a contractual obligation to arbitrate disputes. No other arbitration arising out of or relating to this Part 2 Agreement shall include, by consolidation, joinder or in any other manner, an additional person or entity not a party to this Part 2 Agreement or not a party to an agreement with the Design/Builder, except by written consent containing a specific reference to this Part 2 Agreement signed by the Owner, the Design/Builder and any other person or entities sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Part 2 Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

10.5    The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

10.6    Unless otherwise agreed in writing, Design/Builder shall continue with the Work pending arbitration, and, if so, Owner

shall continue to make payments earned by Design/Builder in accordance with this Agreement.

10.7    This Agreement to arbitrate shall not apply to any claim:

(a) For contribution or indemnity asserted by one party to this Agreement against the other party and arising out of an action brought in a state or federal court or in arbitration by a person who is under no obligation to arbitrate the subject matter of such action with either of the parties hereto: or

(b) Asserted by the Owner against Design/Builder if Design/Builder asserts said claim, either in whole or part, against a Subcontractor or Supplier and such Subcontractor or Supplier will not consent to arbitration or the contract between Design/Builder and such Subcontractor or Supplier does not provide for binding arbitration, or does so provide but the two arbitration proceedings cannot be consolidated, in any case of which the parties hereto shall so notify each other either before or after demand for arbitration is made.

(c) Asserted by the Design/Builder against the Owner if Owner asserts said claim, either in whole or in part against the City of Greenville and the City of Greenville will not consent to arbitration or the contract between Owner and the City of Greenville does not provide for binding arbitration, or does so provide but the two arbitration proceedings cannot be consolidated, in any case of which the parties hereto shall so notify each other either before or after demand for arbitration is made.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

11.1    Unless otherwise provided, this Part 2 Agreement shall be governed by the law of the place where the Project is located.

11.2    SUBCONTRACTS

11.2.1    The Design/Builder, as soon as practicable after execution of this Part 2 Agreement, shall furnish to the Owner in writing the names of the persons or entities the Design/Builder will engage as contractors for the Project.

11.2.2    Design/Builder shall use its best efforts to include in any subcontracts and supplier agreements a binding arbitration clause with a provision for consolidation of any arbitration between Design/Builder and Subcontractor or supplier with related disputes between Owner and Design/Builder.

11.3    WORK BY OWNER, CITY OF GREENVILLE OR OWNER'S THEIR CONTRACTORS

11.3.1    The Owner and The City of Greenville reserves the right to perform construction or operations related to the Project with the Owner's or City of Greenville's own forces, and to award separate contracts in connection with other

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia - 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191 -1996
18

A000007011                                                        A000007011

portions of the Project or other construction or operations on the site under conditions of insurance and waiver of subrogation identical to the provisions of this Part 2 Agreement. If the Design/Builder claims that delay or additional cost is involved because of such action by the Owner, the Design/Builder shall assert such claims as provided in Subparagraph 11.4. Claims against the City of Greenville arising out of the City's performance of work at or adjacent to the Project during the course of Design/Builder's work shall be asserted against the City.

11.3.2    The Design/Builder shall afford the Owner's and City of Greenville's separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities and shall connect and coordinate the Design/Builder's construction and operations with theirs as required by the Contract Documents.

11.3.3    Costs caused by delays or by improperly timed activities or defective construction shall be borne by the party responsible therefor.

**11.4    CLAIMS FOR DAMAGES**

11.4.1    If either party to this Part 2 Agreement suffers injury or damage to person or property because of an act or omission of the other party, of any of the other party's employees or agents, or of others for whose acts such party is legally liable, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after first observance. The notice shall provide sufficient detail to enable the other party to investigate the matter. If a claim of additional cost or time related to this claim is to be asserted, it shall be filed in writing.

**11.5    INDEMNIFICATION**

11.5.1    To the fullest extent permitted by law, the Design/Builder shall indemnify and hold harmless the Owner, Owner's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by negligent acts or omissions of the Design/Builder, anyone directly or indirectly employed by the Design/Builder or anyone for whose acts the Design/Builder may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 11.5.

11.5.2    In claims against any person or entity indemnified under this Paragraph 11.5 by an employee of the Design/Builder, anyone directly or indirectly employed by the Design/Builder or anyone for whose acts the Design/Builder may be liable, the

indemnification obligation under this Paragraph 11.5 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Design/Builder under workers' compensation acts, disability benefit acts or other employee benefit acts.

**11.6    SUCCESSORS AND ASSIGNS**

11.6.1    The Owner and Design/Builder, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Part 2 Agreement and to the partners, successors and assigns of such other party with respect to all covenants of this Part 2 Agreement. Neither the Owner nor the Design/Builder shall assign this Part 2 Agreement without the written consent of the other. The Owner may assign this Part 2 Agreement to any institutional lender providing construction financing, and the Design/Builder agrees to execute all consents reasonably required to facilitate such an assignment. If either party makes such an assignment, that party shall nevertheless remain legally responsible for all obligations under this Part 2 Agreement, unless otherwise agreed by the other party.

**11.7    TERMINATION OF PROFESSIONAL DESIGN SERVICES**

11.7.1    Prior to termination of the services of the Architect or any other design professional designated in this Part 2 Agreement, the Design/Builder shall identify to the Owner in writing another architect or other design professional with respect to whom the Owner has no reasonable objection, who will provide the services originally to have been provided by the Architect or other design professional whose services are being terminated.

**11.8    EXTENT OF AGREEMENT**

11.8.1    This Part 2 Agreement represents the entire agreement between the Owner and the Design/Builder and supersedes prior negotiations, representations or agreements, either written or oral. This Part 2 Agreement may be amended only by written instrument and signed by both the Owner and the Design/Builder.

11.9    Claims for Consequential Damages.  Except for (i) Owner's claims for liquidated damages as expressly specified in this Agreement and except (ii) to the extent Owner's claims are covered by insurance provided by Design/Builder under this Agreement, the Design/Builder and Owner waive any and all claims against each other for consequential damages arising out of or relating to this Contract. Subject to the above-cited exceptions, this mutual waiver includes: (1) Damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and (2) damages incurred by the Design/Builder for principal or home office expenses including the compensation of personnel stationed there, for losses of financing, income, business and reputation, for loss of management or employee productivity or of the services of

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
19

A000007012                                                                                    A000007012

such persons, and for loss of profit except anticipated profit arising directly from the Work. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination of this Agreement.

## 11.10 Site Conditions/Environmental Matters

**11.10.1** Notwithstanding any other provision of the Contract Documents to the contrary, it is hereby expressly agreed that the Design/Builder and its parent, successors, officers, agents, employees, and assigns (hereinafter collectively referred to as "Design/Builder") shall not have any liability or responsibility of any kind whatsoever to the Owner, or any other person, firm or entity, with regard to, or for, any actions, suits, claims, liabilities, warranties, controversies, damages, demands, expenses, incidental damages, causes of action or grievances, of any kind, character, or description, now existing or which may hereafter arise, known or unknown, permanent or otherwise (hereinafter collectively referred to as "claims"), indirectly or directly resulting from, growing out of, pertaining to, or in connection with the condition (including but not limited to, any earth work, fill work, compaction, settlement, soil density, plasticity, or slippage) of the site on which the Project is to be constructed except to the extent such claim is caused by the negligent act or omission of, or breach of contract by, Design/Builder, its Subcontractors, suppliers, consultants, agents and employees.

**11.10.2** Notwithstanding any other provision of this Contract, the Owner is solely responsible for furnishing the site to the Design/Builder in a condition which meets all applicable Federal, State, and/or local requirements concerning hazardous materials, chemicals and/or any other form of contamination. Furthermore, Owner shall be solely responsible for all testing, inspections, permits and/or any other requirements related to the environmental condition of the site necessary in order to make the site suitable for construction of the Project, whether necessary before or after the commencement of Work by Design/Builder on the Project. Notwithstanding any language which may be to the contrary in any of the Contract Documents, Design/Builder shall have no obligation to investigate subsurface or otherwise concealed conditions at the site or unknown physical conditions of an unusual nature at the site, and shall be entitled to relief with respect to any such conditions as provided in Section 8.5.1 of this Agreement. Owner has contracted with the City of Greeneville to perform the subsurface investigation and geotechnical engineering for the Owner with respect to the project and Design/Builder shall be entitled to fully and completely rely upon such subsurface investigation and geotechnical engineering.

**11.10.3** Environmental Audit. Owner is responsible for performing or furnishing an environmental audit. If Owner does not perform or furnish an environmental audit, Design/Builder shall have no responsibility or liability of any kind arising from any conditions, substances, or material

which would have been ascertained or discovered by the performance of an environmental audit of the premises upon which the Project is located.

**11.10.4** Pollutants from Owner's Operations. Owner's knowledge of its activities that will be conducted within the facility to be designed and constructed by Design/Builder, and the materials involved in those activities, is superior to Design/Builder's knowledge. Accordingly, and anything contained in this Agreement to the contrary notwithstanding, any duty or warranty by Design/Builder hereto shall not apply to the discharge, dispersal, escape, release or saturation of any pollutant into the atmosphere or any body of water or on, onto, upon, in or into the surface or subsurface of land resulting from Owner's operations. For purpose of this section, the word "pollutant" shall mean any solid liquid, gaseous, or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkaline, chemicals and waste and shall include any Hazardous Substance. The capacity of the facility and the design of any of its parts, so as to prevent the escape, release, discharge, dispersal or saturation of pollutants shall be the sole responsibility of Owner.

**11.10.4.1** Encountering Hazardous Substances. In the event Design/Builder or its Subcontractors encounter on the Project site material reasonably believed to be asbestos, polychlorinated biphenyl ("PCB") or other "Hazardous Substances" as defined in paragraph 11.10.4.4, which has not been rendered harmless, Gray shall immediately stop Work in the area affected and report the condition to the Owner in writing. The Work in the affected area shall be resumed (1) in the absence of any Hazardous Substances, (2) when any Hazardous Substances have been rendered harmless, (3) by written agreement of the Owner and Gray, or (4) in accordance with the final determination under Article 10.

**11.10.4.2** Working Conditions. Neither Design/Builder nor its Subcontractors shall be required without their consent to perform any Work relating to asbestos, PCB, or other Hazardous Substances.

**11.10.4.3** Owner's Indemnification Responsibilities. To the fullest extent permitted by law, the Owner shall defend, indemnify, and hold harmless Design/Builder, its Subcontractors, Suppliers, consultants, agents and employees, from any and all claims, liability, damages and expenses (including attorney fees and expenses), arising out of or resulting from:

(a) Any claim, suit or legal proceeding to recover damages for wrongful death, bodily injury, illness or disease or injury to, or destruction of, tangible property alleged to be caused either directly or indirectly by any substances, condition, element, or material or any combination of the foregoing: (a) produced by

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia — 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
20

A000007013                                                                          A000007013

Owner or omitted or released by Owner either intentionally or unintentionally, from the facilities designed and/or constructed by Design/Builder for the benefit of Owner, or (b) used by Design/Builder or incorporated by Design/Builder into the Work herein agreed to be performed by Design/Builder for the benefit of Owner if specifically required by Owner or if necessary for the planned use of the work and to the extent not caused by the mishandling of such substances, condition, element, or material by Design/Builder, its Subcontractors, suppliers, consultants, agents, and employees;

(b) Performance of the Work in the affected area if in fact the material is asbestos, PCB, or other Hazardous Substances, and has not been rendered harmless, provided that such claim, damages, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and to the extent not caused by the negligent act or omission of Design/Builder, its Subcontractors, suppliers, consultants, agents and employees;

11.10.4.4.  Definition of Hazardous Substances.  For purposes of this Agreement, the term "Hazardous Substances" means any substance, including solid, liquid or gaseous material which is listed or defined as "Hazardous" in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S. Section 1251, et seq., or regulations promulgated pursuant thereto; and source, special nuclear, or by product material as defined by the Atomic Energy Act of 1954, 42 U.S.C., Section 3011, et seq., or regulations promulgated pursuant thereto; and includes any other substance defined by federal, state or local statute, regulations, or ordinance as hazardous, toxic or dangerous waste or substance.

## ARTICLE 12
## TERMINATION OF THE AGREEMENT

### 12.1    TERMINATION BY THE OWNER

12.1.1    This Part 2 Agreement may be terminated by the

Owner upon 14 days' written notice to the Design/Builder in the event that the Project is abandoned.  If such termination occurs, the Owner shall pay the Design/Builder for Work that is satisfactorily completed, and for proven loss sustained upon materials, equipment, tools, and construction equipment and machinery, including reasonable profit -and -applicable - damages.  Design/Builder will not be entitled to payment for uncompleted work, anticipated profit on Work not completed, or unabsorbed overhead.

12.1.2    If the Design/Builder defaults or persistently fails or neglects to carry out the Work in accordance with the Contract Documents or fails to perform the provisions of this Part 2 Agreement, the Owner may give written notice that the Owner intends to terminate this Part 2 Agreement.    If the Design/Builder fails to correct the defaults, failure or neglect within seven (7) days after being given notice, the Owner may then give a second written notice and, after an additional seven (7) days, the Owner may without prejudice to any other remedy terminate the employment of the Design/Builder and take possession of the site and of all materials, equipment, tools and construction equipment and machinery thereon owned by the Design/Builder and finish the Work by whatever method the Owner may deem expedient.  If the unpaid balance of the Contract Sum exceeds the expense of finishing the Work and all damages incurred by the Owner, such excess shall be paid to the Design/Builder to the extent earned and payable under the Agreement.  If the expense of completing the Work and all damages incurred by the Owner exceeds the unpaid balance, the Design/Builder shall pay the difference to the Owner. This obligation for payment shall survive termination of this Part 2 Agreement.

### 12.2    TERMINATION BY THE DESIGN/BUILDER

12.2.1    If the Owner fails to make payment when due, the Design/Builder may give written notice of the Design/Builder's intention to terminate this Part 2 Agreement.    If the Design/Builder fails to receive payment within seven (7) days after receipt of such notice by the Owner, the Design/Builder may give a second written notice and, seven (7) days after receipt of such second written notice by the Owner, may terminate this Part 2 Agreement and recover from the Owner payment for Work satisfactorily completed executed and for proven losses sustained upon materials, equipment, tools, and construction equipment and machinery, including reasonable profit and applicable damages.

## ARTICLE 13
## BASIS OF COMPENSATION

The Owner shall compensate the Design/Builder in accordance with Article 5, Payments, and the other provisions of this Part 2 Agreement as described below.

### 13.1    COMPENSATION

13.1.1    For the Design/Builder's performance of the Work, as described in Paragraph 3.2 and including any other services listed in Article 14 as part of Basic Services, the Owner shall pay the Design/Builder in current funds the Contract Sum as follows:
For Basic Services, as described in Paragraphs 3.2.2. through 3.2.16, and for any other services included in Article 14 as part of Basic Services, basic compensation shall be as follows:  Owner shall pay Design/Builder in current U.S. funds for the Cost of the Work as

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
21

A000007014                                                                                                                      A000007014

hereinafter defined and Design/Builder's

**Guaranteed Maximum Price**

**13.1.2** The sum of the Cost of the Work and the Design-Builder's Fee is guaranteed by the Design/Builder not to exceed Twelve Million Five Hundred Thousand and No/100 U.S. Dollars ($U.S. 12,500,000.00), subject to additions and deductions by Change Order as provided in the Contract Documents. Such maximum sum is referred to in the Contract Documents as the Guaranteed Maximum Price. Costs which would cause the Guaranteed Maximum Price, as adjusted from time to time pursuant to the Contract Documents, to be exceeded shall be paid by the Design/Builder without reimbursement by the Owner and with no additional Fee to Design/Builder. Upon completion of the Work, an accounting will be made of the Cost of the Work and if the Cost of the Work plus Design/Builder's Fee is less than the adjusted Guaranteed Maximum Price, the difference (the "savings") shall be divided as follows: ninety percent (90%) to Owner and ten percent (10%) to Design/Builder.

Design/Builder's Fee shall be a lump sum of Nine Hundred Thirty Thousand and 00/100 U. S. Dollars ($930,000.00). In the event of changes to the Work, the Design/Builder's Fee shall be adjusted as follows: If a change in the Work is made during the first six (6) weeks of the detailed design phase (i.e. within the first six (6) weeks after the date of Design/Builder's letter of intent dated June 17, 2003) and the Cost of the Work associated with such change is less than $500,000.00, then Design/Builder's Fee shall not be adjusted. If a change in the Work is made during the first six (6) weeks of the detailed design phase and the Cost of the Work associated with such change exceeds $500,000.00, then Design/Builder's Fee shall be adjusted by an amount equal to 5.5% of the Cost of the Work associated with such change (3% for overhead, 2.5% for profit). If a change in the Work is made after the first six (6) weeks of the detailed design phase, then Design/Builder's Fee shall be adjusted to include the design costs associated with such change (at the hourly rates set forth on the attached schedule) plus 7.5% of the Cost of the work associated with such change (5% for overhead, 2.5% for profit).

**13.1.3** The Guaranteed Maximum Price is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:

**13.1.4** The amounts agreed to for unit prices, if any, are as follows:

**13.1.5** The Guaranteed Maximum Price includes the following allowance items/categories. In the event the Cost of the Work allocable to any one or more items/categories exceeds the amount allocated below, the excess shall be an addition to the Guaranteed Maximum Price and shall be paid by the Owner to the Contractor:

| | |
|---|---|
| 1. Pit Allowance | $2,116,104.00 |
| 2. Office Allowance | $   85,200.00 |

**13.1.6** The Guaranteed Maximum Price includes Design/Builder's contingency in the amount of One Hundred Thirty Thousand and No/100 Dollars ($130,000.00), a sum mutually agreed upon for use at Design/Builder's sole and exclusive discretion to cover costs incurred in performing the Work which are properly reimbursable as a Cost of the Work but which are not included in a specific line item or the basis for a Change Order. The contingency is not available to the Owner for any reason including, without limitation, changes in scope or any other item which would enable Design/Builder to increase the Guaranteed Maximum Price under the Contract Documents or which would otherwise entitle Design/Builder to additional compensation.

**13.1.7** Adjustments to the Guaranteed Maximum Price on account of changes in the Work may be determined by any of the methods listed in Article 8 of the Agreement.

**COSTS TO BE REIMBURSED**

**13.1.8** The term Cost of the Work shall mean costs necessarily incurred by the Design/Builder in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 13.

**LABOR COSTS**

**13.1.9** Wages of construction workers directly employed by the Design/Builder to perform the construction of the Work at the site or, with the Owner's agreement, at off-site workshops.

**13.1.10** Wages or salaries of the Design/Builder's supervisory and administrative personnel when stationed at the site with the Owner's

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
22

A000007015                                                                      A000007015

**13.1.11** Wages and salaries of the Design/Builder's supervisory or administrative personnel engaged, at factories or workshops on the road, in expediting the production of transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

**13.1.12** Costs paid or incurred by the Design/Builder for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included the the Cost of the Work under Clauses 13.1.9 through 13.1.12.

## SUBCONTRACT COSTS

**13.1.13** Payments made by the Design/Builder to Subcontractors in accordance with the requirements of the subcontracts.

## COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION

**13.1.14** Costs, including transportation of materials and equipment incorporated or to be incorporated in the completed construction.

**13.1.15** Costs of materials described in the preceding Clause 13.1.14 in excess of those actually installed but required to provide reasonable allowance for waste and for spoilage. Unused excess materials, if any, shall be handed over to the Owner at the completion of the Work or, at the Owner's option, shall be sold by the Design/Builder and amounts realized, if any, from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

## COST OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS

**13.1.16** Costs, including transportation, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by the construction workers, which are provided by the Design/Builder at the site and fully consumed in the performance of the Work; and cost less salvage value on such items if not fully consumed, whether sold to others or retained by the Design/Builder. Cost for items previously used by the Design/Builder shall mean fair market value.

**13.1.17** Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by the construction workers, which are provided by the Design/Builder at the site, whether rented from the Design/Builder or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof. Rates and quantities of equipment rented shall be subject to the Owner's prior approval.

**13.1.18** Costs of removal of debris from the site.

**13.1.19** Costs of telegrams and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

**13.1.20** That portion of the reasonable travel and subsistence expenses of the Design/Builder's personnel incurred while traveling in discharge of duties connected with the Work.

## MISCELLANEOUS COSTS

**13.1.21** That portion directly attributable to this Contract to premiums for insurance and bonds.

**13.1.22** Sales, use or similar taxes imposed by a governmental authority which are related to the Work and for which the Design/Builder is liable.

**13.1.23** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Design/Builder is required by the Contract Documents to pay.

**13.1.24** Fees of testing laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded due to failure of the portions of the Work to comply with requirements established by the Contract Documents and which do not fall within the scope of Clauses 13.1.30 through 13.1.32 below.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
23

A000007016                                        A000007016

**13.1.25** Royalties and license fees pai... the use of a particular design, process or produc.., .quired by the Contract Documents: the cost of defending suits or claims for infringement of patent rights arising from such requirements by the Contract Documents, and payments made in accordance with legal judgments against the Design/Builder resulting from such suits or claims and payments of settlements made with the Owner's consent; provided, however, that such costs of legal defenses, judgment and settlements shall not be included in the calculation of the Design/Builder's Fee or of a Guaranteed Maximum Price. However, if the Design/Build has reason to believe that the required design, process or product is an infringement of a copyright or patent, the Design/Builder shall be responsible for such loss unless such information is promptly furnished to the Owner.

**13.1.26** Deposits lost for causes other than the Design/Builder's fault or negligence.

**OTHER COSTS**

**13.1.27** Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

**EMERGENCIES: REPAIRS TO DAMAGED, DEFECTIVE OR NONCONFORMING WORK**

**13.1.28** The cost of the Work shall also include costs described below which are incurred by the Design/Builder:

**13.1.29** In taking action to prevent threatened damage injury or loss in case of an emergency affecting the safety of persons and property. Additional compensation or extension of time claimed by the Design/Builder on account of acting at the Design/Builder's discretion shall be determined as provided in Article 8 of the Agreement.

**13.1.30** In repairing or correcting Work damaged or improperly executed by construction workers in the employ of the Design/Builder, provided such damage or improper execution did not result from the fault or negligence of the Design/Builder or the Design/Builder's foremen, engineers or superintendents, or other supervisory, administrative or managerial personnel of the Design/Builder.

**13.1.31** In repairing damaged Work other than that described in Clause 13.1.30, provided such damage did not result from the fault or negligence of the Design/Builder or the Design/Builder's personnel, and only to the extent that the cost of such repairs is not recoverable by the Design/Builder from others and the Design/Builder is not compensated therefor by insurance or otherwise.

**13.1.32** [DELETED]

**COSTS NOT TO BE REIMBURSED**

**13.1.33** The Cost of the Work shall not include:

**13.1.34** Salaries and other compensation of the Design/Builder's personnel stationed at the Design/Builder's principal office or offices other than the site office, except as specifically provided in Clauses 13.1.10 and 13.1.11 or as may be provided in Article 14.

**13.1.35** Expenses of the Design/Builder's principal office and offices other than the site office.

**13.1.36** Overhead and general expenses, except as may be expressly included in Article 13.

**13.1.37** Rental costs of machinery and equipment, except as specifically provided in Clause 13.1.17.

**13.1.38** Except as provided in Clauses 13.1.30 through 13.1.32, costs due to the fault or negligence of the Design/Builder, Subcontractors, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including but not limited to costs for the correction of damaged, defective or nonconforming Work, disposal and replacement of materials and equipment incorrectly ordered or supplied, and making good damage to property not forming part of the Work.

**13.1.39** Any cost not specifically and expressly described in Article 13.

**13.1.40** Costs which would cause the Guaranteed Maximum Price, if any, to be exceeded.

**DISCOUNTS, REBATES AND REFUNDS**

**13.1.41** Cash discounts obtained on payments made by the Design/Builder shall accrue to the Owner if (1) before making the payment,

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191 -1996
24

A000007017                                      A000007017

the Design/Builder included them in an application for Payment and received payment there from the Owner; or (2) the Owner has deposited funds with the Design/Builder with which to make payments; otherwise, each disbursement shall accrue to the Design/Builder. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Design/Builder shall make provisions so that they can be secured.

**13.1.42** Amounts which accrue to the Owner in accordance with the provisions of Clause 13.1.41 shall be credited to the Owner as a deduction from the Cost of the Work.

### SUBCONTRACTS AND OTHER AGREEMENTS

**13.1.43** Those portions of the Work that the Design/Builder does not customarily perform with the Design/Builder's own personnel shall be performed under subcontracts or by other appropriate agreements with the Design/Builder. The Design/Builder shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work. The Owner will then determine, with the advice of the Design/Builder, which bids will be accepted. The Owner may designate specific persons or entities from whom the Design/Builder shall obtain bids; however, if a Guaranteed Maximum Price has been established, the Owner may not prohibit the Design/Builder from obtaining bids from others without reasonable objection. The Design/Builder shall not be required to contract with anyone to whom the Design/Builder has a reasonable objection.

**13.1.44** If a Guaranteed Maximum Price has been established and a specific bidder among those whose bids are delivered by the Design/Builder to the Owner (1) is recommended to the Owner by the Design/Builder; (2) is qualified to perform that portion of the Work; and (3) has submitted a bid which conforms to the requirements of the Contract Documents without reservations or exceptions, but the Owner requires another bid be accepted, then the Design/Builder may require that a Change Order be issued to adjust the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Owner by the Design/Builder and the amount of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

### ACCOUNTING RECORDS

**13.1.45** The Design/Builder shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract and the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to the Design/Builder's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Contract, and the Design/Builder shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

### PROGRESS PAYMENTS

**13.1.46** Each Application for Payment shall be based upon the most recent schedule of values submitted by the Design/Builder and approved by the Owner in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work, except that the Design/Builder's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Owner may require. This schedule, unless object to by the Owner, shall be used as a basis for reviewing the Design/Builder's Application for Payment.

**13.1.47** Applications for Payment shall show percentage completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage completion shall be the percentage of that portion of the Work which has actually been completed.

**13.1.48** Subject to other provisions of the Contract Documents, the amount of progress payment shall be computed as follows:

**13.1.49** Take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute may be included as provided in Article 8 of the Agreement, even though the Guaranteed Maximum Price has not yet been adjusted by Change Order.

**13.1.50** Add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored and insured at the site for subsequent incorporation in the Work or, if approved in advance by the Owner, suitably stored and insured off the site at a location agreed upon in writing.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
25

A000007018                                                    A000007018

13.1.51  Add the Design/Builder's Fee. Subtract from the total sum retainage of ten percent (10%). The Design/Builder's Fee shall be computed upon the allocable values described in the two preceding Clauses. Upon achieving 50% completion of the Work, retainage withheld from Design/Builder shall be reduced to five (5%) percent.

13.1.52  Subtract the aggregate of previous payments made by the Owner.

13.1.53  Subtract the shortfall, if any, indicated by the Design/Builder in the documentation required by the Owner to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's accountants in such documentation.

*This article supplements but does not modify the terms of Article 5, Progress Payments of the Agreement.*

**FINAL PAYMENT**

13.1.54  The Owner's final payment to the Design/Builder shall be made after the Owner's receipt of Design/Builder's properly submitted and correct final Application for Payment as provided below.

13.1.55 The Owner's accountants will review and report in writing on the Design/Builder's final accounting within thirty (30) days after delivery of the final accounting to the Owner by the Design/Builder. Based upon such Cost of the Work as the Owner's accountants report to be substantiated by the Design/Builder's final accounting, and provided the other conditions of final payment have been met, the Owner will, within seven (7) days after receipt of the written report of the Owner's accountants, either make final payment to Design/Builder, or notify the Design/Builder in writing of the Owner's reasons for withholding payment, which reasons shall be set forth in detail with references to particular provisions of the Contract Documents pursuant to which Owner is withholding such amounts.

13.1.56  If the Owner's accountants report the Cost of the Work as substantiated by the Design/Builder's final accounting to be less than claimed by the Design/Builder, the Owner shall so notify the Design/Builder in writing, and the Design/Builder shall be entitled to demand arbitration of the disputed amount within thirty (30) days from the receipt thereof; failure to demand arbitration within this thirty (30) day period shall result in the substantiated amount reported by the Owner's accountants becoming binding on the Design/Builder. Pending a final resolution by arbitration, the Owner shall pay the Design/Builder the amounts substantiated by Owner's accountants.

13.1.57  [DELETED]

13.1.258 For Additional Services, as described in Paragraph 3.3 and including any other services listed in Article 14 as Additional Services, compensation shall be as follows:

**13.2    REIMBURSABLE EXPENSES**

13.2.1   Reimbursable Expenses are in addition to the compensation for Basic and Additional Services, and include actual expenditures made by the Design/Builder and the Design/Builder's employees and contractors in the interest of the Project, as follows:

13.2.2   FOR REIMBURSABLE EXPENSES, compensation shall be a multiple of (  ) times the amounts expended.

**13.3    INTEREST PAYMENTS**

13.3.1   The rate of interest for past due payments shall be as follows:

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Design/Builder's principal places of business, at the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletion, modification or other requirements, such as written disclosures or waivers.)*

**ARTICLE 14**
**OTHER CONDITIONS AND SERVICES**

14.1     The Basic Services to be performed shall be commenced on _____ and, subject to authorized adjustments and to delays not caused by the Design/Builder, Substantial Completion shall be achieved on or before May 6, 2004 in the Contract Time of

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191 -1996
26

A000007019                                                               A000007019

~~(~~) calendar days.

14.1.1    Acceleration

(a) Design/Builder shall at all times supply sufficient tools, equipment, materials, supervision, subcontracted services and labor to meet the then-current approved project schedule. To the extent, in the reasonable belief of the Owner, the progress of the Work is such that the contract completion date, as adjusted for time extensions provided elsewhere in this Agreement, will not be met due to the fault or cause of Design/Builder or its subcontractors, suppliers, consultants, agents and employees, then the Owner may direct Design/Builder in writing to take such steps as Owner deems necessary to improve Design/Builder's progress, all without additional cost or fee to the Owner. Such steps may include, but shall not be limited to, increasing the number of shifts, adding overtime operations, increasing the labor force and/or supervision, working holidays and weekends and adding equipment and operators. Such an acceleration shall be separately accounted for by Design/Builder. If Design Builder reasonably believes that acceleration is not justified under the terms of this clause, it shall so advise Owner in writing within seven (7) days of receipt of the directive to accelerate. In such case of objection, Design/Builder may expressly reserve its right to claim a compensable acceleration under paragraph (b) below, but nevertheless must proceed with the acceleration as directed.

(b) In the event the progress of the Work is on schedule for meeting the contract completion date, as adjusted for time extensions provided elsewhere in this Agreement, the Owner reserves the right to direct Design/Builder to accelerate its progress as a change in the Work and with compensation as provided in Article 8 hereof; provided, however, that Design/Builder shall have no obligation to so accelerate its progress unless and until a change order or constructive change directive is executed by Owner with respect to such acceleration. Costs of such acceleration shall be separately accounted for by Design/Builder and shall be cause for an increase in the Guaranteed Maximum Price.

14.2    ~~The Basic Services beyond those described in Article 3 are as follows:~~

14.3    ~~Additional Services beyond those described in Article 3 are as follows:~~

14.4    The Design/Builder shall submit an Application for Payment on the last (—) day of each month. It shall be in a form and with such certifications and releases as reasonably required by Owner.

14.5    The Design/Builder's Proposal includes the following documents:
*(List the documents by specific title and date; include any required performance and payment bonds.)*

14.6    Other documents forming part of the Contract Documents include:

|   |   |
|---|---|
| A. | Bid Documents prepared by SSOE dated April 04, 2003 |
| B. | Addendum No. 1 dated April 11, 2003 |
| C. | Addendum No. 2 dated April 23, 2003 |
| D. | Gray Proposal dated April 24, 2003 |
| E. | Proposal Clarification dated April 28, 2003 |
| F. | Re-Bid and Addendum No. 3 dated May 21, 2003 |
| G. | To Do/Decision List Release 6/15 dated June 15, 2003 |
| H. | Letter of Intent Meeting Minutes dated June 17, 2003, including hourly rate attachment |
| I. | Letter of Intent dated June 17, 2003 |

Title _____    Date  8 OCTOBER, 2003

This Agreement entered into as of the day and year first written above.

_____    _____
OWNER *(Signature)*    DESIGN/BUILDER *(Signature)*

President \ CEO  DONGKIL NAM    JIM GRAY, DIRECTOR
*(Printed name and title)*    *(Printed name and title)*

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 •
OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to
legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license
without violation until the date of expiration as noted below. User Document: a191.aia — 8/26/2003. AIA License Number 1017416, which expires on
10/31/2003.

Electronic Format A191-1996
27

A000007020                                        A000007020

# CERTIFICATE OF
# SUBSTANTIAL COMPLETION

| | |
|---|---|
| **PROJECT:**<br>Hwashin<br>661 Montgomery Hwy<br>Greenville, AL 36037 | **PROJECT NO:** 203048<br>**CONTRACT FOR:** Design/Build Services<br>**CONTRACT DATE:** 09/24/03 |
| **CUSTOMER:**<br>Mr. David Nam, President<br>Hwashin America Corp.<br>2821 Eastern Blvd., Ste. 100<br>Montgomery, AL 36116 | **DESIGN/BUILDER:**<br>James N. Gray Co.<br>10 Quality Street<br>Lexington, KY 40507 |

DATE OF ISSUANCE:

PROJECT OR DESIGNATED PORTION SHALL INCLUDE: Office

The work performed under this Contract has been reviewed and found, to the Design/Builder's best knowledge, information and belief, to be substantially complete. Substantial Completion is the stage in the progress of the work when the work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the customer can occupy or utilize the work for its intended use. The date of Substantial Completion of the Project or portion thereof designated above is hereby established as:

06/30/04

which is also the date of commencement of applicable warranties required by the Contract Documents, except as stated below:

---

A list of items to be completed or corrected is attached hereto. The failure to include any items on such list does not alter the responsibility of the Design/Builder to complete all work in accordance with the Contract Documents.

| | | |
|---|---|---|
| GNF Architects and Engineers, P.S.C.<br>**PROJECT ARCHITECT/ENGINEER** | BY: Dennis E. Bopp, R.A. | 06 august 04<br>**DATE** |

The Contractor will complete or correct the work on the list of items attached hereto within _____ day(s) from the above date of Substantial Completion.

| | | |
|---|---|---|
| James N. Gray Co.<br>**PROJECT CONTRACTOR** | BY: Brad T. Cvengros | 6/23/04<br>**DATE** |

The Customer accepts the work or designated portion thereof as substantially complete and will assume full possession thereof at _____ on _____

| | | |
|---|---|---|
| Hwashin America Corp.<br>**CUSTOMER** | BY: David Nam, President | 8/20/04<br>**DATE** |

1

The responsibilities of the Customer and the Design/Builder for security, maintenance, heat, utilities, damage to the work and insurance shall be as follows:

1.    Door hardware and sweeps to be installed at all exterior doors (typical).

2.    Column at entry vestibule to be wrapped.

3.    Roof leak in office at door between vestibule and cafeteria.

4.    Paint accent soffit between corridor C and Cafeteria 109.  See revised finish schedule.

5.    Verify HIPAA requirements at First Aid -- possibly replace lay-in ceiling system with hard ceiling.

06/23/2004

## REQUIREMENTS FOR CERTIFICATE OF OCCUPANCY

Hwashin America Corp.
Gray Job #203048

| Item | Area | Descriptions | Responsibility | Sub | Date Completed | Note |
|------|------|-------------|----------------|-----|---------------|------|
| 1 | n/a | Produce "Life Safety Plan" drawing. | Gray | Gray | | |
| 2 | All Bldg. | Paint all ladders in safety yellow. | Gray | Woosley | | |
| 3 | All Bldg. | Fire alarm for each zone to be tested and reported. | Gray | Tri-State | | |
| 4 | Mftg. | Install exit sign at door #178. | Gray | M&L | | |
| 5 | All Office | Complete ceiling system. | Gray | Ken Isaacs | | |
| 6 | All Office | Complete all system above ceiling. | Gray | Hardy, M&L, Tri-State | | |
| 7 | All Office | Complete flooring. | Gray | Faulkner | | |
| 8 | All Office | Complete all electrical outlet. | Gray | M&L | | |
| 9 | All Office | Complete all doors. | Gray | CDP | | |
| 10 | All Office | Complete all interior paint. | Gray | Woosley | | |
| 11 | All Office | All emergency device to be complete, tested, and reported. | Gray | M&L | | |
| 12 | Rm#182 | Replace two outlets at workroom (above sink) with GFI receptacles. | Gray | M&L | | |
| 13 | Rm#413 | Replace outlet with medical grade GFI receptacle. | Gray | M&L | | |
| 14 | Rm#116, 118, 119, 120 | Complete receptacle and wiring with GFI rated. | Gray | M&L | | |
| 15 | Rm#116, 120 | Install toilet partitions. | Gray | Ken Isaacs | | |
| 16 | Exterior | Complete employee parking lot (asphalt, stripe, handicap sign, lighting). | Hwashin | --- | | Asphalt andStriping Not in Contract |

Case 2:07-cv-00584-WKW-SRW   Document 71   Filed 06/25/2007   Page 40 of 50

UNITED DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA RECEIVED

|  | | |
|---|---|---|
| **GRAY CONSTRUCTION, INC.,** | ) | 2007 JUN 25 P 2: 44 |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action Number: |
| **v.** | ) | 2:07-CV-584-WKW |
| | ) | |
| **HWASHIN AMERICA CORPORATION,** | ) | **TRIAL BY STRUCK JURY** |
| | ) | **IS DEMANDED** |
| **Defendant.** | ) | |

## COMPLAINT

### PARTIES

1.      Plaintiff Gray Construction, Inc. ("Gray") is a Kentucky corporation with its principal place of business in Lexington, Kentucky.

2.      Defendant Hwashin America Corporation ("Hwashin") is a Delaware corporation, with its principal place of business in Montgomery County, Alabama.

### JURISDICTION AND VENUE

3.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 as the Parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of intent and cost.

4.      Venue is proper in this action pursuant to 28 U.S.C. § 1391(c) as Defendant's principal place of business and the property at issue are located in this judicial district and the acts and omissions giving rise to this Complaint occurred in this judicial district.

EXHIBIT C

## STATEMENT OF FACTS

5.     On or about September 24, 2003, Gray entered into a contract with Hwashin to repair a commercial facility on certain real property located in Butler County, Alabama, which is owned by Hwashin.

6.     The real property is located at 661 Montgomery Highway, Greenville, Butler County, Alabama.

7.     On or about December 29, 2006, Gray completed repairs at the Hwashin facility.

8.     Defendant has refused to pay the outstanding balance of Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00) that is due to Gray in its entirety for the repair work done by Gray at the facility.

9.     On June 22, 2007, Gray recorded a verified statement of lien in the Probate Court of Butler County, Alabama, in the amount of Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00) representing the amount owed to Gray.

## COUNT ONE – MATERIALSMAN LIEN

10.     Gray realleges as though fully set forth all allegations contained in Paragraph Nos. 1 through 9 of the Complaint.

11.     After full payment was not received by Gray and within six (6) months of "final work", Gray filed and recorded in the Probate Court of Butler County, Alabama a verified statement of lien. A true and correct copy of the lien is attached as Exhibit "A".

12.     This lawsuit is filed within six (6) months of the "final work" pursuant to Alabama Code, § 35-11-221 (1975).

WHEREFORE, Gray demands judgment against the Defendant for Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00), plus pre-judgment interest, post-judgment interest, attorney's fees, court cost and expenses, and request that this Court grant a lien against the real property in that amount, declare that the lien be superior to any and all interest of any interested parties and order the property be sold for payment.

## COUNT TWO – BREACH OF CONTRACT

13.     Gray realleges as though fully set forth all allegations contained in Paragraph Nos. 1 through 12 of the Complaint.

14.     Gray entered into a contract with the Defendant for Gray to make repairs to Defendant's commercial building.

15.     Gray completed its work pursuant to the terms of the agreement with the Defendant and has fully complied with its obligation under the contract.

16.     Defendant has breached the contract with Gray by failing to pay Gray for the work performed in the amount of Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00).

17.     As a direct, proximate and consequential result of Defendant's breach of the contract, Gray has been damaged.

WHEREFORE, Gray demands judgment against Defendant for Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00), plus pre-judgment interest, post-judgment interest, attorney's fees, court cost and expenses.

492082-1                                    3

## COUNT THREE – UNJUST ENRICHMENT

18.     Gray realleges as though fully set forth all allegations contained in Paragraph Nos. 1 through 17 of the Complaint.

19.     Gray supplied materials and services to repair the Hwashin facility, from which Hwashin substantially benefited at the expense of Gray.

20.     To allow Hwashin to benefit from these materials and services without compensating Gray would unjustly enrich Defendant.

WHEREFORE, Gray demands judgment against Defendant for Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00), plus pre-judgment interest, post-judgment interest, attorney's fees, court cost and expenses.

## COUNT FOUR – QUANTUM MERUIT

21.     Gray realleges as though fully set forth all allegations contained in Paragraph Nos. 1 through 20 of the Complaint.

22.     Defendant knowingly accepted materials and services provided by Gray and benefited as a result of receipt of Gray's materials and services.

23.     Gray had a reasonable expectation of compensation for the materials and services provided because Defendant agreed to pay for the materials and services provided.

24.     The reasonable value of the materials and services provided by Gray is equal to Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00).

WHEREFORE, Gray demands judgment against Defendant for Six Hundred Ninety Nine

Thousand Two Hundred Six Dollars ($699,206.00), plus pre-judgment interest, post-judgment

interest, attorney's fees, court cost and expenses.

## **TRIAL BY STRUCK JURY IS DEMANDED**

DATED this the $\overline{25}$ day of June, 2007.

By: _____

E. Britton Monroe (MON032)
Mickey B. Wright (WRI048)
Brian M. McClendon (MCC133)
Attorneys for Gray Construction, Inc.

**OF COUNSEL:**
LLOYD, GRAY & WHITEHEAD, P.C.
2501 20th Place South, Suite 300
Birmingham, Alabama 35223
Telephone: (205) 967-8822
Facsimile: (205) 967-2380

**PLAINTIFF REQUESTS THE FOLLOWING BE SERVED BY CERTIFIED MAIL:**

Hwashin America Corporation
c/o Michael B. O'Conner
105 Tallapoosa Street, Suite 101
Montgomery, AL 36104

_____
OF COUNSEL

I CERTIFY THIS INSTRUMENT WAS FILED ON
06/22/2007 12:46:07 PM
JUDGEMENTS BOOK: 30 PAGE: 506
Entry#: 62805
DEED TAX:$0.00 MORTG TAX:$0.00 MIN TAX:$0.00
REC-FEE:$7.00 FILE-FEE:$0.00 TRANS-FEE:$0.00

*Steve Norman*

**Judge of Probate**

This instrument prepared by:
Lloyd, Gray & Whitehead, PC
2501 20th Place South, Suite 300
Birmingham, Alabama 35223

STATE OF ALABAMA  )
BUTLER COUNTY  )

### VERIFIED STATEMENT OF LIEN

**Gray Construction** of Lexington, Kentucky, files this statement in writing, verified by the oath of Scott Parker, as Chief Financial Officer of Gray Construction, who has personal knowledge of the facts herein set forth:

That said Gray Construction, claims a lien upon the following property situated in Butler County, Alabama, to-wit, 661 Montgomery Highway, Greenville, Butler County, Alabama, and is legally described as follows:

Commence at an iron pin at the Northwest Corner of the Northeast Quarter of Section 18, T-10-N, R-15-E, Butler County, Alabama; Thence run N 88° 04'20" E, 1336.44 feet to a point; Thence run N 88° 01'29" E, 111.64 feet to a point lying on the west right of way of U.S. Highway 31 (ROW Varies); Thence run along said west right of way, S 20° 35'24" W, 268.50 feet to a point lying on the existing west right of way of U.S. Highway 31 (ROW Varies); Thence leave said west right of way and run N 24° 24'36" W, 42.43 feet to a point lying on the proposed new west right of way of said U.S. Highway 31, said point being the Point of Beginning; Thence from said Point of Beginning, run along said proposed right of way, S 20° 35'24" W, 116.50 feet to a point; Thence continue along said proposed right of way, 30.0 feet west of, parallel to and contiguous with the existing west right of way, S 20° 42'05" W, 460.76 feet to a point of curvature; Thence continue along said proposed right of way and said curve (concave westerly, R=22346.65'), a chord of S 21° 32'27" W, 654.90 feet to a point of curvature; Thence continue along said proposed right of way and said curve (concave westerly, R=22346.65'), 10.0 feet west of, parallel to and contiguous with the existing west right of way, a chord of S 22° 45'42" W, 297.42 feet to a point of curvature; Thence continue along said proposed right of way and said curve (concave westerly, R=22346.65'), 30.0 feet west of, parallel to and contiguous with the existing west right of way, a chord of S 23° 21'37" W, 169.53 feet to a point; Thence continue along said proposed right of way, S 23° 34'40" W, 209.99 feet to a point; Thence leave said proposed right of way and run N 89° 59'03" W, 662.48 feet to a point; Thence run N 00° 29'08" W, 274.42 feet to a point; Thence run S 87° 49'03" W, 235.74 feet to a point; Thence run N 00° 40'58" W, 1528.36 feet to a point; Thence run N 88° 04'20" E, 939.89 feet to a point; Thence run N 79° 32'29" E, 101.12 feet to a point; Thence run N 88° 04'20" E, 351.31 feet to a point of curvature; Thence run along said curve (concave southerly, R=465.0'), a chord of S 89° 08'17" E, 45.26 feet to a point; Thence run S 65° 20'42" E, 48.12 feet to a point of curvature; Thence run along said curve (concave southerly, R=450.0'), a chord of S 75° 00'51" E, 87.89 feet to a point; Thence run S 69° 24'36" E, 60.47 feet to a point; Thence run S 24° 24'36" E, 21.21 feet to the Point of Beginning.

Said described property lying and being situated in the North Half of Section 18, T-10-N, R-15-E, Butler County, Alabama and contains 52.207 Acres, more or less.

EXHIBIT A

This lien is claimed separately and severally as to the both the buildings and improvements thereon and the land of the owner or lease-hold interest of the proprietor.

That the lien is claimed to secure an indebtedness of SIX HUNDRED NINETY-NINE THOUSAND TWO HUNDRED SIX AND 00/100 DOLLARS ($699,206.00) with interest from December 29, 2006, for work and labor done and materials supplied for the construction of the improvements on the property at the request of the owner.

The above-described property is owned by **Hwashin America Corporation** by virtue of the Statutory Warranty Deed dated May 1, 2005, and recorded May 2, 2006, at Book 0288, Page 613, in the Office of the Judge of Probate, Butler County, Alabama.

Scott Parker, Chief Financial Officer
Gray Construction


STATE OF KENTUCKY        )
FAYETTE COUNTY           )

Before me a Notary Public in and for the said County of Fayette, State of Kentucky, personally appeared Scott Parker, who, being first duly sworn, does depose and say that he has personal knowledge of the facts set forth in the foregoing Statement of Lien and that the same are true and correct to the best of his knowledge and belief. Subscribed and sworn to before me this 21st day of June, 2008, by said affiant.

[SEAL]

My Commission Expires:

November 19, 2008

Chris French
NOTARY PUBLIC
In and for said County and State

## Christi Hice

**From:** efile_notice@almd.uscourts.gov
**Sent:** Tuesday, June 26, 2007 11:40 AM
**To:** almd_mailout@almd.uscourts.gov
**Subject:** Activity in Case 2:07-cv-00584-WKW-SRW Gray Construction, Inc. v. Hwashin America Corporation "Complaint"

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Alabama Middle District

Notice of Electronic Filing

The following transaction was received from entered on 6/26/2007 at 11:39 AM CDT and filed on 6/25/2007

**Case Name:**        Gray Construction, Inc. v. Hwashin America Corporation
**Case Number:**      2:07-cv-584
**Filer:**            Gray Construction, Inc.
**Document Number:** 1

**Docket Text:**
COMPLAINT against Hwashin America Corporation (Filing fee $ 350.00 receipt number 0587.), filed by Gray Construction, Inc.. (Attachments: # (1) Exhibit A)(wcl, )

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=6/26/2007] [FileNumber=747699-0]
[1a786a1593679f9a1655eefdb75aa4309c41ad8a2d751874422d5a49c43987a635bb
b5bf66ebd57b021ef12c11d5a7dafbac4c65e0564d68bcbebd2be32e4840]]
**Document description:**Exhibit A
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=6/26/2007] [FileNumber=747699-1]
[4c0c5e51452f38b93c24a134859a4f472c112def5443971f55d9a52f00eb3174422c
ffd085e1acf0ccf1750cefae30880246313fe304c5ec0ea56436490732b0]]

**2:07-cv-584 Notice will be electronically mailed to:**

Brian Michael McClendon      bmcclendon@lgwpc.com, chice@lgwpc.com

Elliot Britton Monroe    bmonroe@lgwpc.com, rfernandez@lgwpc.com

Mickey B. Wright    mwright@lgwpc.com, chelms@lgwpc.com

**2:07-cv-584 Notice will be delivered by other means to:**

## Christi Hice

**From:** efile_notice@almd.uscourts.gov

**Sent:** Tuesday, June 26, 2007 11:41 AM

**To:** almd_mailout@almd.uscourts.gov

**Subject:** Activity in Case 2:07-cv-00584-WKW-SRW Gray Construction, Inc. v. Hwashin America Corporation "Jury Demand"

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Alabama Middle District

Notice of Electronic Filing

The following transaction was received from wcl, entered on 6/26/2007 at 11:40 AM CDT and filed on 6/25/2007

**Case Name:**       Gray Construction, Inc. v. Hwashin America Corporation

**Case Number:**     2:07-cv-584

**Filer:**           Gray Construction, Inc.

**Document Number:**

**Docket Text:**
DEMAND for Trial by Jury by Gray Construction, Inc.. (NO PDF ATTACHED-SEE DOCKET ENTRY [1]) (wcl, )

The following document(s) are associated with this transaction:

**2:07-cv-584 Notice will be electronically mailed to:**

Brian Michael McClendon     bmcclendon@lgwpc.com, chice@lgwpc.com

Elliot Britton Monroe     bmonroe@lgwpc.com, rfernandez@lgwpc.com

Mickey B. Wright     mwright@lgwpc.com, chelms@lgwpc.com

**2:07-cv-584 Notice will be delivered by other means to:**