**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| JENNIFER PIGGOTT and ) <br> SLADE PIGGOTT, ) <br> ) <br>     **Plaintiffs,** ) <br> ) <br> v. ) <br> ) <br> GRAY CONSTRUCTION, INC., ) <br> ) <br>     **Defendant/Third-Party Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> COOPER'S STEEL ) <br> FABRICATORS, INC., <u>et al.</u>, ) <br> ) <br>     **Third-Party Defendants.** ) | **Case No.: CV-06-1158** |

---

**GRAY CONSTRUCTION INC.'S OPPOSITION TO HWASHIN AMERICA CORPORATION'S MOTION TO DISMISS**

---

Third-Party Plaintiff Gray Construction Inc. ("Gray") respectfully submits this Opposition to Third-Party Defendant Hwashin America Corporation's ("Hwashin") Motion to Dismiss.

## I.      INTRODUCTION

Hwashin argues Gray is unable to recover as a matter of law based on its stated theories of contractual and common law indemnity. Hwashin's Motion to Dismiss ignores the clear language of the indemnity provision between Gray and Hwashin, Alabama case law regarding common law indemnification and seeks to argue facts which are inappropriate for a Motion to Dismiss. Hwashin's Motion to Dismiss is due to be denied.

## I.     STATEMENT OF FACTS

On or about September 24, 2003, Gray and Hwashin entered into a Design/Build Agreement for the construction of an approximately 273,000 square foot manufacturing facility on undeveloped property located in Greenville, Alabama ("Design/Build Agreement"). (A true and correct copy of the Design/Build Agreement is attached as Exhibit A). Article 11 of the Design/Build Agreement is entitled "Miscellaneous Provisions". (Id. at p. 18.). Article 11 addresses such various issues as choice of law, indemnity, notice of damages, termination of design services, limitations of claims for consequential damages and the binding effect of the Design/Build Agreement on Hwashin's and Gray's successors and assigns. (Id. at p. 18-20.).

Section 10 of Article 11 is entitled "Site Conditions/Environmental Matters." (Id. at p. 20.). Included under this section of the Design/Build Agreement is an indemnity provision contained in 11.10.4.3:

> 11.10.4.3 Owner's Indemnification Responsibilities. To the fullest extent permitted by law, the Owner shall defend, indemnify, and hold harmless Design/Builder, its Subcontractors, Suppliers, consultants, agents and employees, from any and all claims, liability, damages and expenses (including attorney fees and expense), arising out of or resulting from:
>
> (a) Any claim, suit or legal proceeding to recover damages for wrongful death, bodily injury, illness or disease or injury to, or destruction of tangible property alleged to be caused either directly or indirectly by any substances, condition, element, or material or any combination of the foregoing: (a) produced by Owner or emitted or released by Owner either intentionally or unintentionally, from the facilities designed and/or constructed by Design/Builder for the benefit of Owner, or (b) used by Design/Builder or incorporated by Design/Builder into the Work herein agreed to be performed by Design/Builder for the benefit of Owner if specifically required by Owner or if necessary for the planned use of the work and to the extent not caused by the mishandling of such substances, condition, element or material by Design/Builder, its Subcontractors, suppliers, consultants, agents, and employees:
>
> (Id.).

Gray constructed the Hwashin facility, including an attached office, in Greenville, Alabama in accordance with the Design/Build Agreement. (Gray's Third Party Complaint, Document No. 26 at ¶ No. 28). On October 17, 2006, the roof of the Hwashin facility office collapsed. (Plaintiffs Jennifer and Slade Piggott's Complaint at ¶ 13-14.).

According to Plaintiffs Jennifer and Slade Piggott's ("Mr. and Mrs. Piggott") Complaint, Mrs. Piggott was inside the Hwashin facility office at the time of the roof collapse. (Id.). Mrs. Piggott alleges she was personally injured as a result of the roof collapse. (Id.).

On June 8, 2007, Gray filed a Third-Party Complaint naming Cooper's Steel Fabricators, Inc., All-South Subcontractors, Freeland Harris Consulting Engineers of Kentucky, Inc., Freeland Harris Consulting Engineers of Georgia, Inc., The Hardy Corporation, Latta Plumbing & Construction Co., Inc., Hwashin America Corporation and Firestone Building Products Company, LLC, as Third-Party Defendants. (Third-Party Complaint, Document No. 26 in the Court Docket.). Gray alleges Hwashin is liable to Gray under theories of contractual and common law indemnity. (Id. at ¶ Nos. 32-36 and 57-61).

The roof of the Hwashin facility office utilized an internal primary drainage system to remove water from the roof. (Id. at ¶ No. 29). It is alleged in Gray's Third-Party Complaint that after construction was complete and Gray had left the facility that Hwashin allowed debris to accumulate on the roof of the office, which substantially clogged the internal primary drainage system, causing the collapse of Hwashin's office. (Id. at ¶ Nos. 32-36 and 57-61).

On July 23, 2007, Hwashin filed a Motion to Dismiss Gray's Third-Party Complaint. (Motion to Dismiss, Document No. 83 in the Court Docket.). The Motion to Dismiss alleges that the contractual indemnity provision cited by Gray does not apply, as it concerns only environmental matters. (Id.). Hwashin also argues that it cannot be held liable under a theory of

common law indemnity due to the worker's compensation exclusivity provision and Gray's own active negligence. (Id.). Hwashin's Motion is due to be dismissed.

## II.     ARGUMENT

### A.     Section 11.10.4.3 of the Design/Build Agreement Requires Hwashin to Indemnify Gray for Conditions at the Site Created by Hwashin.

Hwashin admits Section 11.10.4.3 is an indemnity agreement between Gray and itself. (Hwashin's Motion to Dismiss, Document No. 83 at p. 3.). However, Hwashin argues the indemnity provision is not applicable to the allegations of Gray's Third-Party Complaint. Hwashin is incorrect.

### 1.     Section 11.10.4.3 Unambiguously Requires Hwashin to Indemnify Gray for Conditions Hwashin Created at the Site.

Courts have routinely held that "if the terms of a contract are unambiguous and susceptible to only one reasonable meaning, then the Court should presume that the parties intended what they stated and should enforce the contract as written." See Gulf Coast Realty Co., Inc. v. Professional Real Estate Partners, Inc., 2005 WL 1926429 (Ala. 2005). An instrument is "unambiguous" if only one reasonable meaning clearly emerges from the language. See Harrison v. Morrow, 2007 WL 1953896 (Ala. 2007). In determining whether an agreement has only one reasonable meaning, the words of an agreement are to be given their "ordinary meaning" and the intention of the parties is to be derived from these ordinary meanings. See Ex parte Keelboat Concepts, Inc., 938 So.2d 922 (Ala. 2005). See also Teitel v. Wal-Mart Stores, Inc., 287 F.Supp.2d 1268 (M.D.Ala. 2003). In construing indemnity agreements, "**all fair doubts are resolved in favor of party indemnified**" [in this case Gray]. See Louisville & N.R. Co. v. Cullman Warehouse, 147 So. 421 (Ala. 1933) (emphasis added).

11.10.4.3 states that Hwashin will indemnify Gray for "any claim, suit or legal proceeding to recover damages for wrongful death, bodily injury, illness or disease or injury to or destruction of tangible property".  Mr. and Mrs. Piggott's lawsuit is a claim, suit and legal proceeding to recover damages for a bodily injury.  Hwashin cannot dispute that.  Gray's indemnity claim meets the first requirement of Section 11.10.4.3.

The second requirement – that the bodily injury must also be "alleged to be caused either directly or indirectly by any substances, condition, element or material or any combination of the foregoing produced by owner [Hwashin] or emitted or released by owner [Hwashin] either intentionally or unintentionally, from the facilities designed and/or constructed by design/builder [Gray] for the benefit of the owner" – is also met.  "Condition" is not defined in the contract, but is defined by Black's Law Dictionary Sixth Edition (1990) as a "mode or state of being; state or situation; essential quality, property; attribute; status or rank."

Gray alleges that after Gray completed its work and left the property that Hwashin failed to clean and maintain the roof drains on the roof of the Hwashin facility's office.  (Third-Party Complaint, Document No. 26 at ¶35.).  Gray alleges this lack of maintenance allowed the drains to clog with debris and substantially diminished the drainage system's ability to drain the roof.  (Id.).  Gray alleges the diminished drain capacity allowed water to pond on the office building roof, proximately causing the office roof collapse.  (Id.).

Other Courts have addressed similar issues in the context of premises liability.  There are numerous cases which have held that a property owner allowing snow to accumulate on a roof is a "dangerous condition" created by the owner which could render the owner liable for the resulting roof collapse.  See Maldonado v. Novartis Pharmaceuticals Corp., 795 N.Y.S.2d 759 (N.Y.A.D. 2 Dept., 2005.); Marzotto v. Gay Garment Co., 78 A.2d 394 (N.J.Super.App., 1951);

Bakeman v. Sears, Roebuck & Co., 307 N.E.2d 449 (Ill.App.2.Dist., 1974)(held that an owner does not have a common law duty under Illinois law to remove snow accumulation, but recognized that the accumulation is a "dangerous condition" created by the owner.).

Section 11.10.4.3 requires Hwashin to indemnify Gray for a condition that Hwashin created, the clogged drainage system, which resulted in Mr. and Mrs. Piggott's lawsuit. This Court should enforce the indemnity agreement as written.

Hwashin argues, with no support, that Section 11.10.1 and the indemnification provision, only apply to site conditions existing at the time of the contract between Hwashin and Gray. (Motion to Dismiss at page 3 and footnote 1). This argument contradicts the language of the indemnification provision which provides that Hwashin indemnifies Gray "[t]o the fullest extent permitted by law". There is nothing in Section 11.10.1 or the indemnification provision which limits the indemnification to site conditions existing at the time Hwashin and Gray entered into the contract.

Hwashin also argues that no site conditions "are in any way implicated in this entire lawsuit." (Id. at p. 8.). Site conditions are implicated by Gray's Third-Party Complaint as Gray pleads that Hwashin allowed a site condition to exist at the facility -- clogged drains -- which was the sole cause of the roof collapse. Site conditions are definitely "implicated" in this lawsuit.

Hwashin goes to the extent of extensively identifying and defining the term "pollutants" and "hazardous substances." However, neither of those terms is even mentioned in the indemnity provision. Rather, the indemnity provision focuses on "substances, conditions, elements or materials or any combination" thereof. The fact Gray did not identify a "pollutant" or "hazardous material" in the allegations of its Third-Party Complaint is immaterial. What is

material and what Gray did allege is that a condition existed -- clogged drains -- which is encompassed by the indemnity provision.

Hwashin attempts to distinguish this action from other environmental misconduct by pointing out that the case is not a traditional "pollution" claim. The mere fact that Hwashin dumped HVAC filters, as opposed to some chemical, does not mean Hwashin's actions do not qualify as an environmental pollution matter.[1]

In <u>Yale University v. Cigna Ins. Co.</u> 224 F.Supp.2d 402 D.Conn.,2002, the Court interpreted an exclusion to an insurance policy that defined a pollutant as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material", substantially the same definition of pollutant used in the Design/Build Agreement  The <u>Yale</u> Court held that a contaminant is something that renders property "unfit for use by the introduction of unwholesome or undesirable elements" and/or "physically impure or unclean".  (<u>Id</u>. at p. 422.).  There is no question that the debris and discarded HVAC filters qualify as a solid which were undesirable elements which caused the building to be unfit for use and collapse.

Moreover, the term "pollutant" expressly includes "waste", which used and discarded HVAC filters would qualify as.  "Solid Waste" is defined by 42 U.S.C.A. § 6903 (27) as:

> any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of Title 33, or source, special

---

[1] Hwashin actually argues that the provision not only applies solely to pollutants, but only to hazardous substances, a subset of the term pollutants.  (Motion to Dismiss at p. 9.).  This is simply unsupported by the clear language of the Design/Build Agreement.  The term hazardous substances does not appear in the indemnity provision and is not defined by the Design/Build agreement until two sections after the indemnity provision.

nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) [42 U.S.C.A. § 2011 et seq.].

Black's Law Dictionary (Sixth Edition) defines refuse as "that which is refused or rejected as useless or worthless. Worthless matter, rubbish, scum or leavings". The discarded filters clearly fit within these definitions. Hwashin's Motion to Dismiss is due to be denied.

### 2.    At Most, the Indemnity Agreement Is Ambiguous, Which Requires Denial of Hwashin's Motion to Dismiss.

Hwashin's argument is that Hwashin interprets the indemnification provision is "supposed to" be limited to "pollutants" and "hazardous substance." Unfortunately for Hwashin, there is nothing in the indemnity provision that so limits it. At most, Hwashin's argument that the indemnity provision is limited to "pollutants" and "hazardous materials" establishes the indemnity provision is ambiguous.

When an agreement is reasonably susceptible to more than one meaning, an ambiguity exists. See Downs v. Downs, 2007 WL 1098170 (Ala.Civ.App. 2007). A "patent ambiguity" is one that is apparent upon the face of the instrument, arising by reason of inconsistency or uncertainty in the language employed. See Meyer v. Meyer, 952 So.2d 384 (Ala.Civ.App. 2006). Latent ambiguity occurs when language of instrument is clear and intelligible, but when considered in light of certain extraneous facts, takes on another meaning. See Interstate Inv. Corp. v. Rose Care, Inc., 631 So.2d 836 (Ala. 1993).

If the language is ambiguous, it is the role of the jury to resolve the ambiguity, not the Court. See Blackburn v. Fidelity and Deposit Co. of Maryland, 667 So.2d 661 (Ala. 1995)(held that interpretation of an ambiguous contract provision was a matter for the jury and could not support a motion for summary judgment.). See also J. Paul Jones Hosp. v. Jackson, Coker &

Associates, Inc., 491 So.2d 972 (Ala.Civ.App. 1986)(held that ambiguity in contract precludes summary judgment based upon contract interpretation.).

Hwashin argues that Section 11.10.4.3 should be read in conjunction with the surrounding provisions and the section headings.  (Motion to Dismiss at pp. 3-4.).  Gray alleges the language of the section speaks for itself and there is no specific language in the indemnity provision limiting it as suggested by Hwashin.  In fact, the indemnity provision says it is to be applied "[t]o the full extent permitted by law."  At most, the surrounding language cited by Hwashin creates ambiguity as to the intent of the parties and a jury question as to the scope of Section 11.10.4.3.  Hwashin's Motion to Dismiss is due to be denied.

> **B.** **Gray's Claim For Common Law Indemnity Is Not Barred By The Workers' Compensation Exclusivity Provision or Gray's Active Negligence.**

Hwashin also argues Gray's claim for common law indemnity should be denied because of the Workers' Compensation exclusivity provision and Gray's active negligence.  (Motion to Dismiss at pp. 10-14.).  The exclusivity provision does not apply and there is no allegation Gray was actively negligent.

> **1.** **The Alabama Workers' Compensation Exclusivity Provision Does Not Bar Gray's Claim for Common Law Indemnity.**

Hwashin concedes that the exclusivity provision has no effect on Gray's claim for contractual indemnity.  (Motion to Dismiss at p. 10.).  Hwashin argues, however, that Gray's claim for common law indemnity is barred by the Alabama Worker's Compensation exclusivity provision found at Alabama Code §25-5-53.[2]  (Id.).  Hwashin is incorrect.

Section 25-5-53 does not bar Gray's right to recover under a theory of common law indemnity because the claims are allowable under the "dual capacity" doctrine.  Alabama has

---

[2] Hwashin incorrectly cites the exclusivity provision to Ala. Code (1975) §25-5-4.

recognized the existence of the dual capacity doctrine as an exception to the exclusivity provision.  See Ritchie v. Bridgestone/Firestone, Inc., 621 So. 2d 288 (Ala. 1993).  See also Therrell v. Scott Paper Co., 428 So.2d 33 (Ala.1983); Windham v. Blount International, Ltd., 423 So.2d 194 (Ala.1982); Missildine v. Avondale Mills, Inc., 415 So.2d 1040 (Ala.1981); Stone v. United States Steel Corp., 384 So.2d 17 (Ala.1980); Mapson v. Montgomery White Trucks, Inc., 357 So.2d 971 (Ala.1978).

The dual capacity doctrine states: "An employer normally shielded from tort liability by the exclusive remedy principle may become liable in tort to his own employee if it occupies, in addition to his capacity as employer, a second capacity that confers on its obligations independent of those imposed on it as employer."  See Ritchie at 288, quoting A. Larson, 2A The Law of Workmen's Compensation, § 72.80, p. 14-112 (1976).

In Ritchie, the Court set forth the test for determining whether the dual capacity doctrine applies:

> The decisive test to determine if the dual-capacity doctrine is invocable is not whether the second function or capacity of the employer is different and separate from the first. Rather, the test is whether the employer's conduct in the second role or capacity has generated obligations that are unrelated to those flowing from the company's or individual's first role as an employer. If the obligations are related, the doctrine is not applicable.

Ritchie at p. 290.

In this case, Hwashin assumed dual roles, each with its own duty owed to Mr. and Mrs. Piggott.  Hwashin was admittedly Mrs. Piggott's employer. However, Hwashin was also the property owner who formed a maintenance team to clean the Hwashin office facility roof drains. Hwashin could have subcontracted with another individual or entity to maintain the roof, but instead chose to create its own maintenance team.  By doing so, Hwashin effectively assumed dual roles as both Mrs. Piggott's employer and the entity responsible for maintaining the

building.  The obligation to properly maintain the roof and drainage system is distinct and wholly separate from the duty Hwashin owed to Mrs. Piggott as its employee.

Even if the exclusivity provision applies, at most Gray would be barred from recovering any award of damages it is forced to pay Mr. and Mrs. Piggott.  Gray could still recover its fees, costs and expenses in defending against Mr. and Mrs. Piggott's claims.

As pointed out by Hwashin, the bar against indemnity from the plaintiff's employer is designed to prevent a third-party from recovering what an employee could not recover directly. See Paul Krebs & Associates v. Matthews & Fritts Construction Co., 356 So.2d 638 (Ala.1978). In this case, Gray is also seeking to recover fees and costs incurred in defending against Mr. and Mrs. Piggott's claims, a recovery Mr. and Mrs. Piggott could not recover directly from Hwashin. (Gray's Third Party Complaint, Document No. 26, at ¶ 32-36 and 57-61.). Even if Gray is barred from recovering Mr. and Mrs. Piggott's damages, the exclusivity provision does not bar it from recovering its fees and costs in defending against Mr. and Mrs. Piggott's claims.

## 2.     Hwashin and Gray Are Not Joint Tort Feasors.

Hwashin contends that Gray cannot seek contribution or indemnity from a joint tort feasor, Hwashin.  (Motion to Dismiss at p. 12.).  What Hwashin assumes and fails to address is it is not a joint tort feasor with Gray based on the allegations of Gray's Third-Party Complaint.

The allegations against Hwashin are that after Gray had already constructed the office building and left the site, that Hwashin, who had responsibility for changing HVAC filters and maintenance of the roof, allowed the old HVAC filters and other debris to accumulate on the roof of the office building, clogging the primary drain system, causing water to pool on the roof of the office building and solely causing the collapse.  Gray is not in "pari delicto" with Hwashin.

Hwashin's active negligence took place monthly after Gray had already left the site until the collapse. Gray had no contractual or other duty to maintain the HVAC systems or clean the roof drains. That was Hwashin's duty. It is inconceivable how Hwashin could possibly argue that Gray and Hwashin are in "pari delicto" as to the maintenance of the roof and leaving filters and debris on the roof to clogging the drains, when Gray had completed its work and left the site months before the collapse.

### 3.    Hwashin's Motion To Dismiss Is Actually A Motion For Summary Judgment.

While Hwashin titles its Motion a Motion to Dismiss Gray's common law indemnity claim pursuant to Federal Rules of Civil Procedure, Rule 12, it is actually a Motion for Summary Judgment subject to Federal Rules of Civil Procedure, Rule 56. A Motion to Dismiss should only be granted if "it appears that plaintiff could prove no set of facts in support of his claim which would entitle him to relief. See Jenkins v. McKeithen, 395 U.S. 411 (1969). The factual allegations of the Complaint must only raise a right to relief above the speculative level. See Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955 (2007). The assumption is that all the allegations in the complaint are true, even if doubtful in fact. (Id.).

Hwashin is not relying upon the allegations of Gray's Third-Party Complaint, but rather, seeks to argue facts beyond the allegations of the Third-Party Complaint. Hwashin asks the Court to conclude Gray's conduct, about which there are no allegations in the Third-Party Complaint, constitutes active negligence that would bar its claim for common law indemnity. Determining whether the Gray's conduct constitutes active or passive negligence necessarily requires consideration of facts and evidence beyond the pleadings.

Because Hwashin asks the Court to consider evidence beyond the allegations of the Third-Party Complaint, the Motion should be treated as one for summary judgment and denied.

See Garfield v. NDC Health Corp., 466 F.3d 1255 (11th Cir. 2006)(held that once the court decides to accept matters outside the pleading, it must convert a motion to dismiss into one for summary judgment.).  See also Trustmark Ins. Co. v. ESLU, Inc., 299 F.3d 1265 (11th Cir. 2002)(held that whenever a judge considers matters outside pleadings on motion to dismiss for failure to state claim, that motion is thereby converted into summary judgment motion, and court is required to notify parties that motion has been converted and give them 10 days in which to supplement record before ruling.).

### 4.    There is No Evidence Gray Was Actively Negligent.

Hwashin states the Design/Build Agreement imposes upon Gray the contractual duty to design and construct the Hwashin facility.  Hwashin then cites Gray's Third-Party Complaint which alleges design and construction errors against subcontractors and suppliers.  Hwashin argues that because of Gray's underlying contractual duty to design and construct the building, any error or omission by Gray's subcontractors or suppliers amounts to active negligence by Gray.  This is an incorrect conclusion and overlooks established precedent.

Hwashin seems to confuse contractual duties and tort duties.  While Gray may have had a contractual duty to Hwashin, it was the subcontractor's duties to design the office building and construct it according to design.  Gray had a mere supervisory role based on its contract with Hwashin, which has been the basis for multiple active/passive negligence indemnity cases in the state of Alabama.  (See Coates v. CTB, Inc. 173 F.Supp.2d 1200 (M.D.Ala. 2001.); Stovall v. Universal Const. Co., Inc. 893 So.2d 1090 (Ala. 2004.).

This Court addressed an issue similar to this case in Coates.  See Coates v. CTB, Inc. 173 F.Supp.2d 1200 (M.D. Ala. 2001.). In Coates, Plaintiff Coates brought suit against the builder of his chicken houses, Latco, for alleged construction defects, including a leaky roof.  (Id. at 1201.).

Latco then filed a Third-Party Complaint against Illinois Tool Works, Inc. (ITW) and J & S Tool and Fastener (J & S), two corporations which allegedly supplied some of the tools and material used in the construction of the chicken house.  (Id. at 1202.).

The Court recognized the general rule barring indemnity or contribution among joint tortfeasors.  (Id. at p. 1203).  The Court also recognized the exception to this rule "that a joint wrongdoer may claim indemnity where he has not been guilty of any fault, except technically or constructively, or where both parties are at fault, but the fault of the party from whom indemnity is claimed was the efficient cause of the injury.  Where an injury results from a violation of a duty which one owes to another, the parties are not in pari delicto." (Id. quoting Mallory S.S. Co. v. Druhan, 84 So. 874, 877 (1920)).

> The Court held:
>
> In the instant case, the builder, Latco, which is responsible for any injury resulting from his construction of the chicken houses, can shift liability for that harm to the manufacturer of the defective equipment used in construction, ITW. For the portion of the harm resulting from the use of the nails and nail guns, Latco could be found to be merely passively liable, in that it negligently failed to determine independently whether those items were properly used for the construction, while ITW could be actively negligent by supplying improper items to Latco in breach of implied warranties.
>
> (Id. at p. 1203.).

This case is directly analogous to Coates.  Gray's Third-Party Complaint pleads its subcontractors' and suppliers' active negligence.

It is alleged the design and construction errors were the fault of Gray's subcontractors and suppliers and Gray was merely passive in failing "to determine independently whether these items were properly" done.  This is a classic example of passive negligence and mirrors Coates.

Hwashin also contends that because Gray has filed indemnity claims against certain of its subcontractors, that Gray was actively negligent.  (Motion to Dismiss at p. 13.).  Gray is entitled

to plead alternative theories of indemnity in this case.  Gray has plead alternative theories of indemnity relating to its subcontractors which related to design failures and mechanical failures of the roof drainage system.  However, Gray has also alleged that had Hwashin properly maintained the primary drainage system the roof would not have collapsed. See Brookhaven Landscape & Grading Co., Inc. v. J. F. Barton Contracting Co., 676 F.2d 516 (11th Cir. 1982)(held litigants in Federal court may pursue alternative theories of recovery pursuant to Federal Rules of Civil Procedure, Rule 8.).

Hwashin, in conclusory fashion, argues that there are allegations of active negligence by Gray in the Third Party Complaint.  However, Hwashin fails to provide any citation to the allegations in Gray's Third Party Complaint that alleges active negligence on behalf of Gray.

Hwashin also argues Gray cannot seek common law indemnity because Mr. and Mrs. Piggott assert claims of active negligence against Gray.  To support this argument, Hwashin cites a single case from Michigan, Lakeside Oakland Development, L.C. v. H&J Beef Co., 644 N.W.2d 765 (Mich. 2002).

Hwashin correctly states that under **Michigan law** a party cannot seek indemnity from a joint tortfeasor where the primary complaint alleges active negligence.  (Id.).  That, however, is not the law in Alabama.

Under Alabama law, it is not the manner in which a Complaint has been pled that establishes active negligence, but rather the actual conduct of the Defendant.  Mallory S.S. Co. v. Druhan, 84 So. 874 (Ala.App. 1920.); Crockett v. Uniroyal, Inc., 772 F.2d 1524 (11th Cir. 1985)(held that whether claim for indemnity or contribution may be entertained in a negligence suit depends upon character of negligence involved; if it is demonstrated that one party was actively negligent in face of the other party's passive negligence, an action for indemnity lies; if

both parties are demonstrably negligent, but no apportionment of relative negligence can be made, the claim is one for contribution.); Magnum Marine v. Kenosha Auto Transport Corp., 481 F.2d 933 (5th Cir. 1973)(held that right of indemnity exists between parties, one of whom is guilty of active or affirmative negligence, while the other's fault is only technical or passive.).   It is irrelevant whether Mr. and Mrs. Piggott allege active or passive negligence.   The determination of the degree of Gray's negligence is left to a jury, not determined on a Motion to Dismiss based upon the Plaintiffs' unsupported pleadings.

### D.    Gray's Third-Party Claims Are Not Compulsory Counterclaims.

Hwashin argues that Gray's Third-Party claims are actually compulsory counterclaims to the Complaint in Intervention.  Federal Rules of Civil Procedure, Rule 13 (a) states:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. But the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon the claim by attachment or other process by which the court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule 13.

A claim is deemed a "compulsory counterclaim" under logical relationship test if (1) it arises from same transaction and (2) the same operative facts serve as basis for both claims, or aggregate core of facts upon which claim rests activates additional legal rights in defendant. Blue Cross and Blue Shield of Alabama v. Hobbs, 209 F.R.D. 218 (M.D.Ala.  2002.); U.S. v. Aronson, 617 F.2d 119 (5th Cir. 1980.).  In this case, however, Gray's Third-Party claims against Hwashin are not compulsory counterclaims because Hwashin is not the real party in interest in the Complaint in Intervention.

On May 22, 2007, Hwashin, by and through the Alabama Self-Insured Worker's Compensation Fund ("the Fund"), filed a Complaint in Intervention asserting claims to recover the Fund's worker's compensation subrogation interest. (Intervenor Complaint, Document No. 20 in the Court Docket.). On June 29, 2007, Hwashin filed a Motion for Leave to Amend the Complaint in Intervention to assert claims of property damage and lost profits. (Motion For Leave to File, Document No. 55.). That Motion has not been granted.

Gray has no claim for indemnity against the Fund, only Hwashin. At this time, the Fund is the only Plaintiff in Intervention, not Hwashin. Until Hwashin is allowed to intervene, which it should not be allowed to do, there is no basis for a counterclaim.

Gray did not contract with the Fund and does not allege the Fund was in any way responsible for causing the roof collapse. Gray cannot allege counterclaims against the Fund for Hwashin's misconduct.[3]

Hwashin argues that Gray's Third-Party Complaint should be dismissed because it disrupts the proper alignment of the parties and will confuse the jury. (Motion to Dismiss at p. 16.). In support of this argument Hwashin cites two cases, National Fire Ins. Co. of Hartford v. Daniel J. Keating Co. 35 F.R.D. 137 (W.D.Pa. 1964) and American Fire and Cas. Co. v. Material Handling Supply, Inc. 2007 WL 1296200 (D.N.J. 2007.).

In National Fire, Plaintiff National Fire claimed to be a subrogee of six named insureds who allegedly sustained fire losses which were covered under an insurance policy from National Fire. (Id. at p. 138.). National Fire sought to recover payments it made pursuant to the policy from Defendant Daniel J. Keating Company (Mr. Keating), who it was alleged negligently

---

[3] The issue of whether Hwashin is the real party in interest in the Complaint in Intervention has not been decided by the Court. If the Court determines Hwashin is the real party in interest, Gray requests the Court grant it leave to file counterclaims.

caused the fire.  (<u>Id</u>.).  Mr. Keating, as a third-party plaintiff, brought in as third-party defendants John McShain Company, Raffel Bros., Inc., and GSA, three of the named insureds.  (<u>Id</u>.).

The insureds filed a Motion to Dismiss the Third-Party Complaint, which was granted. (<u>Id</u>. at 141.)  The District Court for the Western District of Pennsylvania recognized that the Third-Party Complaint would serve no purpose, other than to confuse the jury, because National Fire could not recover its subrogation interest if its insureds were found to be contributorily negligent.  (<u>Id</u>. at 140.).

In <u>American Fire,</u> the District Court of New Jersey considered a similar case and also refused to allow a Defendant leave to file a Third-Party Complaint against insureds.  In that case, American Fire was the property insurance carrier for Atlantic Mills Inc., Royal Wiping Cloth Company, Don Vog, LLC, Peter Paul Donnelly, Peter John Donnelly, Mary Kate Nitto and Kerry Donnelly (collectively "insureds").  (<u>Id</u>. at p. 1.).  A fire destroyed a warehouse owned by the insureds and American Fire paid proceeds under the insureds' policy.  (<u>Id</u>.).  American Fire then sued Material Handling Supply, Inc. ("MHS") alleging that a defective forklift provided by MHS caused the fire.  (<u>Id</u>.).  MHS filed a Motion for Leave to file a Third-Party Complaint naming the insureds as Third-Party Defendants.  (Id.).  The Court denied the Motion.  (<u>Id</u>. at p. 3.).

<u>National Fire</u> and <u>American Fire</u> can easily be distinguished from this action.  Both cases were actions brought by an insurer to recover its subrogation interest.  The Court recognized because the insurer stands in the shoes of its insured, the Third-Party Complaint served no purpose.  The Court in <u>National Fire</u> explained its reasoning best by saying:

> For example, assuming that the jury will find Keating, the original defendant, a negligent cause of the fire loss, if it also found contributory negligence on the part of GSA, those plaintiffs, who are GSA's subrogees, could not recover damages from Keating; hence, there is no need for Keating to implead the negligent

subrogor (GSA) as a third-party defendant. On the other hand, if the jury should exonerate GSA from negligence, GSA's subrogees would be entitled to damages from Keating, the negligent defendant, and, of course, the latter could not recover indemnity or contribution from GSA, the non-negligent subrogor, and impleading it as a third party would be useless. Thus, to compel GSA, as a subrogor, to remain in this case as a third-party defendant would serve no legal purpose or be of any legal benefit to Keating.

(National Fire at p. 140.).

This action is not simply an action to recover an insurer's subrogation claim. Gray admits that it can assert Hwashin's contributory negligence as a defense to the Fund's claims. However, Gray cannot recover for contributory or common law indemnity against the Fund, only Hwashin. Gray's claims for fees and costs in defending against Mr. and Mrs. Piggott's claims can only be recovered from Hwashin through a Third-Party Complaint. The Third-Party Complaint obviously serves a legitimate purpose in this case, unlike in National Fire and American Fire.

## III    CONCLUSION

Hwashin's Motion to Dismiss repeatedly contradicts itself. In one section Hwashin argues that Gray's claim for common law indemnity is barred by the exclusivity provision of the worker's compensation statutes. In another section Hwashin argues that Gray's claims are compulsory counterclaims to its subrogation claim for recovery of the worker's compensation benefits paid to Mrs. Piggott. Obviously, both arguments cannot be true.

Hwashin's Motion to Dismiss is nothing more than a scattershot attempt to discredit Gray's Third-Party Complaint in any manner it can. None of Hwashin's arguments warrant a dismissal of the Third-Party Claims.

The Design/Build Agreement clearly requires Hwashin to indemnify Gray for the condition of clogged drains Hwashin created at the facility and which caused Mr. and Mrs.

Piggott's claims. At most, Hwashin has argued the indemnity provision is ambiguous in scope and must be interpreted by a jury.

Gray's common law indemnity claim is not barred by the exclusivity provision of the Alabama Worker's Compensation statute, as Hwashin assumed a dual capacity as both employer and building maintenance company and Gray seeks its fees and costs associated with defending against Mr. and Mrs. Piggott's claims which is not barred by the exclusivity provision. Moreover, Gray and Hwashin are not just tortfeasors and there is no allegation in the Third Party Complaint that Gray was actively negligent.

WHEREFORE, Gray respectfully requests this Court deny Hwashin's Motion to Dismiss.

Done this 16th day of August, 2007.

By: *s/Brian M. McClendon*
E. Britton Monroe (MON032)
Mickey B. Wright (WRI048)
Brian M. McClendon (MCC133)
Attorneys for Defendant/ Third Party
Plaintiff Gray Construction, Inc.

**OF COUNSEL:**
LLOYD, GRAY & WHITEHEAD, P.C.
2501 20th Place South, Suite 300
Birmingham, Alabama 35223
Telephone: (205) 967-8822
Facsimile: (205) 967-2380

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of August, a true and correct copy of the foregoing has been furnished by electronic filing upon the following parties:

Jere L. Beasley, Esq.
Julia Ann Beasley, Esq.
Beasley, Allen, Crow, Methvin,
   Portis & Miles, P.C.
P.O. Box 4160
Montgomery, AL 36103-4160
***Counsel for Plaintiffs, Jennifer and Slade
Piggott***

Thomas T. Gallion, III, Esq.
Constance C. Walker, Esq.
Felicia A. Long, Esq.
Haskell, Slaughter, Young & Gallion, LLC
P.O. Box 4660
Montgomery, AL 36103-4660
***Counsel for Latta Plumbing & Construction Co.,
Inc.***

Charles Keith Hamilton, Esq.
Bainbridge, Mims, Rogers & Smith
P.O. Box 530886
Birmingham, AL 35253-0886
***Counsel for Freeland-Harris Consulting
Engineers of Kentucky, Inc.***

John S. Somerset, Esq.
Sudderth & Somerset
5385 First Avenue North
Birmingham, AL 35212
***Counsel for All-South Subcontractors, Inc.***

Linda H. Ambrose, Esq.
Rogers & Associates
3000 Riverchase Galleria, Ste. 650
Birmingham, AL 35244
***Counsel for Hwashin America Corp.***

A. Joe Peddy, Esq.
Robert B. Stewart, Esq.
Smith, Spires & Peddy
2015 2nd Avenue North, Ste. 200
Birmingham, AL 35203
***Counsel for Cooper's Steel Fabricators, Inc.***

J. Lister Hubbard, Esq.
Richard H. Allen, Esq.
Arden Reed Pathak, Esq.
Capell & Howard, P.C.
P.O. Box 2069
Montgomery, AL 36102-2069
***Counsel for Hwashin America Corp.***

James A. Rives, Esq.
William Christopher Waller, Jr., Esq.
Ball, Ball, Matthews & Novak, P.A.
P.O. Box 2148
Montgomery, AL 36102-2148
***Counsel for Hwashin America Corp.***

Hope T. Cannon, Esq.
Brittin T. Coleman, Esq.
Kenneth M. Perry, Esq.
Bradley, Arant, Rose & White, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
***Counsel for Firestone Building Products
Company, LLC***

John M. Laney, Jr., Esq.
John C. DeShazo, Esq.
Laney & Foster, P.C.
P.O. Box 43798
Birmingham, AL 35243-0798
***Counsel for Freeland-Harris Consulting
Engineers of Georgia, Inc.***

Larry W. Harper, Esq.
Porterfield, Harper, Mills & Motlow, P.A.
22 Inverness Center Parkway, Ste. 600
P.O. Box 530790
Birmingham, AL   35253-0790
***Counsel for The Hardy Corporation***

                *s/Brian M. McClendon*
                OF COUNSEL

*executed copy*

# Owner and Design/Builder

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS USE, COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

This document comprises two separate Agreements: Part 1 Agreement and Part 2 Agreement. To the extent referenced in these Agreements, subordinate parallel agreements to A191 consist of AIA Document A491, Standard Form of Agreements Between Design/Builder and Contractor, and AIA Document B901, Standard Form of Agreements Between Design/Builder and Architect.

Copyright 1985, ©1996 The American Institute of Architects, 1735 New York Avenue, NW, Washington, DC 20006-5292. Reproduction of the material herein or substantial quotation of its provisions without the written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.

**PART 2 AGREEMENT**

## 1996 EDITION

**AGREEMENT**
made as of the 24 day of September in the year of 2003
*(In words, indicate day, month and year.)*

**BETWEEN** the Owner:
*(Name and address)*
Hwashin America Corporation
P.O. Box 1139
Greenville, AL 36037

and the Design/Builder:
*(Name and address)*
James N. Gray Company
10 Quality Street
Lexington, KY 40507-1450

For the following Project:
*(Include Project name, location and a summary description.)*
To design and build an approximately 273,000 sq. ft. manufacturing facility on an undeveloped property located in Greenville, Alabama.

The architectural services described in Article 3 will be provided by the following person or entity who is lawfully licensed to practice architecture:
*(Name and address)*                    *(Registration Number)*              *(Relationship to Design/Builder)*
GNF Architects and Engineers, P.S.C.    Dennis Bopp (Alabama 5077)           Architect of Record
10 Quality Street
Lexington, Kentucky 40507

Normal structural, mechanical and electrical engineering services will be provided contractually through the Architect except as indicated below:
*(Name, address and discipline)*        *(Registration Number)*              *(Relationship to Design/Builder)*
Freeland Harris Structural Engineers    Freeland Harris, P.E. (Alabama 19702)  Structural Engineering Consultant
108 Esplanade, Suite 210
Lexington, Kentucky 40507

The Owner and the Design/Builder agree as set forth below.

---

| TERMS AND CONDITIONS - PART 2 AGREEMENT |
|:---:|

**ARTICLE 1**          **1.1**     **BASIC DEFINITIONS**
**GENERAL PROVISIONS**

**1.1.1**   The Contract Documents consist of the ~~Part~~ 2

---

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia — 8/26/2003. AIA License Number 1012416, which expires on 10/31/2003.

Electronic Format A191-1996
8

A000007001                                                              A000007001

~~Agreement to the extent not modified by this Part 2 Agreement,~~ this Part 2 Agreement, the Design/Builder's Proposal and written addenda to the Proposal __as well as other documents__ identified in Article 14, the Construction Documents approved by the Owner in accordance with Subparagraph 3.2.3 and Modifications issued after execution of this Part 2 Agreement. A Modification is a Change Order or a written amendment to this Part 2 Agreement signed by both parties, or a Construction Change Directive issued by the Owner in accordance with Paragraph 8.3.

**1.1.2** The term "Work" means the construction and services provided by the Design/Builder to fulfill the Design/Builder's obligations.

**1.2    EXECUTION, CORRELATION AND INTENT**

**1.2.1** It is the intent of the Owner and Design/Builder that the Contract Documents include all items necessary for proper execution and completion of the Work. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Design/Builder shall be required only to the extent consistent with and reasonably inferable from the Contract Documents as being necessary to produce the intended results. Words that have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

**1.2.2** If the Design/Builder believes or is advised by the Architect or by another design professional retained to provide services on the Project that implementation of any instruction received from the Owner would cause a violation of any applicable law, the Design/Builder shall notify the Owner in writing. Neither the Design/Builder nor the Architect shall be obligated to perform any act which either believes will violate any applicable law.

**1.2.3** Nothing contained in this Part 2 Agreement shall create a contractual relationship between the Owner and any person or entity other than the Design/Builder.

**1.3    OWNERSHIP AND USE OF DOCUMENTS**

**1.3.1** Drawings, specifications, and other documents and electronic data furnished by the Design/Builder are instruments of service. The Design/Builder's Architect and other providers of professional services shall retain all common law, statutory and other reserved rights, including copyright in those instruments of service furnished by them. Drawings, specifications, and other documents and electronic data are furnished for use solely with respect to this Part 2 Agreement. The Owner shall be permitted to retain copies, including reproducible copies, of the drawings, specifications, and other documents and electronic data furnished by the Design/Builder for information and reference in connection with the Project except as provided in Subparagraphs 1.3.2 and 1.3.3.

**1.3.2** Drawings, specifications, and other documents and electronic data furnished by the Design/Builder shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, except

by agreement in writing and with appropriate compensation to the Design/Builder, unless the Design/Builder is adjudged to be in default under this Part 2 Agreement or under any other subsequently executed agreement.

**1.3.3** If the Design/Builder defaults in the Design/Builder's obligations to the Owner, the Architect shall grant a license to the Owner to use the drawings, specifications, and other documents and electronic data furnished by the Architect to the Design/Builder for the completion of the Project, conditioned upon the Owner's execution of an agreement to cure the Design/Builder's default in payment to the Architect for services previously performed and to indemnify the Architect __and Design/Builder__ with regard to claims arising from such reuse without the Design/Builder's or Architect's professional involvement __to the extent such claims are not caused by the negligence of Design/Builder or Architect.__

**1.3.4** Submission or distribution of the Design/Builder's documents to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the rights reserved in Subparagraph 1.3.1.

**ARTICLE 2**
**OWNER**

**2.1** The Owner shall designate a representative authorized to act on the Owner's behalf with respect to the Project. The Owner or such authorized representative shall examine documents submitted by the Design/Builder and shall render decisions in a timely manner and in accordance with the schedule accepted by the Owner. The Owner may obtain independent review of the Contract Documents __and shop drawings__ by a separate architect, engineer, contractor or cost estimator under contract to or employed by the Owner. Such independent review shall be undertaken at the Owner's expense in a timely manner and shall not delay the orderly progress of the Work.

**2.2** The Owner may appoint an on-site project representative to observe the Work and to have such other responsibilities as the Owner and Design/Builder agree in writing.

**2.3** The Owner shall cooperate with the Design/Builder in securing building and other permits, licenses and inspections. The Owner shall not be required to pay the fees for such permits, licenses and inspections unless the cost of such fees is excluded from the Design/Builder's Proposal.

**2.4** __Except where the City of Greenville has otherwise agreed to furnish,__ ~~T~~the Owner shall furnish services of land surveyors, geotechnical engineers and other consultants for subsoil, air and water conditions, in addition to those provided under the Part 1 Agreement, when such services are deemed necessary by the Design/Builder to properly carry out the design services required by this Part 2 Agreement. __In the event the City of Greenville fails to furnish any item to__

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
9

A000007002                                                        A000007002

Design/Builders that it has agreed to furnish, then Owner, upon written request from Design/Builder shall promptly furnish such item.

**2.5**    The Owner shall disclose, to the extent known to the Owner, the results and reports of prior tests, inspections or investigations conducted for the Project involving: structural, or mechanical systems; chemical, air and water pollution; hazardous materials; or other environmental and subsurface conditions. The Owner shall disclose all information known to the Owner regarding the presence of pollutants at the Project's site.

**2.6**    The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including such auditing services as the Owner may require to verify the Design/Builder's Applications for Payment.

**2.7**    Those services, information, surveys and reports required by Paragraphs 2.4 through 2.6 which are within the Owner's control provided by the Owner or the City of Greenville shall be furnished at the Owner's or City's expense, and the Design/Builder shall be entitled to rely upon, and the Owner accepts full responsibility and liability for, the accuracy and completeness thereof, except to the extent the Owner advises the Design/Builder to the contrary in writing.

**2.8**    If the Owner requires the Design/Builder to maintain any special insurance coverage, policy, amendment, or rider, the Owner shall pay the additional cost thereof, except as otherwise stipulated in this Part 2 Agreement.

**2.9**    If the Owner observes or otherwise becomes aware of a fault or defect in the Work or nonconformity with the Design/Builder's Proposal or the Construction Documents, the Owner shall give prompt written notice thereof to the Design/Builder.

**2.10**    The Owner shall, at the request of the Design/Builder, prior to execution of this Part 2 Agreement and promptly upon request thereafter, furnish to the Design/Builder reasonable evidence and documentation acceptable to Design/Builder of Owner's ability to pay for the Work that financial arrangements have been made to fulfill the Owner's obligations under the Contract. Owner shall not thereafter materially alter such financial arrangements without written notice to, and consent in writing from, Design/Builder. Furnishing such evidence and documentation of financial arrangements shall be a condition precedent to Design/Builder's commencement or continuation of the Work.

**2.11**    The Owner shall communicate with persons or entities employed or retained by the Design/Builder through the Design/Builder, unless otherwise directed by the Design/Builder.

**ARTICLE 3**
**DESIGN/BUILDER**

**3.1    SERVICES AND RESPONSIBILITIES**

**3.1.1**    Design services required by this Part 2 Agreement shall be performed by qualified architects and other design professionals. The contractual obligations of such professional persons or entities are undertaken and performed in the interest of the Design/Builder. The standard of care for all design services performed to execute the Work shall be the care and skill ordinarily used by members of the design profession practicing under similar conditions at the same time and locality of the Project. Notwithstanding the preceding sentence, if the parties agree upon specific performance standards for any aspect of the Work, which standards are to be set forth in an exhibit to the Agreement entitled "Performance Standard Requirements," the design services shall be performed to achieve such standards.

**3.1.2**    The agreements between the Design/Builder and the persons or entities identified in this Part 2 Agreement, and any subsequent modifications, shall be in writing. These agreements, including financial arrangements with respect to this Project, shall be promptly and fully disclosed to the Owner upon request.

**3.1.3**    The Design/Builder shall be responsible to the Owner for the quality of the design services and for the quality of the construction performed by acts and omissions of the Design/Builder's employees, subcontractors and their agents and employees, and other persons, including the Architect and other design professionals, performing any portion of the Design/Builder's obligations under this Part 2 Agreement.

**3.2    BASIC SERVICES**

**3.2.1**    The Design/Builder's Basic Services are described below and in Article 14.

**3.2.2**    The Design/Builder shall designate a representative authorized to act on the Design/Builder's behalf with respect to the Project.

**3.2.3**    The Design/Builder shall submit Construction Documents for review and approval by the Owner. Construction Documents may include drawings, specifications, and other documents and electronic data setting forth in detail the requirements for construction of the Work, and shall:

.1    be consistent with the intent of the May 21, 2003, Bid Package and the Design/Builder's Proposal;

.2    provide information for the use of those in the building trades; and

.3    include documents customarily required for regulatory agency approvals.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1012416, which expires on 10/31/2003.

Electronic Format A191-1996
10

**3.2.4** The Design/Builder, with the assistance of the Owner, shall file documents required to obtain necessary approvals of governmental authorities having jurisdiction over the Project.

**3.2.5** Unless otherwise provided in the Contract Documents, the Design/Builder shall provide or cause to be provided and shall pay for design services, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

**3.2.6** Design/Builder agrees to defend, indemnify (including payment of attorney's fees) and to hold Owner harmless from any and all liens, claims of lien, security interests or other encumbrances against Owner's property in favor of the Design/Builder, contractors, materials suppliers, consultants or other persons or entities making a claim by reason of having provided labor, services, materials and equipment relating to the Work. Design/Builder further agrees to bond off, at its cost, any such liens or encumbrances pursuant to Alabama law, if requested by Owner. Notwithstanding the foregoing, Design/Builder shall be obligated to defend, indemnify and hold Owner harmless from liens, claims of lien, security interests and other encumbrances and to bond off such liens or encumbrances only to the extent such lien, claim of lien, security interest or encumbrance is not the result of Owner's non-payment of funds justly due under this Agreement.

**3.2.6̶7̶** The Design/Builder shall be responsible for all construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under this Part 2 Agreement.

**3.2.7̶8̶** The Design/Builder shall keep the Owner informed of the progress and quality of the Work.

**3.2.8̶9̶** The Design/Builder shall be responsible for correcting Work which does not conform to the Contract Documents as provided in Article 9 of this Agreement.

**3.2.9̶10̶** The Design/Builder warrants to the Owner that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the construction will be free from faults and defects, and that the construction will conform with the requirements of the Contract Documents. Construction not conforming to these requirements, including substitutions not properly approved by the Owner, shall be corrected in accordance with Article 9. Notwithstanding any other provision of the Contract Documents, it is agreed that Design/Builder does not expressly or impliedly warrant the adequacy, sufficiency or suitability of any design

provided or specified by the Owner or specified sole source or brand-named products, equipment or materials and Owner accepts the manufacturer's warranty as its sole recourse with regard to such items.

**3.2.10̶11̶** The Design/Builder shall pay all sales, consumer, use and similar taxes which had been legally enacted at the time the Design/Builder's Proposal was first submitted to the Owner, and shall secure and pay for building and other permits and governmental fees, licenses and inspections necessary for the proper execution and completion of the Work which are either customarily secured after execution of a contract for construction or are legally required at the time the Design/Builder's Proposal was first submitted to the Owner.

**3.2.11̶12̶** The Design/Builder shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities relating to the Project.

**3.2.12̶13̶** The Design/Builder shall pay royalties and license fees for patented designs, processes or products. The Design/Builder shall defend suits or claims for infringement of patent rights and shall hold the Owner harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer is required by the Owner. However, if the Design/Builder has reason to believe that the use of a required design, process or product is an infringement of a patent, the Design/Builder shall be responsible for such loss unless such information is promptly furnished to the Owner.

**3.2.13̶14̶** The Design/Builder shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under this Part 2 Agreement. At the completion of the Work, the Design/Builder shall remove from the site waste materials, rubbish, the Design/Builder's tools, construction equipment, machinery, and surplus materials.

**3.2.14̶15̶** The Design/Builder shall notify the Owner when the Design/Builder believes that the Work or an agreed upon portion thereof is substantially completed. If the Owner concurs, the D̶e̶s̶i̶g̶n̶/̶B̶u̶i̶l̶d̶e̶r̶ Owner shall issue a Certificate of Substantial Completion which shall establish the Date of Substantial Completion, shall state the responsibility of each party for security, maintenance, heat, utilities, damage to the Work and insurance, shall include a list of items to be completed or corrected and shall fix the time within which the Design/Builder shall complete items listed therein. Disputes between the Owner and Design/Builder regarding the Certificate of Substantial Completion shall be resolved in accordance with provisions of Article 10.

**3.2.15̶1̶6̶** The Design/Builder shall maintain at the site for the Owner one record copy of the drawings, specifications, product data, samples, shop drawings, Change Orders and other modifications, in good order and regularly updated to record the completed construction. These shall be delivered to the Owner upon completion of construction and prior to final payment.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia — 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
11

A000007004                              A000007004

### 3.3    ADDITIONAL SERVICES

**3.3.1**   The services described in this Paragraph 3.3 are not included in Basic Services unless so identified in Article 14, and they shall be paid for by the Owner as provided in this Part 2 Agreement, in addition to the compensation for Basic Services. The services described in this Paragraph 3.3 shall be provided only if authorized or confirmed in writing by the Owner.

**3.3.2**   Making revisions in drawings, specifications, and other documents or electronic data when such revisions are required by the enactment or revision of codes, laws or regulations subsequent to the preparation of such documents or electronic data.

**3.3.3**   Providing consultation concerning replacement of Work damaged by fire or other cause during construction, and furnishing services required in connection with the replacement of such Work.

**3.3.4**   Providing services in connection with a public hearing, arbitration proceeding or legal proceeding, except where the Design/Builder is a party thereto.

**3.3.5**   Providing coordination of construction performed by the Owner's own forces or separate contractors employed by the Owner, and coordination of services required in connection with construction performed and equipment supplied by the Owner.

**3.3.6**   Preparing a set of reproducible record documents or electronic data showing significant changes in the Work made during construction.

**3.3.7**   Providing assistance in the utilization of equipment or systems such as preparation of operation and maintenance manuals, training personnel for operation and maintenance, and consultation during operation.

### ARTICLE 4
### TIME

**4.1**   Unless otherwise indicated, the Owner and the Design/Builder shall perform their respective obligations as expeditiously as is consistent with reasonable skill and care and the orderly progress of the Project.

**4.2**   Time limits stated in the Contract Documents are of the essence. The Work to be performed under this Part 2 Agreement shall commence upon receipt of a notice to proceed unless otherwise agreed and, subject to authorized Modifications, Substantial Completion shall be achieved on or before the date established in Article 14.

**4.3**   Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the Owner can occupy or utilize the Work for its intended use.

**4.4**   Based on the Design/Builder's Proposal, a construction schedule shall be provided consistent with Paragraph 4.2 above and for Owner's approval.

**4.5**   If the Design/Builder is delayed at any time in the progress of the Work by an act or neglect of the Owner, Owner's employees, or separate contractors employed by the Owner or by the City of Greenville, or by changes ordered in the Work, or by labor disputes, fire, unusual delay in deliveries, adverse weather conditions not reasonably anticipatable, unavoidable casualties or other causes beyond the Design/Builder's control, or by delay authorized by the Owner pending arbitration, or by other causes which the Owner and Design/Builder agree may justify delay, then the Contract Time shall be reasonably extended by Change Order.

### ARTICLE 5
### PAYMENTS

### 5.1    PROGRESS PAYMENTS

**5.1.1**   The Design/Builder shall deliver to the Owner itemized Applications for Payment in such detail as indicated in Article 14.

**5.1.2**   Within ten (10) twenty (20) days of the Owner's receipt of a properly submitted and correct Application for Payment, the Owner shall make payment to the Design/Builder.

**5.1.3**   The Application for Payment shall constitute a representation by the Design/Builder to the Owner that the design and construction have progressed to the point indicated, the quality of the Work covered by the application is in accordance with the Contract Documents, and the Design/Builder is entitled to payment in the amount requested.

**5.1.4**   Upon receipt of payment from the Owner, the Design/Builder shall promptly pay the Architect, other design professionals and each contractor the amount to which each is entitled in accordance with the terms of their respective contracts.

**5.1.5**   The Owner shall have no obligation under this Part 2 Agreement to pay or to be responsible in any way for payment to the Architect, another design professional or a contractor performing portions of the Work.

**5.1.6**   Neither progress payment nor partial or entire use or occupancy of the Project by the Owner shall constitute an acceptance of Work not in accordance with the Contract Documents.

**5.1.7**   The Design/Builder warrants that title to all construction covered by an Application for Payment will pass to the Owner no later than the time of payment. The Design/Builder further warrants that upon submittal of an Application for Payment all construction for which payments have been received from the Owner shall be free and clear of liens, claims, security interests or encumbrances in favor of the

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191 -1996
12

A000007005                                            A000007005

Design/Builder or any other person or entity performing construction at the site or furnishing design services materials or equipment relating to the construction.

**5.1.8** At the time of Substantial Completion, the Owner shall pay the Design/Builder the retainage, if any, less the reasonable cost to correct or complete incorrect or incomplete Work and any offsets or credits to which Owner is entitled under the terms of this Agreement Final payment of such withheld sum shall be made upon correction or completion of such Work.

**5.1.9** Contemporaneously with the execution of this Agreement, Owner shall make an initial, up-front payment to Design/Builder in the amount of Six Hundred Twenty-Five Thousand and No/100 U.S. Dollars ($625,000.00).

**5.1.10** Notwithstanding any other provisions of the Contract Documents to the contrary, if the Owner does not pay the Design/Builder for any partial billing within the twenty (20) day period following receipt by the Owner of a properly submitted and correct application for payment from the Design/Builder, then, after providing Owner with seven (7) days written notice of such nonpayment, the Design/Builder shall have the absolute unconditional right to stop the work until payment has been received. The Contract Sum and Contract Time shall be increased by the amount of the Design/Builder's cost and time of shutdown, delay and startup and such changes shall be effected by appropriate change order before Design/Builder shall be obligated to return to work. Design-Builder shall not have or incur any liability to Owner or any other person as a result of exercising its rights hereunder.

**5.2    FINAL PAYMENT**

**5.2.1** Neither final payment nor amounts retained, if any, shall become due until the Design/Builder submits to the Owner: (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or Owner's property might be responsible or encumbered (less amounts withheld by the Owner) have been paid or otherwise satisfied; (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner; (3) a written statement that the Design/Builder knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents; (4) consent of surety, if any, to final payment; and (5) if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a contractor or other person or entity entitled to assert a lien against the Owner's property refuses to furnish a release or waiver required by the Owner, the Design/ Builder may furnish

a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Design/Builder shall indemnify the Owner for all loss and cost, including reasonable attorneys' fees incurred as a result of such lien.

**5.2.2** When the Work has been completed and the contract fully performed, the Design/Builder shall submit a final application for payment to the Owner, who shall make final payment within 30 days of receipt in accordance with subparagraphs 13.1.54 through 13.1.56.

**5.2.3** The making of final payment shall constitute a waiver of claims by the Owner except those arising from:

.1    liens, claims, security interests or encumbrances arising out of the Contract and unsettled;

.2    failure of the Work to comply with the requirements of the Contract Documents; or

.3    terms of special or general warranties required by the Contract Documents.

.4    latent defects;

.5    Design/Builder's indemnity and insurance obligations as set forth in this Agreement; or

**5.2.4** Acceptance of final payment shall constitute a waiver of all claims by the Design/Builder except those previously made in writing and identified by the Design/Builder as unsettled at the time of final Application for Payment.

**5.3    INTEREST PAYMENTS**

**5.3.1** Payments due the Design/Builder under this Part 2 Agreement which are not paid when due shall bear interest from the date due at the rate specified in Article 13, or in the absence of a specified rate, at the legal rate prevailing where the Project is located.

**ARTICLE 6**
**PROTECTION OF PERSONS AND PROPERTY**

**6.1** The Design/Builder shall be responsible for initiating, maintaining and providing supervision of all safety precautions and programs in connection with the performance of this Part 2 Agreement. Notwithstanding any other provision of the Contract Documents, all provisions of this Article 6 are solely for the benefit of the Owner and are not intended to benefit or create a duty to, and shall not be relied upon in any way whatsoever by any other person, firm, or entity.

**6.2** The Design/Builder shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to: (1) employees on the Work and other persons who may be affected thereby; (2) the Work

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.ala – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191 -1996
13

A000007006                                                A000007006

and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody, or control of the Design/Builder or the Design/Builder's contractors; and (3) other property at or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal relocation or replacement in the course of construction.

**6.3**     The Design/Builder shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on the safety of persons or property or their protection from damage, injury or loss.

**6.4**     The Design/Builder shall promptly remedy damage and loss (other than damage or loss insured or required to be insured under property insurance provided or required by the Contract Documents) to property at the site but only to the extent caused in whole or in part by the Design/Builder, a contractor of the Design/Builder or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable.

### ARTICLE 7
### INSURANCE AND BONDS

**7.1**     DESIGN/BUILDER'S LIABILITY INSURANCE

**7.1.1**     The Design/Builder shall purchase from and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, such insurance as will protect the Design/Builder from claims set forth below which may arise out of or result from operations under this Part 2 Agreement by the Design/Builder or by a contractor of the Design/Builder, or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

   .1   claims under workers' compensation, disability benefit and other similar employee benefit laws that are applicable to the Work to be performed;

   .2   claims for damages because of bodily injury, occupational sickness or disease, or death of the Design/Builder's employees;

   .3   claims for damages because of bodily injury, sickness or disease, or death of persons other than the Design/Builder's employees;

   .4   claims for damages covered by usual personal injury liability coverage which are sustained (1) by a person as a result of an offense directly or indirectly related to employment of such person by the Design/Builder or (2) by another person;

   .5   claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

   .6   claims for damages because of bodily injury, death of a person or property damage arising out of ownership,

maintenance or use of a motor vehicle; and

   .7   claims involving contractual liability insurance applicable to the Design/Builder's obligations under Paragraph 11.5.

   .8   claims arising out of the performance of professional services caused by negligent errors or omissions.

**7.1.2**     The insurance required by Subparagraph 7.1.1 shall be written for not less than limits of liability specified in this Part 2 Agreement or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work until until date of final payment and termination of any coverage required to be maintained after final payment three (3) years after the final payment.

**7.1.3**     Certificates of Insurance acceptable to the Owner shall be delivered to the Owner immediately after execution of this Part 2 Agreement. These Certificates and the insurance policies required by this Paragraph 7.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. If any of the foregoing insurance coverages are required to remain in force after final payment, an additional certificate evidencing continuation of such coverage shall be submitted with the application for final payment. Information concerning reduction of coverage shall be furnished by the Design/Builder with reasonable promptness in accordance with the Design/Builder's information and belief.

**7.1.4**     Design/Builder shall name Owner as an additional insured on Design/Builder's general liability, automobile liability and excess liability insurance policies and such insurance shall be primary and non-contributory with respect to the additional insured.

**7.1.5**     Design/Builder's worker's compensation insurance policy shall provide for a waiver of subrogation against Owner arising out of claims covered by such insurance.

**7.2**     OWNER'S LIABILITY INSURANCE

**7.2.1**     The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance. Optionally, the Owner may purchase and maintain other insurance for self-protection against claims which may arise from operations under this Part 2 Agreement. The Design/Builder shall not be responsible for purchasing and maintaining this optional Owner's liability insurance unless specifically required by the Contract Documents.

**7.3**     PROPERTY INSURANCE

**7.3.1**     Unless otherwise provided under this Part 2 Agreement, the Owner - Design/Builder shall purchase and maintain, in a company or companies authorized to do business in the jurisdiction in which the principal

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
14

A000007007                                           A000007007

improvements are to be located, property insurance upon the Work to the full insurable value thereof on a replacement cost basis ~~without optional deductibles~~. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made or until no person or entity other than the Owner has an insurable interest in the property required by this Paragraph 7.3 to be insured, whichever is earlier. This insurance shall include interests of the Owner, the Design/Builder, and their respective contractors and subcontractors in the Work.

**7.3.2** Property insurance shall be on an all-risk policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, falsework, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for the services and expenses of the Design/Builder's Architect and other professionals required as a result of such insured loss. Coverage for other perils shall not be required unless otherwise provided in the Contract Documents.

**7.3.3** ~~If the Owner does not intend to purchase such property insurance required by this Part 2 Agreement and with all of the coverages in the amount described above, the Owner shall so inform the Design/Builder prior to commencement of the construction. The Design/Builder may then effect insurance which will protect the interests of the Design/Builder and the Design/Builder's contractors in the construction, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Design/Builder is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, then the Owner shall bear all reasonable costs properly attributable thereto.~~

**7.3.4** ~~Unless otherwise provided, t~~The Owner shall purchase and maintain such boiler and machinery insurance required by this Part 2 Agreement or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner. This insurance shall include interests of the Owner, the Design/Builder, the Design/Builder's contractors and subcontractors in the Work, and the Design/Builder's Architect and other design professionals. The Owner and the Design/Builder shall be named insureds.

**7.3.5** A loss insured under the ~~Owner's~~ Design/Builder's property insurance shall be adjusted by the ~~Owner~~ Design/Builder as fiduciary and made payable to the ~~Owner~~Design/Builder as fiduciary for the insureds, as their interests may appear, ~~subject to requirements of any applicable mortgage clause and of Subparagraph 7.3.10~~. The Design/Builder shall pay contractors their shares of insurance proceeds received by the Design/Builder, and by appropriate agreement, written where legally required for validity, shall require contractors to make payments to their subcontractors in similar manner.

**7.3.6** Before an exposure to loss may occur, the ~~Owner~~Parties shall file with the ~~each other~~ Design/Builder a copy of each policy that includes insurance coverages required by this Paragraph 7.3. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Design/Builder ~~or Owner, whichever is applicable~~.

**7.3.7** If the ~~Design/Builder~~Owner requests in writing that insurance for risks other than those described herein or for other special hazards be included in the property insurance policy, the ~~Owner~~Design/Builder shall, if possible, obtain such insurance, and the cost thereof shall be charged to the ~~Design/Builder~~ Owner by appropriate Change Order.

**7.3.8** The Owner and the Design/Builder waive all rights against each other and the Architect and other design professionals, contractors, subcontractors, agents and employees, each of the other, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 7.3 or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the ~~Owner~~Design/Builder as trustee. The Owner or Design/Builder, as appropriate, shall require from contractors and subcontractors by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated in this Paragraph 7.3. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

**7.3.9** If required in writing by a party in interest, the ~~Owner~~ Design/Builder as trustee shall, upon occurrence of an insured loss, give bond for proper performance of the~~ir~~ ~~Owner~~'s duties. The cost of required bonds shall be charged against proceeds received as fiduciary. The ~~Owner~~ Design/Builder shall deposit in a separate account proceeds so received, which the ~~Owner~~ Design/Builder shall distribute in accordance with such agreement as the parties in interest may reach, or in accordance with an arbitration award in which case the procedure shall be as provided in Article 10. If after such loss no other special agreement is made, replacement of damaged Work shall be covered by appropriate Change Order.

**7.3.10** The ~~Owner~~ Design/Builder as trustee shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing, within five (5) days after occurrence of loss to the ~~Owner's~~ Design/Builder's exercise of this power; if such objection be made, the parties shall enter into dispute resolution under procedures provided in Article 10. If distribution of insurance proceeds by arbitration is required, the arbitrators will direct such distribution.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996

15

**7.3.11** Partial occupancy or use prior to Substantial Completion shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Design/ Builder shall take reasonable steps to obtain consent of the insurance company or companies and shall not, without mutual written consent, take any action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of coverage.

## 7.4   LOSS OF USE INSURANCE

**7.4.1** The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Design/Builder for loss of use of the Owner's property, including consequential losses due to fire or other hazards, however caused.

## ARTICLE 8
## CHANGES IN THE WORK

### 8.1   CHANGES

**8.1.1** Changes in the Work may be accomplished after execution of this Part 2 Agreement, without invalidating this Part 2 Agreement, by Change Order, Construction Change Directive, or order for a minor change in the Work, subject to the limitations stated in the Contract Documents.

**8.1.2** A Change Order shall be based upon agreement between the Owner and the Design/Builder; a Construction Change Directive may be issued by the Owner without the agreement of the Design/Builder; an order for a minor change in the Work may be issued by the Design/Builder alone.

**8.1.3** Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Design/Builder shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive, or order for a minor change in the Work.

**8.1.4** If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are so changed in a proposed Change Order or Construction Change Directive that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or the Design/ Builder, the applicable unit prices shall be equitably adjusted.

### 8.2   CHANGE ORDERS

**8.2.1** A Change Order is a written instrument prepared by the Design/Builder and signed by the Owner and the Design/Builder, stating their agreement upon all of the

following:

.1   a change in the Work;

.2   the amount of the adjustment, if any, in the Contract Sum; and

.3   the extent of the adjustment, if any, in the Contract Time.

**8.2.2** If the Owner requests a proposal for a change in the Work from the Design/Builder and subsequently elects not to proceed with the change, a Change Order shall be issued to reimburse the Design/Builder for any costs incurred for estimating services, design services or preparation of proposed revisions to the Contract Documents.

### 8.3   CONSTRUCTION CHANGE DIRECTIVES

**8.3.1** A Construction Change Directive is a written order prepared and signed by the Owner, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both.

**8.3.2** Except as otherwise agreed by the Owner and the Design/Builder, the adjustment to the Contract Sum shall be determined on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including the expenditures for design services and revisions to the Contract Documents. In case of an increase in the Contract Sum, the cost shall include a reasonable allowance for overhead and profit. In such case, the Design/Builder shall keep and present an itemized accounting together with appropriate supporting data for inclusion in a Change Order. Unless otherwise provided in the Contract Documents, costs for these purposes shall be limited to the following:

.1   costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

.2   costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

.3   rental costs of machinery and equipment exclusive of hand tools, whether rented from the Design/Builder or others;

.4   costs of premiums for all bonds and insurance permit fees, and sales, use or similar taxes;

.5   additional costs of supervision and field office personnel directly attributable to the change; and fees paid to the Architect, engineers and other professionals.

**8.3.3** Pending final determination of cost to the Owner, amounts not in dispute may be included in Applications for Payment. The amount of credit to be allowed by the Design/Builder to the Owner for deletion or change which results in a net decrease in the Contract Sum will be actual net

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191 -1996
16

A000007009                                            A000007009

cost. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of the net increase, if any, with respect to that change.

**8.3.4**    When the Owner and the Design/Builder agree upon the adjustments in the Contract Sum and Contract Time, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

**8.4    MINOR CHANGES IN THE WORK**

**8.4.1**    The Design/Builder shall have authority to make minor changes in the Construction Documents and construction consistent with the intent of the Contract Documents when such minor changes do not involve adjustment in the Contract Sum or extension of the Contract Time. The Design/Builder shall promptly inform the Owner, in writing, of minor changes in the Construction Documents and construction.

**8.5    CONCEALED CONDITIONS**

**8.5.1**    If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents, or (2) unknown physical conditions of an unusual nature which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Contract Sum shall be equitably adjusted for such concealed or unknown conditions by Change Order upon claim by either party made within 21 days after the claimant becomes aware of the conditions.

**8.6    REGULATORY CHANGES**

**8.6.1**    The Design/Builder shall be compensated for changes in the construction necessitated by the enactment or revisions of codes, laws or regulations subsequent to the submission of the Design/Builder's Proposal.

**ARTICLE 9**
**CORRECTION OF WORK**

**9.1**    The Design/Builder shall promptly correct Work rejected by the Owner or known by the Design/Builder to be defective or failing to conform to the requirements of the Contract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed. The Design/Builder shall bear costs of correcting such rejected Work, including additional testing and inspections.

**9.2**    If, within one (1) year after the date of Substantial Completion of the Work or, after the date for commencement of warranties established in a written agreement between the Owner and the Design/Builder, or by terms of an applicable special warranty required by the Contract Documents, any of

the Work is found to be not in accordance with the requirements of the Contract Documents, the Design/Builder shall correct it promptly after receipt of a written notice from the Owner to do so unless the Owner has previously given the Design/ Builder a written acceptance of such condition.

**9.3**    Nothing contained in this Article 9 shall be construed to establish a period of limitation with respect to other obligations which the Design/Builder might have under the Contract Documents. Establishment of the time period of one (1) year as described in Subparagraph 9.2 relates only to the specific obligation of the Design/Builder to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Design/Builder's liability with respect to the Design/Builder's obligations other than specifically to correct the Work.

**9.4**    If the Design/Builder fails to correct nonconforming Work as required or fails to carry out Work in accordance with the Contract Documents, the Owner, by written order signed personally or by an agent specifically so empowered by the Owner in writing, may order the Design/Builder to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the Owner's right to stop the Work shall not give rise to a duty on the part of the Owner to exercise the right for benefit of the Design/Builder or other persons or entities.

**9.5**    If the Design/Builder defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within seven (7) days after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may give a second written notice to the Design/Builder and, seven (7) days following receipt by the Design/Builder of that second written notice and without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Design/ Builder, the costs of correcting such deficiencies. If the payments then or thereafter due the Design/Builder are not sufficient to cover the amount of the deduction, the Design/Builder shall pay the difference to the Owner. Such action by the Owner shall be subject to dispute resolution procedures as provided in Article 10.

**ARTICLE 10**
**DISPUTE RESOLUTION -**
**MEDIATION AND ARBITRATION**

**10.1**    Claims, disputes or other matters in question between the parties to this Part 2 Agreement arising out of or relating to this Part 2 Agreement or breach thereof, except those claims that have been waived by the making or acceptance of final payment and those claims expressly excluded by Paragraph 10.7, shall be subject to and decided by mediation or arbitration. Such mediation or arbitration shall be conducted in accordance with the Construction Industry Mediation or Arbitration Rules of the American Arbitration Association

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

A000007010                                                                A000007010

currently in effect. The location of such mediation or arbitration shall be the Project site or Montgomery, Alabama, as mutually agreed by the parties.

**10.2** ~~In addition to and~~ Prior to a demand for arbitration or initiation of litigation of claims not subject to arbitration, the parties shall attempt in good faith to resolve the dispute during the twenty (20) day period following first written notice by one party of its claim. If the matter remains unresolved, prior to arbitration, the parties shall endeavor to settle disputes by mediation. Demand for mediation shall be filed in writing with the other party to this Part 2 Agreement and with the American Arbitration Association. A demand for mediation shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for mediation be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of repose or limitations.

**10.3** If the matter remains unresolved for ninety (90) days following the first written notice of the claim, then ~~D~~demand for arbitration shall be filed in writing with the other party to this Part 2 Agreement and with the American Arbitration Association. A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of repose or limitations.

**10.4** An arbitration pursuant to this Article may be joined with an arbitration involving common issues of law or fact between the Design/Builder and any person or entity with whom the Design/Builder has a contractual obligation to arbitrate disputes. No other arbitration arising out of or relating to this Part 2 Agreement shall include, by consolidation, joinder or in any other manner, an additional person or entity not a party to this Part 2 Agreement or not a party to an agreement with the Design/Builder, except by written consent containing a specific reference to this Part 2 Agreement signed by the Owner, the Design/Builder and any other person or entities sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Part 2 Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

**10.5** The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

**10.6** Unless otherwise agreed in writing, Design/Builder shall continue with the Work pending arbitration, and, if so, Owner shall continue to make payments earned by Design/Builder in accordance with this Agreement.

**10.7** This Agreement to arbitrate shall not apply to any claim:

**(a)** For contribution or indemnity asserted by one party to this Agreement against the other party and arising out of an action brought in a state or federal court or in arbitration by a person who is under no obligation to arbitrate the subject matter of such action with either of the parties hereto; or

**(b)** Asserted by the Owner against Design/Builder if Design/Builder asserts said claim, either in whole or part, against a Subcontractor or Supplier and such Subcontractor or Supplier will not consent to arbitration or the contract between Design/Builder and such Subcontractor or Supplier does not provide for binding arbitration, or does so provide but the two arbitration proceedings cannot be consolidated, in any case of which the parties hereto shall so notify each other either before or after demand of arbitration is made.

**(c)** Asserted by the Design/Builder against the Owner if Owner asserts said claim, either in whole or in part against the City of Greeneville and the City of Greeneville will not consent to arbitration or the contract between Owner and the City of Greeneville does not provide for binding arbitration, or does so provide but the two arbitration proceedings cannot be consolidated, in any case of which the parties hereto shall so notify each other either before or after demand for arbitration is made.

### ARTICLE 11
### MISCELLANEOUS PROVISIONS

**11.1** Unless otherwise provided, this Part 2 Agreement shall be governed by the law of the place where the Project is located.

**11.2 SUBCONTRACTS**

**11.2.1** The Design/Builder, as soon as practicable after execution of this Part 2 Agreement, shall furnish to the Owner in writing the names of the persons or entities the Design/Builder will engage as contractors for the Project.

**11.2.2** Design/Builder shall use its best efforts to include in any subcontracts and supplier agreements a binding arbitration clause with a provision for consolidation of any arbitration between Design/Builder and Subcontractor or supplier with related disputes between Owner and Design/Builder.

**11.3 WORK BY OWNER, CITY OF GREENVILLE OR OWNER'S THEIR CONTRACTORS**

**11.3.1** The Owner and The City of Greenville reserves the right to perform construction or operations related to the Project with the Owner's or City of Greenville's own forces, and to award separate contracts in connection with other

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
18

A000007011                          A000007011

portions of the Project or other construction or operations on the site under conditions of insurance and waiver of subrogation identical to the provisions of this Part 2 Agreement. If the Design/Builder claims that delay or additional cost is involved because of such action by the Owner, the Design/Builder shall assert such claims as provided in Subparagraph 11.4. Claims against the City of Greenville arising out of the City's performance of work at or adjacent to the Project during the course of Design/Builder's work shall be asserted against the City.

**11.3.2**  The Design/Builder shall afford the Owner's and City of Greenville's separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities and shall connect and coordinate the Design/Builder's construction and operations with theirs as required by the Contract Documents.

**11.3.3**  Costs caused by delays or by improperly timed activities or defective construction shall be borne by the party responsible therefor.

**11.4    CLAIMS FOR DAMAGES**

**11.4.1**  If either party to this Part 2 Agreement suffers injury or damage to person or property because of an act or omission of the other party, of any of the other party's employees or agents, or of others for whose acts such party is legally liable, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after first observance. The notice shall provide sufficient detail to enable the other party to investigate the matter. If a claim of additional cost or time related to this claim is to be asserted, it shall be filed in writing.

**11.5    INDEMNIFICATION**

**11.5.1**  To the fullest extent permitted by law, the Design/Builder shall indemnify and hold harmless the Owner, Owner's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by negligent acts or omissions of the Design/Builder, anyone directly or indirectly employed by the Design/Builder or anyone for whose acts the Design/Builder may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 11.5.

**11.5.2**  In claims against any person or entity indemnified under this Paragraph 11.5 by an employee of the Design/Builder, anyone directly or indirectly employed by the Design/Builder or anyone for whose acts the Design/Builder may be liable, the

indemnification obligation under this Paragraph 11.5 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Design/Builder under workers' compensation acts, disability benefit acts or other employee benefit acts.

**11.6    SUCCESSORS AND ASSIGNS**

**11.6.1**  The Owner and Design/Builder, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Part 2 Agreement and to the partners, successors and assigns of such other party with respect to all covenants of this Part 2 Agreement. Neither the Owner nor the Design/Builder shall assign this Part 2 Agreement without the written consent of the other. The Owner may assign this Part 2 Agreement to any institutional lender providing construction financing, and the Design/Builder agrees to execute all consents reasonably required to facilitate such an assignment. If either party makes such an assignment, that party shall nevertheless remain legally responsible for all obligations under this Part 2 Agreement, unless otherwise agreed by the other party.

**11.7    TERMINATION OF PROFESSIONAL DESIGN SERVICES**

**11.7.1**  Prior to termination of the services of the Architect or any other design professional designated in this Part 2 Agreement, the Design/Builder shall identify to the Owner in writing another architect or other design professional with respect to whom the Owner has no reasonable objection, who will provide the services originally to have been provided by the Architect or other design professional whose services are being terminated.

**11.8    EXTENT OF AGREEMENT**

**11.8.1**  This Part 2 Agreement represents the entire agreement between the Owner and the Design/Builder and supersedes prior negotiations, representations or agreements, either written or oral. This Part 2 Agreement may be amended only by written instrument and signed by both the Owner and the Design/Builder.

**11.9   Claims for Consequential Damages.  Except for (i) Owner's claims for liquidated damages as expressly specified in this Agreement and except (ii) to the extent Owner's claims are covered by insurance provided by Design/Builder under this Agreement, the Design/Builder and Owner waive any and all claims against each other for consequential damages arising out of or relating to this Contract. Subject to the above-cited exceptions, this mutual waiver includes: (1) Damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and (2) damages incurred by the Design/Builder for principal or home office expenses including the compensation of personnel stationed there, for losses of financing, income, business and reputation, for loss of management or employee productivity or of the services of**

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996

19

A000007012                                                                 A000007012

such persons, and for loss of profit except anticipated profit arising directly from the Work. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination of this Agreement.

## 11.10 Site Conditions/Environmental Matters

**11.10.1** Notwithstanding any other provision of the Contract Documents to the contrary, it is hereby expressly agreed that the Design/Builder and its parent, successors, officers, agents, employees, and assigns (hereinafter collectively referred to as "Design/Builder") shall not have any liability or responsibility of any kind whatsoever to the Owner, or any other person, firm or entity, with regard to, or for, any actions, suits, claims, liabilities, warranties, controversies, damages, demands, expenses, incidental damages, causes of action or grievances of any kind, character, or description, now existing or which may hereafter arise, known or unknown, permanent or otherwise (hereinafter collectively referred to as "claims"), indirectly or directly resulting from, growing out of, pertaining to, or in connection with the condition (including but not limited to, any earth work, fill work, compaction, settlement, soil density, plasticity, or slippage) of the site on which the Project is to be constructed except to the extent such claim is caused by the negligent act or omission of, or breach of contract by, Design/Builder, its Subcontractors, suppliers, consultants, agents and employees.

**11.10.2** Notwithstanding any other provision of this Contract, the Owner is solely responsible for furnishing the site to the Design/Builder in a condition which meets all applicable Federal, State, and/or local requirements concerning hazardous materials, chemicals and/or any other form of contamination. Furthermore, Owner shall be solely responsible for all testing, inspections, permits and/or any other requirements related to the environmental condition of the site necessary in order to make the site suitable for construction of the Project, whether necessary before or after the commencement of Work by Design/Builder on the Project. Notwithstanding any language which may be to the contrary in any of the Contract Documents, Design/Builder shall have no obligation to investigate subsurface or otherwise concealed conditions at the site or unknown physical conditions of an unusual nature at the site, and shall be entitled to relief with respect to any such conditions as provided in Section 8.5.1 of this Agreement. Owner has contracted with the City of Greeneville to perform the subsurface investigation and geotechnical engineering for the Owner with respect to the project and Design/Builder shall be entitled to fully and completely rely upon such subsurface investigation and geotechnical engineering.

**11.10.3** Environmental Audit. Owner is responsible for performing or furnishing an environmental audit. If Owner does not perform or furnish an environmental audit, Design/Builder shall have no responsibility or liability of any kind arising from any conditions, substances, or material

which would have been ascertained or discovered by the performance of an environmental audit of the premises upon which the Project is located.

**11.10.4** Pollutants from Owner's Operations. Owner's knowledge of its activities that will be conducted within the facility to be designed and constructed by Design/Builder, and the materials involved in those activities, is superior to Design/Builder's knowledge. Accordingly, and anything contained in this Agreement to the contrary notwithstanding, any duty or warranty by Design/Builder hereto shall not apply to the discharge, dispersal, escape, release or saturation of any pollutant into the atmosphere or any body of water or on, onto, upon, in or into the surface or subsurface of land resulting from Owner's operations. For purpose of this section, the word "pollutant" shall mean any solid liquid, gaseous, or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkaline, chemicals and waste and shall include any Hazardous Substance. The capacity of the facility and the design of any of its parts, so as to prevent the escape, release, discharge, dispersal or saturation of pollutants shall be the sole responsibility of Owner.

**11.10.4.1** Encountering Hazardous Substances. In the event Design/Builder or its Subcontractors encounter on the Project site material reasonably believed to be asbestos, polychlorinated biphenyl ("PCB") or other "Hazardous Substances" as defined in paragraph 11.10.4.4, which has not been rendered harmless, Gray shall immediately stop Work in the area affected and report the condition to the Owner in writing. The Work in the affected area shall be resumed (1) in the absence of any Hazardous Substances, (2) when any Hazardous Substances have been rendered harmless, (3) by written agreement of the Owner and Gray, or (4) in accordance with the final determination under Article 10.

**11.10.4.2** Working Conditions. Neither Design/Builder nor its Subcontractors shall be required without their consent to perform any Work relating to asbestos, PCB, or other Hazardous Substances.

**11.10.4.3** Owner's Indemnification Responsibilities. To the fullest extent permitted by law, the Owner shall defend, indemnify, and hold harmless Design/Builder, its Subcontractors, Suppliers, consultants, agents and employees, from any and all claims, liability, damages and expenses (including attorney fees and expenses), arising out of or resulting from:

(a) Any claim, suit or legal proceeding to recover damages for wrongful death, bodily injury, illness or disease or injury to, or destruction of, tangible property alleged to be caused either directly or indirectly by any substances, condition, element or material or any combination of the foregoing: (a) produced by

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
20

Owner or omitted or released by Owner either intentionally or unintentionally, from the facilities designed and/or constructed by Design/Builder for the benefit of Owner, or (b) used by Design/Builder or incorporated by Design/Builder into the Work herein agreed to be performed by Design/Builder for the benefit of Owner, if specifically required by Owner or if necessary for the planned use of the work and to the extent not caused by the mishandling of such substances, condition, element, or material by Design/Builder, its Subcontractors, suppliers, consultants, agents, and employees;

(b) Performance of the Work in the affected area if in fact the material is asbestos, PCB, or other Hazardous Substances, and has not been rendered harmless, provided that such claim, damages, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and to the extent not caused by the negligent act or omission of Design/Builder, its Subcontractors, suppliers, consultants, agents and employees;

11.10.4.4   Definition of Hazardous Substances.   For purposes of this Agreement, the term "Hazardous Substances" means any substance, including solid, liquid or gaseous material which is listed or defined as "Hazardous" in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S. Section 1251, et seq., or regulations promulgated pursuant thereto; and source, special nuclear, or by product material as defined by the Atomic Energy Act of 1954, 42 U.S.C., Section 3011, et seq., or regulations promulgated pursuant thereto; and includes any other substance defined by federal, state or local statute, regulations, or ordinance as hazardous, toxic or dangerous waste or substance.

## ARTICLE 12
### TERMINATION OF THE AGREEMENT

**12.1   TERMINATION BY THE OWNER**

12.1.1   This Part 2 Agreement may be terminated by the

Owner upon 14 days' written notice to the Design/Builder in the event that the Project is abandoned.  If such termination occurs, the Owner shall pay the Design/Builder for Work that is satisfactorily completed, and for proven loss sustained upon materials, equipment, tools, and construction equipment and machinery, including reasonable profit and applicable damages.  Design/Builder will not be entitled to payment for uncompleted work, anticipated profit on Work not completed, or unabsorbed overhead.

12.1.2   If the Design/Builder defaults or persistently fails or neglects to carry out the Work in accordance with the Contract Documents or fails to perform the provisions of this Part 2 Agreement, the Owner may give written notice that the Owner intends to terminate this Part 2 Agreement.   If the Design/Builder fails to correct the defaults, failure or neglect within seven (7) days after being given notice, the Owner may then give a second written notice and, after an additional seven (7) days, the Owner may without prejudice to any other remedy terminate the employment of the Design/Builder and take possession of the site and of all materials, equipment, tools and construction equipment and machinery thereon owned by the Design/Builder and finish the Work by whatever method the Owner may deem expedient.  If the unpaid balance of the Contract Sum exceeds the expense of finishing the Work and all damages incurred by the Owner, such excess shall be paid to the Design/Builder to the extent earned and payable under the Agreement.   If the expense of completing the Work and all damages incurred by the Owner exceeds the unpaid balance, the Design/Builder shall pay the difference to the Owner. This obligation for payment shall survive termination of this Part 2 Agreement.

**12.2   TERMINATION BY THE DESIGN/BUILDER**

12.2.1   If the Owner fails to make payment when due, the Design/Builder may give written notice of the Design/Builder's intention to terminate this Part 2 Agreement.  If the Design/Builder fails to receive payment within seven   (7) days after receipt of such notice by the Owner, the Design/Builder may give a second written notice and, seven (7) days after receipt of such second written notice by the Owner, may terminate this Part 2 Agreement and recover from the Owner payment for Work satisfactorily completed executed and for proven losses sustained upon materials, equipment, tools, and construction equipment and machinery, including reasonable profit and applicable damages.

## ARTICLE 13
### BASIS OF COMPENSATION

The Owner shall compensate the Design/Builder in accordance with Article 5, Payments, and the other provisions of this Part 2 Agreement as described below.

**13.1   COMPENSATION**

13.1.1   For the Design/Builder's performance of the Work, as described in Paragraph 3.2 and including any other services listed in Article 14 as part of Basic Services, the Owner shall pay the Design/Builder in current funds the Contract Sum as follows:
For Basic Services, as described in Paragraphs 3.2.2. through 3.2.16, and for any other services included in Article 14 as part of Basic Services, basic compensation shall be as follows:  Owner shall pay Design/Builder in current U.S. funds for the Cost of the Work as

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292.  AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia — 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996

21

A000007014                                          A000007014

**Guaranteed Maximum Price**

**13.1.2** The sum of the Cost of the Work and the Design/Builder's Fee is guaranteed by the Design/Builder not to exceed Twelve Million Five Hundred Thousand and No/100 U.S. Dollars ($U.S. 12,500,000.00), subject to additions and deductions by Change Order as provided in the Contract Documents. Such maximum sum is referred to in the Contract Documents as the Guaranteed Maximum Price. Costs which would cause the Guaranteed Maximum Price, as adjusted from time to time pursuant to the Contract Documents, to be exceeded shall be paid by the Design/Builder without reimbursement by the Owner and with no additional Fee to Design/Builder. Upon completion of the Work, an accounting will be made of the Cost of Work and if the Cost of the Work plus Design/Builder's Fee is less than the adjusted Guaranteed Maximum Price, the difference (the "savings") shall be divided as follows: ninety percent (90%) to Owner and ten percent (10%) to Design/Builder.

Design/Builder's Fee shall be a lump sum of Nine Hundred Thirty Thousand and 00/100 U. S. Dollars ($930,000.00). In the event of changes to the Work, the Design/Builder's Fee shall be adjusted as follows: If a change in the Work is made during the first six (6) weeks of the detailed design phase (i.e. within the first six (6) weeks after the date of Design/Builder's letter of intent dated June 17, 2003) and the Cost of the Work associated with such change is less than $500,000.00, then Design/Builder's Fee shall not be adjusted. If a change in the Work is made during the first six (6) weeks of the detailed design phase and the Cost of the Work associated with such change exceeds $500,000.00, then Design/Builder's Fee shall be adjusted by an amount equal to 5.5% of the Cost of the Work associated with such change (3% for overhead, 2.5% for profit). If a change in the Work is made after the first six (6) weeks of the detailed design phase, then Design/Builder's Fee shall be adjusted to include the design costs associated with such change (at the hourly rates set forth on the attached schedule) plus 7.5% of the Cost of the work associated with such change (5% for overhead, 2.5% for profit).

**13.1.3** The Guaranteed Maximum Price is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:

**13.1.4** The amounts agreed to for unit prices, if any, are as follows:

**13.1.5** The Guaranteed Maximum Price includes the following allowance items/categories. In the event the Cost of the Work allocable to any one or more items/categories exceeds the amount allocated below, the excess shall be an addition to the Guaranteed Maximum Price and shall be paid by the Owner to the Contractor:

| 1. Pit Allowance | $2,116,104.00 |
|---|---|
| 2. Office Allowance | $   85,200.00 |

**13.1.6** The Guaranteed Maximum Price includes Design/Builder's contingency in the amount of One Hundred Thirty Thousand and No/100 Dollars ($130,000.00), a sum mutually agreed upon for use at Design/Builder's sole and exclusive discretion to cover costs incurred in performing the Work which are properly reimbursable as a Cost of the Work but which are not included in a specific line item or the basis for a Change Order. The contingency is not available to the Owner for any reason including, without limitation, changes in scope or any other item which would enable Design/Builder to increase the Guaranteed Maximum Price under the Contract Documents or which would otherwise entitle Design/Builder to additional compensation.

**13.1.7** Adjustments to the Guaranteed Maximum Price on account of changes in the Work may be determined by any of the methods listed in Article 8 of the Agreement.

**COSTS TO BE REIMBURSED**

**13.1.8** The term Cost of the Work shall mean costs necessarily incurred by the Design/Builder in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 13.

**LABOR COSTS**

**13.1.9** Wages of construction workers directly employed by the Design/Builder to perform the construction of the Work at the site or, with the Owner's agreement, at off-site workshops.

**13.1.10** Wages or salaries of the Design/Builder's supervisory and administrative personnel when stationed at the site with the Owner's

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
22

A000007015                                                                    A000007015

**13.1.11** Wages and salaries of the Design/Builder's supervisory or administrative personnel engaged, at factories or workshops on the road, in expediting the production of transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

**13.1.12** Costs paid or incurred by the Design/Builder for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included the the Cost of the Work under Clauses 13.1.9 through 13.1.12.

## SUBCONTRACT COSTS

**13.1.13** Payments made by the Design/Builder to Subcontractors in accordance with the requirements of the subcontracts.

## COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION

**13.1.14** Costs, including transportation of materials and equipment incorporated or to be incorporated in the completed construction.

**13.1.15** Costs of materials described in the preceding Clause 13.1.14 in excess of those actually installed but required to provide reasonable allowance for waste and for spoilage. Unused excess materials, if any, shall be handed over to the Owner at the completion of the Work or, at the Owner's option, shall be sold by the Design/Builder and amounts realized, if any, from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

## COST OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS

**13.1.16** Costs, including transportation, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by the construction workers, which are provided by the Design/Builder at the site and fully consumed in the performance of the Work; and cost less salvage value on such items if not fully consumed, whether sold to others or retained by the Design/Builder. Cost for items previously used by the Design/Builder shall mean fair market value.

**13.1.17** Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by the construction workers, which are provided by the Design/Builder at the site, whether rented from the Design/Builder or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof. Rates and quantities of equipment rented shall be subject to the Owner's prior approval.

**13.1.18** Costs of removal of debris from the site.

**13.1.19** Costs of telegrams and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

**13.1.20** That portion of the reasonable travel and subsistence expenses of the Design/Builder's personnel incurred while traveling in discharge of duties connected with the Work.

## MISCELLANEOUS COSTS

**13.1.21** That portion directly attributable to this Contract to premiums for insurance and bonds.

**13.1.22** Sales, use or similar taxes imposed by a governmental authority which are related to the Work and for which the Design/Builder is liable.

**13.1.23** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Design/Builder is required by the Contract Documents to pay.

**13.1.24** Fees of testing laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded due to failure of the portions of the Work to comply with requirements established by the Contract Documents and which do not fall within the scope of Clauses 13.1.30 through 13.1.32 below.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
23

A000007016                                                    A000007016

royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement by the Contract Documents; payments made in accordance with legal judgments against the Design/Builder resulting from such suits or claims and payments of settlements made with the Owner's consent; provided, however, that such costs of legal defenses, judgment and settlements shall not be included in the calculation of the Design/Builder's Fee or of a Guaranteed Maximum Price. However, if the Design/Build has reason to believe that the required design, process or product is an infringement of a copyright or patent, the Design/Builder shall be responsible for such loss unless such information is promptly furnished to the Owner.

**13.1.26** Deposits lost for causes other than the Design/Builder's fault or negligence.

**OTHER COSTS**

**13.1.27** Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

**EMERGENCIES; REPAIRS TO DAMAGED, DEFECTIVE OR NONCONFORMING WORK**

**13.1.28** The cost of the Work shall also include costs described below which are incurred by the Design/Builder:

**13.1.29** In taking action to prevent threatened damage injury or loss in case of an emergency affecting the safety of persons and property. Additional compensation or extension of time claimed by the Design/Builder on account of acting at the Design/Builder's discretion shall be determined as provided in Article 8 of the Agreement.

**13.1.30** In repairing or correcting Work damaged or improperly executed by construction workers in the employ of the Design/Builder, provided such damage or improper execution did not result from the fault or negligence of the Design/Builder or the Design/Builder's foremen, engineers or superintendents, or other supervisory, administrative or managerial personnel of the Design/Builder.

**13.1.31** In repairing damaged Work other than that described in Clause 13.1.30, provided such damage did not result from the fault or negligence of the Design/Builder or the Design/Builder's personnel, and only to the extent that the cost of such repairs is not recoverable by the Design/Builder from others and the Design/Builder is not compensated therefor by insurance or otherwise.

**13.1.32** [DELETED]

**COSTS NOT TO BE REIMBURSED**

**13.1.33** The Cost of the Work shall not include:

**13.1.34** Salaries and other compensation of the Design/Builder's personnel stationed at the Design/Builder's principal office or offices other than the site office, except as specifically provided in Clauses 13.1.10 and 13.1.11 or as may be provided in Article 14.

**13.1.35** Expenses of the Design/Builder's principal office and offices other than the site office.

**13.1.36** Overhead and general expenses, except as may be expressly included in Article 13.

**13.1.37** Rental costs of machinery and equipment, except as specifically provided in Clause 13.1.17.

**13.1.38** Except as provided in Clauses 13.1.30 through 13.1.32, costs due to the fault or negligence of the Design/Builder, Subcontractors, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including but not limited to costs for the correction of damaged, defective or nonconforming Work, disposal and replacement of materials and equipment incorrectly ordered or supplied, and making good damage to property not forming part of the Work.

**13.1.39** Any cost not specifically and expressly described in Article 13.

**13.1.40** Costs which would cause the Guaranteed Maximum Price, if any, to be exceeded.

**DISCOUNTS, REBATES AND REFUNDS**

**13.1.41** Cash discounts obtained on payments made by the Design/Builder shall accrue to the Owner if (1) before making the payment,

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191 -1996
24

A000007017                                                      A000007017

the Design/Builder included them in an Application for Payment and received payment from the Owner; (7) the Owner's deposited funds with the Design/Builder, with which to make payments, otherwise, cash discounts shall accrue to the Design/Builder. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Design/Builder shall make provisions so that they can be secured.

**13.1.42** Amounts which accrue to the Owner in accordance with the provisions of Clause 13.1.41 shall be credited to the Owner as a deduction from the Cost of the Work.

### SUBCONTRACTS AND OTHER AGREEMENTS

**13.1.43** Those portions of the Work that the Design/Builder does not customarily perform with the Design/Builder's own personnel shall be performed under subcontracts or by other appropriate agreements with the Design/Builder. The Design/Builder shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work. The Owner will then determine, with the advice of the Design/Builder, which bids will be accepted. The Owner may designate specific persons or entities from whom the Design/Builder shall obtain bids; however, if a Guaranteed Maximum Price has been established, the Owner may not prohibit the Design/Builder from obtaining bids from others without reasonable objection. The Design/Builder shall not be required to contract with anyone to whom the Design/Builder has a reasonable objection.

**13.1.44** If a Guaranteed Maximum Price has been established and a specific bidder among those whose bids are delivered by the Design/Builder to the Owner (1) is recommended to the Owner by the Design/Builder; (2) is qualified to perform that portion of the Work; and (3) has submitted a bid which conforms to the requirements of the Contract Documents without reservations or exceptions, but the Owner requires another bid be accepted, then the Design/Builder may require that a Change Order be issued to adjust the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Owner by the Design/Builder and the amount of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

### ACCOUNTING RECORDS

**13.1.45** The Design/Builder shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract and the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to the Design/Builder's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Contract, and the Design/Builder shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

### PROGRESS PAYMENTS

**13.1.46** Each Application for Payment shall be based upon the most recent schedule of values submitted by the Design/Builder and approved by the Owner in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work, except that the Design/Builder's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Owner may require. This schedule, unless object to by the Owner, shall be used as a basis for reviewing the Design/Builder's Application for Payment.

**13.1.47** Applications for Payment shall show percentage completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage completion shall be the percentage of that portion of the Work which has actually been completed.

**13.1.48** Subject to other provisions of the Contract Documents, the amount of progress payment shall be computed as follows:

**13.1.49** Take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute may be included as provided in Article 8 of the Agreement, even though the Guaranteed Maximum Price has not yet been adjusted by Change Order.

**13.1.50** Add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored and insured at the site for subsequent incorporation in the Work or, if approved in advance by the Owner, suitably stored and insured off the site at a location agreed upon in writing.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
25

A000007018                                            A000007018

13.1.51  Add the Design/Builder's Fee.  Subtract from the total sum retainage of ten percent (10%).  The Design/Builder's Fee shall be computed upon the allocable values described in the two preceding Clauses.  Upon achieving 50% completion of the Work, retainage withheld from Design/Builder shall be reduced to five (5%) percent.

13.1.52  Subtract the aggregate of previous payments made by the Owner.

13.1.53  Subtract the shortfall, if any, indicated by the Design/Builder in the documentation required by the Owner to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's accountants in such documentation.

*This article supplements but does not modify the terms of Article 5, Progress Payments of the Agreement.*

**FINAL PAYMENT**

13.1.54  The Owner's final payment to the Design/Builder shall be made after the Owner's receipt of Design/Builder's properly submitted and correct final Application for Payment as provided herein.

13.1.55 The Owner's accountants will review and report in writing on the Design/Builder's final accounting within thirty (30) days after delivery of the final accounting to the Owner by the Design/Builder.  Based upon such Cost of the Work as the Owner's accountants report to be substantiated by the Design/Builder's final accounting, and provided the other conditions of final payment have been met, the Owner will, within seven (7) days after receipt of the written report of the Owner's accountants, either make final payment to Design/Builder, or notify the Design/Builder in writing of the Owner's reasons for withholding payment, which reasons shall be set forth in detail with references to particular provisions of the Contract Documents pursuant to which Owner is withholding such amounts.

13.1.56  If the Owner's accountants report the Cost of the Work as substantiated by the Design/Builder's final accounting to be less than claimed by the Design/Builder, the Owner shall so notify the Design/Builder in writing, and the Design/Builder shall be entitled to demand arbitration of the disputed amount within thirty (30) days from the receipt thereof; failure to demand arbitration within this thirty (30) day period shall result in the substantiated amount reported by the Owner's accountants becoming binding on the Design/Builder.  Pending a final resolution by arbitration, the Owner shall pay the Design/Builder the amount substantiated by Owner's accountants.

13.1.57  [DELETED]

13.1.258 For Additional Services, as described in Paragraph 3.3 and including any other services listed in Article 14 as Additional Services, compensation shall be as follows:

**13.2    REIMBURSABLE EXPENSES**

13.2.1  Reimbursable Expenses are in addition to the compensation for Basic and Additional Services, and include actual expenditures made by the Design/Builder and the Design/Builder's employees and contractors in the interest of the Project, as follows:

13.2.2  FOR REIMBURSABLE EXPENSES, compensation shall be a multiple of (   ) times the amounts expended.

**13.3    INTEREST PAYMENTS**

13.3.1  The rate of interest for past due payments shall be as follows:

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Design/Builder's principal places of business, at the location of the Project and elsewhere may affect the validity of this provision.  Specific legal advice should be obtained with respect to deletion, modification or other requirements, such as written disclosures or waivers.)*

**ARTICLE 14**
**OTHER CONDITIONS AND SERVICES**

14.1    The Basic Services to be performed shall be commenced on _____ and, subject to authorized adjustments and to delays not caused by the Design/Builder, Substantial Completion shall be achieved on or before May 6, 2004 in the Contract Time of

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
26

A000007019                                                    A000007019

(–) calendar days.

### 14.1.1   Acceleration

(a) Design/Builder shall at all times supply sufficient tools, equipment, materials, supervision, subcontracted services and labor to meet the then-current approved project schedule.  To the extent, in the reasonable belief of the Owner, the progress of the Work is such that the contract completion date, as adjusted for time extensions provided elsewhere in this Agreement, will not be met due to the fault or cause of Design/Builder or its subcontractors, suppliers, consultants, agents and employees, then the Owner may direct Design/Builder in writing to take such steps as Owner deems necessary to improve Design/Builder's progress, all without additional cost or fee to the Owner.  Such steps may include, but shall not be limited to, increasing the number of shifts, adding overtime operations, increasing the labor force and/or supervision, working holidays and weekends and adding equipment and operators.  Such an acceleration shall be separately accounted for by Design/Builder.  If Design Builder reasonably believes that acceleration is not justified under the terms of this clause, it shall so advise Owner in writing within seven (7) days of receipt of the directive to accelerate.  In such case of objection, Design/Builder may expressly reserve its right to claim a compensable acceleration under paragraph (b) below, but nevertheless must proceed with the acceleration as directed.

(b) In the event the progress of the Work is on schedule for meeting the contract completion date, as adjusted for time extensions provided elsewhere in this Agreement, the Owner reserves the right to direct Design/Builder to accelerate its progress as a change in the Work and with compensation as provided in Article 8 hereof; provided, however, that Design/Builder shall have no obligation to so accelerate its progress unless and until a change order or constructive change directive is executed by Owner with respect to such acceleration.  Costs of such acceleration shall be separately accounted for by Design/Builder and shall be cause for an increase in the Guaranteed Maximum Price.

14.2    The Basic Services beyond those described in Article 3 are as follows:

14.3    Additional Services beyond those described in Article 3 are as follows:

14.4    The Design/Builder shall submit an Application for Payment on the last  (–) day of each month. It shall be in a form and with such certifications and releases as reasonably required by Owner.

14.5    The Design/Builder's Proposal includes the following documents:
*(List the documents by specific title and date; include any required performance and payment bonds.)*

14.6    Other documents forming part of the Contract Documents include:

|   |   |
|---|---|
| A. | Bid Documents prepared by SSOE dated April 04, 2003 |
| B. | Addendum No. 1 dated April 11, 2003 |
| C. | Addendum No. 2 dated April 23, 2003 |
| D. | Gray Proposal dated April 24, 2003 |
| E. | Proposal Clarification dated April 28, 2003 |
| F. | Re-Bid and Addendum No. 3 dated May 21, 2003 |
| G. | To Do/Decision List Release 6/15 dated June 15, 2003 |
| H. | Letter of Intent Meeting Minutes dated June 17, 2003, including hourly rate attachment |
| I. | Letter of Intent dated June 17, 2003 |

Title _____          Date  8 OCTOBER, 2003

This Agreement entered into as of the day and year first written above.

OWNER *(Signature)*           DESIGN/BUILDER *(Signature)*

President / CEO DONGKIL NAM        JIM GRAY, DIRECTOR
*(Printed name and title)*            *(Printed name and title)*

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
27

A000007020                                    A000007020